No. 15-1115

# *United States Court of Appeals*
# *For the Federal Circuit*

KELLY J. BREAUX, KENNETH W. ERICKSON,

Appellants

v.

KIDTRIBE, INC.,

Appellee

**Appeal from the Trademark Trial and Appeal Board
For the United States Patent and Trademark Office
In Opposition Case No. 91201062**

**\*\*NON-CONFIDENTIAL\*\***

**OPENING BRIEF OF APPELLANTS
with APPENDIX**

***CORRECTED***

HEATHER D. BENNETT
Law Office of Heather D. Bennett
4500 Via Marina, Suite 309
Marina Del Rey, CA 90292
(310) 351-8487

*Attorney for Applicants-Appellants Kelly J. Breaux and Kenneth W. Erickson*

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Breaux _____ v. KidTribe, Inc. _____

No. 15-1115

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Kenneth W. Erickson _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Kelly J. Breaux
Kenneth W. Erickson

---

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Kelly J. Breaux, Kenneth W. Erickson

---

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

---

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Morris E. Turek

---

December 21, 2014
_____
Date

_____
Signature of counsel

Heather Bennett
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

Form 9

FORM 9. Certificate of Interest

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Breaux _____ v. KidTribe, Inc. _____

No. 15-1115

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Kelly Breaux _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Kelly J. Breaux
Kenneth W. Erickson

---

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Kelly J. Breaux, Kenneth W. Erickson

---

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

---

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Morris E. Turek

---

December 21, 2014
_____                          _____
Date                                        Signature of counsel

                                          Heather Bennett
                                          _____
                                          Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

-iii-

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................................i

TABLE OF CONTENTS.........................................................................................iv

TABLE OF AUTHORITIES .................................................................................vi

STATEMENT OF RELATED CASES ....................................................................x

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF ISSUES FOR REVIEW .............................................................1

STATEMENT OF THE CASE..................................................................................2

  I.  NATURE OF THE CASE ................................................................................2

  II. PROCEDURAL HISTORY ............................................................................3

STATEMENT OF FACTS ........................................................................................7

ARGUMENT ...........................................................................................................14

  I.  DE NOVO REVIEW IS THE APPLICABLE STANDARD OF REVIEW
     FOR ORDERS THAT MISSINTERPRET AND/OR MISSAPPLY THE
     LANHAM ACT. ...............................................................................................14

  II. OPPOSER'S TERMS, AS USED BY OPPOSER, ARE DESCRIPTIVE
     AND THEREFORE NOT ENTITLED TO TRADEMARK STATUS. .........15

  III. OPPOSER FAILED TO ESTABLISH "ACQUIRED DISTINCTION." .......20

  IV. LYRICS AND RECORDINGS OF SONGS, USE IN CLASS 9, ARE
     INSUFFICIENT TO GRANT OPPOSER THE STATUS OF A FAMOUS
     MARK............................................................................................................22

  V. RECORDINGS SUBMITTED AFTER THE CLOSE OF DISCOVERY
     AND NOT INCLUDED IN PRE-TRIAL DISCLOSURES CANNOT
     BECOME PART OF THE RECORD. ............................................................24

CONCLUSION .......................................................................................................26

ADDENDUM ...........................................................................................................

APPENDIX ..............................................................................................................

CERTIFICATE OF SERVICE ................................................................................

CERTIFICATE OF COMPLIANCE........................................................................

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 9-10 and 12-14 consists of quotations taken from portions of Opposer's HOOP HOP and HOOP-A-PA-LOOZA script marked by Opposer as confidential trade secret. The portions marked as confidential show Opposer's prominent and extensive use of the term HOOP HOP and the absence of use of the term "hoop it up" in key areas to marketing Opposer's services.

# TABLE OF AUTHORITIES

**Page(s)**

## *Cases*

*General Shoe Corp. v. Rosen,*
  *111 F.2d 95,98 (4 Cir. 1940)* .................................................................................. 20

*Abercrombie & Fitch, Co. v. Hunting World, Inc.,*
  *537 F.2d. 4 (2d Cir. 1976)* .............................................................................. 19, 23

*Avery Dennison Corp. v. Sumpton,*
  *189 F.3d 868, 876 n. 6 (9th Cir.1999)* .................................................................. 22

*B & L Sales Associates v. H. Daroff & Sons, Inc.*
  *421 F.2d 352 (2d Cir. 1970)* .................................................................................. 20

*Carter-Wallace, Inc. v. Proctor & Gamble,*
  *434 F. 2d 794 (9th Cir. 1970)* ............................................................................... 20

*In re the Boston Beer Company Limited Partnership,*
  *198 F.3d 1370 (Fed. Cir. 1999)* ........................................................................... 16

*Freixenet, S.A. Admiral Wine & Liquour Co.,*
  *731 F.2d. 148 (3rd Cir. 1984)* ............................................................................... 23

*Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts,*
  *944 F.2d 1235, 1239 (6th Cir.1991)* ..................................................................... 17

*Filipino Yellow Pages. v. Asian Journal Publications,*
  *198 F.3d 1143, 1151–52 (9th Cir.1999)* ............................................................... 17

*Harjo v. Pro-Football Inc.,*
  *45 U.S.P.Q. 2d 1789, 1790 (TTAB 1998)* ............................................................. 26

*Hewlett Packard Co. v. Packard Press, Inc.*
  *281 F.3d 261 (Fed Cir. 2002)* ............................................................................... 22

*In re Bongrain Int'l (Am.) Corp.,*
  *894 F.2d 1316, 1317 n.4 (Fed. Cir. 1990)* ........................................................... 23

*In re Loew's Theatres, Inc.,*
  *769 F.2d 764 (Fed. Cir. 1985)* ............................................................................. 22

*In re Meyer & Wenthe, Inc.,*
  *267 F.2d 945 (C.C.P.A. 1959)* ............................................................................. 22

*In re Moody's Investors Service Inc.,*
  *13 U.S.P.Q. 2d 2043 (TTAB 1989)* ...................................................................... 20

*In re Packaging Specialists, Inc.,*
  *221 U.S.P.Q. 917, 919 (TTAB 1984)* .................................................................... 23

*In re Seaman & Assocs., Inc.,*
  *1 U.S.P.Q. 2d. 1657, 1659 (TTAB 1986)* .............................................................. 23

*Landscape Forms, Inc. v. Columbia Cascade Co.,*
  *113 F.3d 373, 380 (2d Cir.1997)* .......................................................................... 19

*Luemme Inc. v. D.B. Plus Inc.,*
  *53 U.S.P.Q. 2d. 1758,1760 (TTAB 1999)* ............................................................. 26

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,*
  *469 U.S. 189, 191 n.1 (1985)* ............................................................................... 21

*Roux Laboratories, Inc. v. Clairol, Inc.*
  *427 F.2d 823 (1970)* ............................................................................................. 20

*Self–Realization Fellowship Church v. Ananda,*
  *59 F.3d 902, 910–12 (9th Cir.1995)* ..................................................................... 17

*Sengoku Work Ltd. v. RMC Intern., Ltd.,*
  *96 F.3d 1217, 1219–20 (9th Cir.1996)* ................................................................. 17

*Sicilia Di R. Biebow & Co. v. Cox,*
  *732 F.2d 417, 426 (5th Cir. 1984)* ........................................................................ 18

*Stix Products, Inc. v. United Merchants & Manufacturers Inc.,*
  *295 F.Supp. 479, 488 (S.D.N.Y.1968)*.................................................................... 19

*Two Pesos, Inc. v, Taco Cabana, Inc.*
  *505 U.S. 763 (1984)* ............................................................................................ 18

*Value Engineering, Inc. v. Rexnord Corp.*
  *278 F.3d 1268 (Fed Cir. 2002)*............................................................................ 22

*Vuitton et Fils S.A. v. J. Young Enterprises, Inc.,*
  *644 F.2d 769, 775–76 (9th Cir.1981)*.................................................................. 17

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.,*
  *529 U.S. 205, 210 (2000)* ..................................................................................... 17

*Yamaha Int'l Corp. v. Hoshino Gakki Co. ,*
  *840 F.2d 1572 (Fed. Cir. 1988)*............................................................................ 22

## Statutes

*15 U.S.C. § 1052(f)* ................................................................................................22

*§43 of the Lanham Act* .............................................................................................18

*§43(a) of the Lanham Act* ........................................................................................20

*15 U.S.C. § 1051* ................................................................................................16, 21

*15 U.S.C. § 1053* .....................................................................................................21

*15 U.S.C. § 1057(b)* .................................................................................................16

*15 U.S.C. § 1127 (1994)* ..........................................................................................16

*15 U.S.C. § 1127 (2012)* ..........................................................................................16

*15 U.S.C. §1125(a)* ..................................................................................................17

*15 U.S.C. §1125(c)(2)(A)* ......................................................................................... 24

*15 U.S.C. §1125(c)(2)(B)* ......................................................................................... 25

*§32 Lanham Act* ......................................................................................................... 18

*§2(f) of the Lanham Act* ............................................................................................ 20

## Regulations

*37 C.F.R. § 2.120(a)(2)* ............................................................................................. 26

*37 C.F.R. §2.122(a)* .................................................................................................. 25

*37 C.F.R § 2.118* ....................................................................................................... 26

*37 C.F.R § 2.121(e)* ................................................................................................... 26

*37 C.F.R § 2.123(e)(3)* .............................................................................................. 26

*37 C.F.R §2.41* .......................................................................................................... 23

## Other Authorities

*McCarthy on Trademarks and Unfair Competition § 27:18 (4th ed.)* ..................... 18

*Restatement (Third) of Unfair Competition § 13 (1990)* .......................................... 18

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules, Rule 47.5, Appellant provides:

(a)    There have been no previous appeals in this case;

(b)    On July 24, 2014 Appellees filed with the USPTO an application for federal registration of the Mark at issue in this appeal, USPTO Serial No. 86347446. The outcome of the decision on this appeal may have an affect on Appellee's ability to register the Mark.

## STATEMENT OF JURISDICTION

This appeal is from the decision of the United States Patent and Trademark Office (USPTO) Trial and Appeal Board rendered July 23, 2014. Jurisdiction of the United States Court of Appeal for the Federal Circuit is authorized by 15 U.S.C. §1071 subdivision (a)(1) and Rule 15(1) of the Federal Circuit Rules. Appellant timely appealed on September 16, 2014.

## STATEMENT OF ISSUES FOR REVIEW

1.     Whether Trial and Appeal Board ("TTAB") erred as a matter of law by not addressing the inherently descriptive nature of the terms as used by Opposer;

2.     Whether the Trial and Appeal Board erred as a matter of law in not requiring Opposer to provide evidence showing acquired distinction and/or secondary meaning within the meaning of Trademark Law and Jurisprudence;

3.     Whether TTAB erred as a matter of law when it used evidence of Opposer's use of the disputed term in Class 9 as a means for denying Applicant's registration in Class 41;

4.     Whether TTAB erred as a matter of fact in finding the evidence submitted by Opposer was sufficient to prove acquired distinction and/or secondary meaning;

5.     Whether TTAB erred as a matter of law in allowing Opposer to

submit evidence 7 months after the Discovery period closed without receiving a stipulation from Applicant or filing a Motion for a court order.

## STATEMENT OF THE CASE

### I.    NATURE OF THE CASE

Opposer is a health and wellness organization that provides physical activity content, nutrition and education since 2002 via its owner "a children's fitness expert …[on] trend-setting programs … preventing childhood obesity," a self-proclaimed "Pied Piper with a Boom Box." Opposer's fitness education class has been consistently and extensively marketed under the name HOOP-HOP since 2004; her fitness class has been marketed consistently and extensively under the name HOOP-A-PA-LOOZA since at least 2008. Opposer sells fitness DVDs and CDs marketed under various names including HOOPER-SIZE since 2007, WHAT'S UP? WARM UP since at least 2007, and HOOPER-SIZE ME!

Opposer has never marketed any of these services or products using the term "hoop it up." Opposer's primary use of the words "hoop it up" is during a 3-minute segment of her 45/55-minute HOOP-A-PA-LOOZA fitness class. In Opposer's own words, it is used "as a call to action" to start using hula hoops.  On or about 2008, she wrote and recorded a song to play during this portion of the fitness routine.  The song uses the words "hoop it up" to get give a fun emphasis to the "call to action."  Opposer's use of these terms is not registered with USPTO.

Applicants desire to use the name HOOPITUP to market their hula-hoop based fitness classes, and in 2010, applied for registration with the USPTO. Opposer objected claiming its unregistered common law usage qualified as a trademark. The U.S. Trademark Trial and Appeal Board (TTAB) agreed citing her "emphatic and repetitive vocalization" of the term, and, on this basis, has refused to register Applicant's mark.

## II.   PROCEDURAL HISTORY

September 30, 2010 Applicants filed for federal registration of HOOPITUP as a Service Mark, Application Serial No. 85142516, which was approved for registration by the Trademark Office Examining Attorney and published for opposition on April 12, 2011. (A035.)

August 9, 2011 Opposer filed a Notice of Opposition with TTAB opposing the application claiming exclusive and continuous use of the words "hoop it up" in connection with fitness education services on the one hand and music products on the other so as to indicate Opposer as the source of origin since 2007. (A030-A032.) The mark is not registered with the U.S. Patent and Trademark Office in either International Class 41 (education services) or Class 9 (music recording products). (A030.) Applicants denied the truth of Opposer's allegations. (A034.)

TTAB Opposition Case No. 91201062 ensued. By Notification pursuant to 37 C.F.R. §2.120, Opposer's Time for Initial Disclosures closed November 18,

2011. (A049.) By Stipulation of the Parties, the Discovery Period closed August

15, 2012. (A051.) After numerous requests for extension, Opposer's Pre-Trial

Disclosures closed February 27, 2013. (A053-A055.) After several extensions,

Opposer's Trial Period closed May 10, 2013. (A056.) During Discovery,

Applicants propounded written Discovery including Interrogatories, Requests for

Production of Documents and Requests for Admissions during which time a

certain recording of a song written and produced by Opposer entitled "Hoop it Up"

was delivered as being produced in 2008 (A153.) After receiving an Order from

TTAB compelling a response to Applicant's Supplemental Requests for

Admissions regarding the date of production (A053-A055.), rather than respond to

the Supplemental Interrogatory as ordered, on March 4, 2013 Opposer submitted a

CD comprised of a new recording of the Hoop it Up song (KT00066) along with

two video recordings of a news broadcast (KT00067 and KT00068) that had never

been produced before. (A163.) Applicants opposed to the late introduction of all

three recordings on the grounds they were produced well beyond the close of

Discovery. (A163.) Applicants' objection to all three recordings produced March

4, 2013 were overruled by TTAB on the grounds Applicants did not move the

Court to re-open Discovery. (A017.) On May 9, 2013, Trial Testimony of

Opposer's main witness and the following was taken submitted into evidence:

1. The testimony of Opposer's founder and CEO regarding her use of the

-4-

terms during her fitness HOOP-A-PA-LOOZA class since 2004 and in a song allegedly written and produced by her in 2008;

2. Script for HOOP-A-PA-LOOZA allegedly written in 2008;

3. 2008-revised version of Opposer's teacher's guide for hula hoop fitness marketed under the name HOOP-HOP, (which includes in part the HOOP-A-PA-LOOZA routine) allegedly written in 2008;

4. Lyrics of a song called "hoop it up" used during HOOP-A-PA-LOOZA allegedly written in 2008;

5. An audial recording of Opposer's lyrics "Hoop it Up" created sometime after 2011 using the music "Party Rock Anthem" composed by British band LMFAO and released in 2011;

6. A rough unreleased version of lyrics "Hoop it Up" set to music composed by someone else that was publically performed for the first time in 2013.

7. Two 2006 videos of news covering HOOP-A-PA-LOOZA;

8. DVD marketed under the name HOOPER-SIZE™. (A059.)

At the hearing, Applicants introduced the following for the purposes of impeaching the testimony of Opposer's witness:

1. HOOP-HOP Guidebook used from 2004-2008 (the date of Opposer's revised version) showing no use of the term "hoop it up". (A109.)

-5-

Under Notices of Reliance, Applicants admitted for the purpose of impeaching the testimony of Opposer's witness and documents and things submitted:

1. Evidence that music ("Rock Party Anthem" composed and released by British band LMFAO) in Opposer's alleged 2008 recording of the song could not have existed until 2011 when the music was created;

2. Evidence that music referenced in HOOP-A-PA-LOOZA alleged 2008 script ("I Gotta Feeling" composed by band Black Eyed Peas) was not released until 2009.

3. Admissions and Response to Requests by Opposer that the 2004 HOOP-HOP Guide was revised in 2008, the HOOP-A-PA-LOOZA script was written in Fall 2009, HOOP IT UP lyrics were written in 2008; recording of HOOP IT UP song based on "Party Rock Anthem" was recorded in 2008, the second recording of HOOP IT UP song was recorded in 2008, the news broadcast of HOOP-A-PA-LOOZA performances occurred in 2006.

For purposes of narrowing the issues, Applicants and Opposer entered into a Stipulation of facts that their Mark HOOP IT UP is likely to be confused with Opposer's term "hoop it up" if Opposer can meet its burden of proof that it's use constituted Trademark usage under the applicable laws of Trademark prior to the day they applied for their Mark. (A050.)

July 23, 2014, TTAB issued a Decision in favor of Opposer finding: 1)

Opposer's use of "hoop it up" constitutes a Mark within the meaning of Trademark

Act §2(d), 15 U.S.C §1052(d); and on this ground 2) refused Applicants

application of registration. September 19, 2014, Applicant's filed and served a

Notice of Appeal. Opposer did not file a Cross Appeal.

## STATEMENT OF FACTS

Kellee McQuinn Maginness, Miss Kellee,™ (hereinafter "Miss Kellee™")

is the founder and CEO of Opposer KidTribe®, a "health and wellness

organization that provides physical activity content, nutrition and education, staff

training, and support." (A057.)  Miss Kellee™ is "a children's fitness expert and

television personality who has led millions of kids to healthier, happier lives with

… trend-setting programs … preventing childhood obesity" and advertises herself

as "the Pied Piper with a Boom Box." (A060.)  KidTribe® was founded in 2002

and registered as a USPTO in 2008. (A047-A048.) KidTribe® is registered in two

classes: International Class ("Class") 41 and 9. Class 41 is registered as Service

Mark with the following description:

> Education services, namely, providing classes, seminars, and
> workshops in the field of child education, health, fitness and
> motivation; entertainment in the nature of live music concerts,
> conducting assemblies in the field of health and fitness for
> children, conducting parties for children, and live show
> performances featuring music, songs and dialogue; all of the
> foregoing specifically excluding the sport of baseball. (A047.)

Class 9 is registered with the following description as:

Pre-recorded CD's, [video tapes, laser disks] and DVD's featuring musical performances and exercise activities and instructions. (A048.)

Under Trademark Class 41, KidTribe® offers "a cornucopia of progressive [dance] activities," one of which consists of an interactive fitness class at schools involving the use of a hula-hoop and marketed under the name HOOP-A-PA-LOOZA! It's other "[f]eatured [p]rograms" include its "hippest program" HOOPER-SIZE ME!,™and S.L.I.M™. (A057-A058.)  During testimony, Miss Kellee™ presented a written script of HOOP-A-PA-LOOZA,™[1] (A160-A162; A066-A069.) Throughout the script, participants are continually and extensively reminded to repeat the name of Opposer "We're KidTribe! And we're about exercise! … When I say Kid—you say Tribe!" (A066.) Also, reference is made to play the "KidTribe Theme." (A066.) as well as other songs including "Hoop Hop Don't Stop," "Hooper's Delight," "Hooper-Size." (A067-A068.) "Hoop it Up" is not featured; but merely mentioned in conjunction with these other songs other than in Part 3, where participants are asked to start using their hoops.

Although, Miss Kellee™ testified the script was created in 2008, (A130.), the script includes a reference to a song titled "I Gotta Feeling" by Black Eyed Peas that was not released until 2009. (A137.)  Metadata in the Property View of

---

1 It is noted that although the program is generally marketed using a hyphenated spelling of HOOP-A-PA-LOOZA, the script is spelled without hyphens as HOOPAPALOOZA.

the script filed reveals a creation date of 2012. (A070.) "The script is not publically

distributed; but used by KidTribe® employees during HOOP-A-PA-LOOZA™

assemblies. (A130.)

According to testimony and the script, HOOP-A-PA-LOOZA™ lasts 45-55

minutes and is divided into 12 Parts, each ranging from 2-8 minutes. (A130.) Part 1

is titled "Intro," Part 2 "Warm Up," and Part 3 "Hoop it Up". (A066-A069.) In this

context, "hoop it up" is used as "the segue between the—kids getting started, the

introduction to the actual activities. So it's done in a big call-response like 'Are

you ready to hoop it up." (A121.)  The terms are a "call to action . . . the

introduction of the whole hooping portion of the show. In 2008, Opposer allegedly

wrote the lyrics to her own hip-hop style song called "Hoop it Up." (A061.)

A performance of HOOP-A-PA-LOOZA at an event called Kidspalooza

recorded and broadcast by ABC7News in 2006 was offered and admitted into

evidence. (A124-A125.)  A performance of HOOP-A-PALOOZA at Madison

Elementary School in Anaheim CA was recorded and broadcast by E!Network in

2006. (A126.) The recording of this performance was admitted and entered into

evidence as part of the CD referenced as Exhibit 6. (A064.) Applicants objected to

the introduction of this evidence because it was produced outside of the Discovery

period. Miss Kellee™ states in her deposition that the term "hoop it up" is used

throughout HOOP-A-PA-LOOZA. (A131.) The script and performances of HOOP-

A-PALOOZA show mere use it as the segue and "call to action."

Under Class 41, KidTribe® also offers teacher trainings that last 3-5 hours long. (A132.) During testimony, Miss Kellee™ introduced into evidence a 50-page document entitled "HOOP-HOP . . . HOOP HOP Guide Book A Pied Piper's Companion Level One." a curriculum guidebook book for teacher trainings. (A132; A071.). HOOP-HOP Guidebook was marked as Exhibit 9, KT00001-54, entered into evidence, and filed at Docket No. 46.  Although MISS KELLEE testified the document was created in 2008 (A133.), metadata reveals a creation date of 2012 (A108.) All 50 pages are marked in bold print "HOOP HOP ©2004 KIDTRIBE™." Throughout, the fitness program is consistently referenced as HOOP-HOP; not "hoop it up." On the page title "Call and Response," HOOP HOP sets out what it calls, its signature "Call and Response" activities. Notably, "hoop it up" is not included in this list of "signature call and response activities" outlined in either version of the HOOP HOP Guide (A082.) In one section, a table gives a breakdown of the 1-hour hula-hoop fitness session. Notably, HOOP HOP is used to denote the routine; not "hoop it up.(A084.).

Under Class 9, KidTribe® produces songs, CDs and DVDs of fitness programs, some involving the hula hoop among other dance-related activities within the realm of hip hop. KidTribe® has produced a DVD involving hula hooping which

is marketed under the trademark HOOPER-SIZE™. (A059.)[2] Each program in HOOPER-SIZE™ has a hoop-related name including: HOW TO HOOP WITH DR. HOOPENSTEIN, HOOPER'S DELIGHT, CHOOSE YOUR MOVE and HOOPER BLOOPER. (A060.) KidTribe's other hoop-related products include a CD called HOOPER-SIZE ME! and a DVD named WHAT UP? WARM UP! (A060.)

Miss Kellee® has a number of songs she has written and are used at HOOP-A-PA-LOOZA that have not been produced separately for sale like her other products. These include "Hoop it Up." Miss Kellee® claims she wrote the lyrics for "Hoop it Up" in 2008 (A142.)  Lyrics begin "HOOP PARTY! HOOP IT UP!" Throughout the song, HOOP PARTY! or HOOP HOOP PARTY! is repeated. (A061-A062.) Metadata Property View of document KT00061 filed under Docket Entry 46 reveals "HOOP PARTY" as the name of the document with a creation date of 2012. (A063.)

During discovery, Opposer produced a recorded version of the "Hoop it Up" song as evidence of use since 2008 (A148.) The recording was set to the music of "Party Rock Anthem," written by British rock band LFMAO that was released in 2011. (A053.)  After Applicant's Motion to Compel Responses to Requests for Admissions, Opposer produced a different recording of the song set to different

---

[2] HOOPER-SIZE™ is also the name Opposer uses to market the hoop routine featured in the DVD (A059.), the HOOP-HOP teacher's guide (A071), and the HOOP-A-LOOZA script (A066)

music (hereinafter "KT00066 (A144.) She testified KT00066 was never performed publically until 2013 (A145.) Metadata of the Wave Sound file (.wav) submitted shows it was originally created or the contents of the file were modified in 2013 by the Opposer. (A065.)

Appellants Kelly Breaux and William Erickson are hula hoop artists once employed by Opposer to choreograph and teach HOOP-A-PA-LOOZA. Both left and together started their own hula hoop fitness business in 2010. That same year, they filed an application for federal registration of the trademark HOOPITUP for their business. (A035-A038.) The registration was approved by the Trademark Examining Attorney. (A035.)

## SUMMARY OF ARGUMENT

The Trademark Trial and Appeal Board (TTAB) erred as a matter of law in refusing Applicant's registration on the basis of likelihood of confusion with its "call to action" words used by Opposer during the course of performing her fitness class. It erred as a matter law by not addressing the highly descriptive nature and use of the words. In doing so, it not only prevented Applicant from registering its Mark; it resulted in awarding Opposer exclusive rights to highly descriptive words without having to prove it had acquired distinction and/or secondary meaning as required by Trademark law.  Also, much of the evidence on which TTAB based its Decision showed evidence of use on sound and video recordings, usage belonging

to Class 9 of the International Class of Goods and Services. In awarding Opposer exclusive rights to the words in Class 41, the Class sought by Applicant, TTAB in essence awarded Opposer the status of a famous mark.

The U.S. Trademark Trial and Appeal Board (TTAB) agreed because of her "emphatic and repetitive vocalization" of the term in part 3 of her fitness class, a recording of a song she wrote and played for that portion, and the use of the term in Part 4 of her guidebook all on or about 2008.

Because Opposer's alleged mark is unregistered, Opposer's mark must first pass scrutiny for descriptiveness and functionality in the category(ies) for which protection is sought first for descriptiveness. The evidence of record shows that the slogan is not only highly descriptive in the context of hula-hooping, but Opposer uses the "hoop it up" in a merely descriptive manner literally, in Opposer's own words "as a call to action . . . the introduction of the whole hooping portion of the show," "the introduction to the actual [hooping] activities" because "when the kids first arrive, they're sitting in the hoops." (A131.)

As descriptive terms, they are part of the public domain especially within the context of hula-hooping. Therefore, they are not capable of trademark status without proof of Acquired Distinctiveness or Secondary Meaning; or that its use of HOOP IT UP in Class 9 for music is Famous within the meaning of Trademark law so as to warrant preventing Applicant's use in Class 41.

## ARGUMENT

I.   **DE NOVO REVIEW IS THE APPLICABLE STANDARD OF REVIEW FOR ORDERS THAT MISSINTERPRET AND/OR MISSAPPLY THE LANHAM ACT.**

The record shows Opposer uses the term "hoop it up" during a 3-4 minute portion of a 44-55 minute fitness routine involving the use of "hula-hoops." In Opposer's own word, the terms are used as a "call to action . . . the introduction of the whole <u>hooping</u> portion of the show. . . [because when the] kids first arrive, they're sitting . . . ." (emphasis added). (A131). As of 2008, she began to use a song she wrote entitled "Hoop it Up." (A064). The Board found this to constitute trademark usage without first addressing the inherently descriptive nature of the terms as used by Opposer. Because the decision is devoid of the "descriptive/distinction" analysis, the Board erred as a matter of law

The Federal Circuit Court of Appeals reviews de novo legal conclusions made by the Trademark Trial and Appeal Board such as its interpretation of the Lanham Act, 15 U.S.C. § 1051-1127, de novo. *In re the Boston Beer Company Limited Partnership*, *198 F.3d 1370 (Fed. Cir. 1999).*

Trademark law protects distinctive marks—those that identify the source of goods or services and distinguish those products from others in the marketplace. *15 U.S.C. § 1127 (2012).* In order for a trademark to receive the protection afforded under sections 32 and 45 of the Lanham Act, the trademark must be capable of

distinguishing the goods of the trademark holder from the goods of others. *Id.*

Because the Board failed to address the descriptive nature of the terms and test it for acquired distinction, it violated the mandates of the Lanham Act.

## II.    OPPOSER'S TERMS, AS USED BY OPPOSER, ARE DESCRIPTIVE AND THEREFORE NOT ENTITLED TO TRADEMARK STATUS.

"If a designation is not 'distinctive,' it is not a 'mark.'" *2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition  §11:2, at 11-5 (4th ed. 2013)*. In other words, in order to receive the protections of the Lanham Act, the trademark must be distinctive, either: 1) inherently distinctive; or 2) show it has acquired distinctiveness and/or secondary meaning.

A trademark or service mark registration on the Principal Register of the PTO is prima facie evidence that the mark is a valid trademark and therefore distinctive. *15 U.S.C. § 1057(b).* Such a registrant is granted a presumption of ownership under the Lanham Act and any "challenger must overcome this presumption by a preponderance of the evidence." *Sengoku Work Ltd. v. RMC Intern., Ltd.,* 96 F.3d 1217, 1219–20 (9th Cir.1996); *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775–76 (9th Cir.1981).  All Lanham Act provisions governing trademarks are applicable to service marks. *15 U.S.C. § 1053; Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 191 n.1 (1985)*

(noting that the Lanham Act "generally applies the same principles concerning registration and protection to both trade and service marks").

Marks that are not registered, do not have the advantage of this presumption. Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) provides the same protection to an unregistered owner of mark or trade dress if the party claiming the mark can prove: 1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar. *See Wal–Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); see also Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts, 944 F.2d 1235, 1239 (6th Cir.1991).* The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement. *Id.* The burden is on the plaintiff if the mark is not registered to show the mark is distinctive (either by being inherently distinctive or by having acquired secondary meaning), and hence protectable. *See Self–Realization Fellowship Church v. Ananda, 59 F.3d 902, 910–12 (9th Cir.1995).* See also *Filipino Yellow Pages. v. Asian Journal Publications, 198 F.3d 1143, 1151–52 (9th Cir.1999).* Therefore, in order to get protection as a trademark or to obtain registration, the proponent must show proof of distinction. Id.

Like Section 32, proof of distinction is required in order to obtain trademark

protection of non registered marks. *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S.*

*763* (citing *Restatement (Third) of Unfair Competition § 13 (1990).* In determining

the rights of unregistered marks, Courts have largely treated the substantive inquiry

of the protectability the same whether an action of infringement under Lanham Act

§32 or §43 of the Lanham Act. *Id.*; *see also 5 McCarthy on Trademarks and*

*Unfair Competition § 27:18 (4th ed.).* A court will not afford protection under §43

to a product or service originator's attempt to identify the product's or service's

source of origin when the means chosen is "legally functional" that is, when "it is

one of a limited number of equally efficient options available to competitors and

free competition would be unduly hindered by according the design trademark

protection." *Two Pesos, at 775, citing Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d*

*417, 426 (5th Cir. 1984).* Allowing the concept of protectable trade dress to spill

over into functional or descriptive identifiers would be anticompetitive, because it

would impose limits on a seller's ability to choose the ordinary and natural means

of identifying for the consuming public the types of goods being offered for sale.

There is, after all, a strong public policy "in favor of vigorously competitive

markets," and giving too much protection to language that is naturally descriptive

of the goods offered for sale would create a "linguistic monopoly." *Landscape*

*Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380 (2d Cir.1997).* Precisely

in order to avoid this result, "[o]nly nonfunctional, distinctive trade dress is

-17-

protected under § 43(a) [of the Lanham Act]." *Two Pesos, at 775 (1992)*. The distinctiveness of a trademark depends upon the class in which it belongs in relation to the specific goods at issue. *Abercrombie & Fitch, Co. v. Hunting World, Inc., 537 F.2d. 4 at 9, 189 U.S.P.Q. 759, 764 (2d Cir. 1976).* The law measures distinctiveness on a scale from "generic" to "fanciful," with "suggestive" or "descriptive with secondary meaning" required as a minimum for protectability. *Id. at 9–11.* Proof of secondary meaning is not required if the trade dress is "inherently distinctive," meaning that the means chosen by the owner of the trade dress to describe its product "is capable of identifying a particular source of the product" without proof that the consuming public has actually made such an identification. *Two Pesos at 769.* A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.

A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods. *Stix Products, Inc. v. United Merchants & Manufacturers Inc., 295 F. Supp. 479, 488 (S.D.N.Y.1968) a formulation deriving from General Shoe Corp. v. Rosen, 111 F.2d 95,98 (4 Cir. 1940).* Descriptive terms, because they describe a product or characteristic of a product, can only be distinctive (under section 2(f) of the Lanham Act) if they have acquired distinctiveness through secondary meaning. *Id. at 10.* A slogan that refers or directly points out a characteristic of the goods fits into the descriptive category.

*Carter-Wallace, Inc. v. Proctor & Gamble, 434 F. 2d 794 (9th Cir. 1970)* (use of "Arrid to be sure" was found descriptive with not proof of secondary meaning prior to Defendant's use of "be Sure with Sure"). The mere fact that a combination of words or a slogan is adopted by a manufacturer with the intent that it identify its goods and distinguishing from those of others . . . does not necessarily mean the slogan accomplished that purpose in reality. *Roux Laboratories, Inc. v. Clairol, Inc. 427 F.2d 823 (1970).* A term that is used only to identify a product, device or instrument sold or used in the performance of a service rather than to identify the service itself does not function as a service mark. *See In re Moody's Investors Service Inc., 13 U.S.P.Q. 2d 2043 (TTAB 1989)* ("Aaa," as used on the specimen, found to identify the applicant's ratings instead of its rating services). There is no likelihood of confusion where it cannot be shown that the slogan was capable on its own to identify the source of origin. *B & L Sales Associates v. H. Daroff & Sons, Inc. 421 F.2d 352 (2d Cir. 1970).*

In applying the factors, it is clear Opposer's mark is descriptive and, as such, ineligible for protection under §43(a) of the Lanham Act without proof it "acquired distinction." The Board erred in using Opposer's use of "hoop it up" as grounds for denying Applicants registration.

### III.    OPPOSER FAILED TO ESTABLISH "ACQUIRED DISTINCTION."

Opposer's use of the term "hoop it up" in Class 41 is not registered and is highly descriptive and functional. Because of its descriptive nature, federal law forbids registration without proof of acquired distinction. The weight of the evidence of record shows that Opposer used the term "hoop it up" primarily beginning in 2008, only two years prior to the date Applicant's applied for registration of their mark HOOPITUP. There is no evidence of record that their use had acquired distinction five years prior to the effective date as required by the Lanham Act. The evidence does not support the TTAB's finding that Opposer made "emphatic and repetitive" use of "hoop it up" qualifies as Trademark usage. Rather, Opposer made repetitive use of its other marks, particularly HOOP HOP, HOOP-A-PA-LOOZA, and HOOPER-SIZE to identify its service. The documents presented shows that "hoop it up" use is minimal compared to the prominent Opposer makes of its other marks. Because TTAB failed to hold Opposer to the appropriate evidentiary standard, it erred as a matter of law. Since the record is devoid of the evidence required to show "acquired distinction," TTAB also erred as a matter of fact.

Although, merely descriptive marks are not registerable under Section 2(e), the Lanham Act makes an exception with merely descriptive terms which have acquired secondary meaning, see § 2(f), 15 U.S.C. § 1052(f). Whether acquired

distinctiveness has been established is a question of fact. *See In re Loew's Theatres, Inc.*, 769 F.2d 764, 769-70, 226 USPQ 865, 869 (Fed. Cir. 1985), and cases cited therein. The test for secondary meaning is the same whether for product configuration or trade dress or trademark cases. See Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 876 n. 6 (9th Cir.1999).

To acquire secondary meaning, the record must contain facts or evidence of "acquired" distinctiveness. The burden of proving that a mark has acquired distinctiveness is on the applicant. *See Yamaha Int'l Corp. v. Hoshino Gakki Co. , 840 F.2d 1572, 1578-79 (Fed. Cir. 1988)(emphasis added)*; *In re Meyer & Wenthe, Inc.*, 267 F.2d 945, 949 (C.C.P.A. 1959). The greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning*." In Re Bongrain Int'l (Am.) Corp., 894 F.2d 1316, 1317 n.4 (Fed. Cir. 1990) (internal quotations omitted); In re Seaman & Assocs., Inc., 1 U.S.P.Q. 2d 1657, 1659 (TTAB 1986); In re Packaging Specialists, Inc., 221 U.S.P.Q. 917, 919 (TTAB 1984).* Relevant factors in addressing the issue of secondary meaning include: (1) the length of time the trade dress has been used by a single producer; (2) the amount of sales and image advertising of the trade dress; (3) actual buyer association; and (4) the fact of copying. *Freixene, S.A. v. Admiral Wine & Liquour, 731 F.2d, 148, 150 (3rd Cir 1984)*. The Board may accept, as prima facie evidence that the mark has become distinctive, proof of substantially exclusive and

continuous use of the mark applied to the applicant's goods for five years preceding

the application. *37 CFR §2.41; Abercrombie & Fitch, Co. v. Hunting World, Inc.,*

*537 F.2d. 4 at 9 (2d Cir. 1976).*

The record shows no evidence of acquired distinction. Because, the Board

did not analyze Opposer's evidence with the scrutiny required for acquired

distinction, it erred as a matter of law in denying Applicant's registration based on

Opposer's use of the terms.

### IV. LYRICS AND RECORDINGS OF SONGS, USE IN CLASS 9, ARE INSUFFICIENT TO GRANT OPPOSER THE STATUS OF A FAMOUS MARK

The Board erred as a matter of law in relying on evidence of Class 9 use--

lyrics and recording of a song making "emphatic and repetitive" use of the term

"hoop it up" and a reference on the back cover of a DVD--as the primary focus of

its decision in finding trademark usage. Proof of use in Class 9 cannot apply to

Applicant's application in Class 41 without proof that Opposer's mark is famous

under Trademark law.

The Board's factual findings are subject to the "substantial evidence" rule.

We [the Federal Circuit] uphold the board's factual findings unless they are

unsupported by substantial evidence." *Value Engineering, Inc. v. Rexnord Corp.*

*278 F.3d 1268 (Fed Cir. 2002).* The substantial evidence standard asks whether a

reasonable fact finder would have arrived at the agency's decision. *Hewlett*

*Packard Co. v. Packard Press, Inc. 281 F.3d 261 (Fed Cir. 2002).*

A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following: (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) The extent of actual recognition of the mark; (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. *15 U.S.C. §1125(c)(2)(A).* For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:(i) The degree of similarity between the mark or trade name and the famous mark; (ii) The degree of inherent or acquired distinctiveness of the famous mark; (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) The degree of recognition of the famous mark; (v) Whether the user of the mark or trade name intended to create an association with the famous mark;

(vi) Any actual association between the mark or trade name and the famous mark.

*15 U.S.C. §1125(c)(2)(B).*

None of this evidence was provided by Opposer. Therefore, the Board erred in applying evidence of trademark usage in Class 9 to the case at hand, which is a Class 41 matter.

## V.   RECORDINGS SUBMITTED AFTER THE CLOSE OF DISCOVERY AND NOT INCLUDED IN PRE-TRIAL DISCLOSURES CANNOT BECOME PART OF THE RECORD.

The Board erred as a matter of law and/or abused its discretion in admitting the audial and two video recordings contained in Exhibit 6 because they were submitted outside Discovery periods and in violation of the Board's orders.

The rules of evidence for proceedings before the Trademark Trial and Appeal Board are the Federal Rules of Evidence, the relevant provisions of the Federal Rules of Civil Procedure, the relevant provisions of Title 28 of the United States Code, and the provisions of this part of title 37 of the Code of Federal Regulations. *37 C.F.R. §2.122(a).* The discovery period may be extended upon stipulation of the parties approved by the Board, or upon motion granted by the Board, or by order of the Board. If a motion for an extension is denied, the discovery period may remain as originally set or as reset. Disclosure deadlines and obligations may be modified upon written stipulation of the parties approved by the Board, or upon motion granted by the Board, or by order of the Board. *37*

*C.F.R. § 2.120(a)(2)*. In making its pretrial disclosures, the party must disclose …
a general summary or list of the types of documents and things which may be
introduced as exhibits during the testimony of the witness. *37 CFR § 2.121(e)*. A
party may object to improper or inadequate pretrial disclosures and may move to
strike the testimony of a witness for lack of proper pretrial disclosure. See *37 CFR
§ 2.123(e)(3)*. See also *37 CFR § 2.118. Luemme Inc. v. D.B. Plus Inc., 53
USPQ2d 1758,1760 (TTAB 1999)* (motion to extend denied where sparse motion
contained insufficient facts on which to find good cause); *Harjo v. Pro-Football
Inc., 45 U.S.P.Q. 2d 1789, 1790 (TTAB 1998)*)(motion to reopen to submit new
evidence denied).

Here, the Discovery Period closed August 15, 2012. On January 6, 2013,
Opposer was compelled by order of the Board to respond to Requests for
Admissions about certain recordings submitted by Opposer during Discovery "no
later than February 6, 2013." Rather than respond as ordered, on March 4, 2013
Opposer submitted three new pieces of evidence, a CD containing an audial
recording of "Hoop it Up" and two video recordings marked as Exhibit 6. No
motion to re-open discovery was filed with the Board or stipulation sought from
Appellant. Opposer's Pre-Trial Disclosures closed February 27, 2013. These items
were not included in Opposer's Pre-Trial Disclosures. Because Opposer had over 8
months to find and produce such evidence, the TTAB erred as a matter of law

and/or abused its discretion in making them part of the record.

## CONCLUSION

Based on the above, Appellants respectfully request the court reverse the decision of the Trademark and Appeal Board denying Applicants' registration and finding Opposer's use of the terms "hoop it up" qualifies as a trademark in the relevant Trademark Class 41.

Dated: January 19, 2015

Respectfully submitted,

Heather D. Bennett
Law Office of Heather Bennett
Attorney for Appls Breaux and Erickson

**ADDENDUM**

> This opinion is not a
> Precedent of the TTAB

Mailed: July 23, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*KidTribe, Inc.*
*v.*
*Kenneth W. Erickson and Kelly J. Breaux*
_____

Opposition No. 91201062
_____

Steven M. Weinberg and Michael J. Salvatore of Holmes Weinberg, PC for KidTribe, Inc.

Morris E. Turek of Yourtrademarkattorney.com for Kenneth W. Erickson and Kelly J. Breaux.

_____

Before Bucher, Wolfson and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Kenneth W. Erickson and Kelly J. Breaux ("Applicants"), two individuals, filed jointly an application[1] to register the mark HOOPITUP in standard characters for the following services:

> Education services, namely, classes and events in the nature of seminars and workshops in the field of health, exercise, dance and hoop dance; physical fitness instruction using the hoop; dance instruction using the

---

[1] Application Serial No. 85142516, filed on September 30, 2010 under Trademark Act § 1(b), 15 U.S.C. § 1051(b), on the basis of Applicants' *bona fide* intent to use the mark in commerce.

> hoop; physical fitness instruction with children; physical
> fitness instruction with children using the hoop;
> entertainment in the nature of live hoop dance
> performances; training fitness instructors and teachers,
> namely, in the field of health, fitness and motivation;
> training fitness instructors and teachers, namely, in the
> field of health, fitness and motivation using the hoop and
> distribution of course material in connection therewith;
> educational services for children in the field of fitness,
> health, and nutrition, namely, party planning, arranging,
> organizing, conducting, and hosting social entertainment
> events and assemblies in the nature of physical fitness
> workshops for children utilizing motivation, dance and
> the hoop; entertainment in the nature of on-going
> television programs in the field of health, fitness, dance
> and the hoop; all of the foregoing specifically excluding
> the sport of basketball, in International Class 41.

KidTribe, Inc. ("Opposer") opposed registration of the mark on the ground that Opposer owns common law service mark rights in the mark HOOP IT UP and that use of Applicants' mark in connection with the identified services will cause consumers to "mistakenly believe that [Applicants' mark] … is connected to, endorsed by, sponsored by or is otherwise associated with [Opposer] or its well-known educational and entertainment services."[2] Opposer also alleges that Applicant Kelly J. Breaux worked for Opposer and, with the intent to cause confusion, began a business directly competitive with Opposer under the HOOPITUP mark.[3]

In answering the notice of opposition, Applicants admit "that their mark is identical in sound to Opposer's alleged HOOP IT UP mark."[4] They also admit "that

---

[2] Notice of opposition ¶ 6, 1 TTABvue at 5 of 6.

[3] *Id.* at ¶ 7.

[4] Answer ¶ 5, 5 TTABvue at 3 of 4.

Opposition No. 91201062

Kelly J. Breaux once worked for Opposer and later started a business under the HOOPITUP mark."[5] Applicants deny the other salient allegations of the notice of opposition. The parties have stipulated as follows:

> 1)    With respect to the issue of priority, Applicants will rely on the filing date of September 30, 2010, and will not attempt to prove an earlier first use date of the HOOPITUP trademark (App. No. 85142516).

> 2)    Applicants stipulate that a likelihood of confusion exists between Opposer's HOOP IT UP trademark and Applicants' HOOPITUP trademark if Opposer proves priority of use of its HOOP IT UP trademark. Accordingly, if Opposer proves priority of use in this Opposition, the Board may enter judgment against Applicant [*sic*] without further proceedings in this Opposition.

> 3)    Applicants hereby waive with prejudice the right to assert any defenses or affirmative defenses in this Opposition, whether or not already asserted, other than the defense that Opposer does not have priority of use.[6]

The case has been fully briefed.

I.    The record.

The record includes the pleadings and, by operation of Trademark Rule 2.122, 37 C.F.R. § 2.122, the application file for the opposed mark. The record also includes the following testimony and evidence:

A.    Opposer's evidence.

1.    Testimony deposition of Kellee McQuinn Maginness, Opposer's founder and CEO, and attached exhibits ("McQuinn")  44, 45 and 52 TTABvue.

---

[5] *Id.* ¶ 7.

[6] Joint Stipulation of the Parties, 16 TTABvue.

Opposition No. 91201062

Opposer also submitted three notices of reliance which, for the reasons discussed below, we exclude from the record.[7]

    B.   Applicants' evidence.

        1.   Notice of reliance on Opposer's objections and supplemental response to Request No. 7 of Applicants' second set of requests for admission. 33 TTABvue.

        2.   Notice of reliance on the Wikipedia entry for "Party Rock Anthem." 34 TTABvue.

        3.   Notice of reliance on the Wikipedia entry for "I Gotta Feeling." 35 TTABvue.

        4.   Notice of reliance on Opposer's supplemented responses to Applicants' second set of interrogatories. 36 TTABvue.

        5.   Notice of reliance on Opposer's responses to Applicants' second set of requests for admission. 37 TTABvue.

        6.   Notice of reliance on Opposer's supplemented responses to Requests Nos. 1-3 of Applicants' first set of requests for production of documents and things. 38 TTABvue.

        7.   Notice of reliance on a sound recording produced by Opposer during discovery. 39 and 40 TTABvue.[8]

---

[7] We note that Opposer filed, during its rebuttal period, transcripts of the depositions of Pamela Brasher, Anne Gaffney, Rita Henderson, Geoffry Iannello, and Michael Torchia (47-51 TTABvue). All of these depositions were taken on May 9, 2013, during Opposer's main testimony period, and were stricken on Applicants' motion by the Board's order of September 16, 2013 (31 TTABvue). The factor of surprise in Opposer's calling of these witnesses, which was one of the primary reasons for the Board's decision to strike the testimony, may have affected Applicants' ability to prepare for the depositions and cannot be cured merely by filing the same transcripts as rebuttal testimony instead of testimony in chief. Accordingly, we have not considered the testimony of these witnesses.

[8] Generally, a party that has obtained documents or things from another party through discovery may not make the produced documents or things of record by notice of reliance alone (except to the extent that they are admissible by notice of reliance under 37 CFR § 2.122(e)). 37 C.F.R. § 2.120(j)(3)(ii). However, in the present case, Opposer authenticated the sound recording in question in response to Request # 1 of Applicants' second set of requests for admission. 37 TTABvue. Accordingly, it may be admitted in evidence. *See* TBMP § 704.11.

Opposition No. 91201062

C.    Applicants' evidentiary objections.

Applicants, in their brief, objected to the admission of documents submitted by Opposer under notices of reliance at 41-43 TTABvue on a number of grounds. Opposer characterizes one of them (41 TTABvue) as a "Media Alert" that "was distributed to relevant media outlets in Southern California…." This document is in the nature of a press release and, as such, cannot be made of record under notice of reliance alone. Press releases are not "Printed publications … available to the general public in libraries or of general circulation among members of the public" within the meaning of 37 C.F.R. § 2.122(e). *Hard Rock Café Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1403 (TTAB 1998). Accordingly, we exclude it.

Two of the documents submitted (42 and 43 TTABvue) are offered as official records of the State of California Labor Commissioner. A copy of an official record offered under 37 C.F.R. § 1.122(e) must be one "whose authenticity is established under the Federal Rules of Evidence." Generally, an official record (other than an official record of the USPTO) must be certified as correct under Fed. R. Evid. 902(4) in order to be offered under a notice of reliance. As the copies submitted in this case have not been certified, nor otherwise authenticated, we exclude them. *See* TBMP § 704.07.

Applicants have objected to admission of Exhibit 6 to the deposition of Kellee McQuinn Maginness, which consists of two video recordings and one audio recording, on the ground that they were not timely disclosed to Applicants.[9] Opposer

---

[9] Applicants' brief at 2-3, 55 TTABvue at 3-4 of 13.

Opposition No. 91201062

produced the materials in question on March 4, 2013, more than six weeks prior to the opening of Opposer's testimony period, to supplement its discovery responses. Opposer contends that it produced the materials "as soon as those materials were discovered by Opposer."[10] Applicants contend that they were deprived of the opportunity to depose Ms. McQuinn and others with respect to the recordings, inasmuch as the discovery period had closed.[11] Yet at the time of disclosure Applicants made no motion to reopen requesting an opportunity for such discovery. Applicants' objection to admission of Exhibit 6 is overruled.

Finally, Applicants object to admission of the screenshot from Opposer's website shown on page 4 of Applicant's brief. Evidentiary materials attached to a party's brief on the case can be given no consideration unless they were properly made of record during the time for taking testimony. TBMP § 704.05(b) and cases cited therein. Accordingly, we have given no consideration to the screenshot.

II. <u>Standing</u>.

Opposer's witness has testified that Opposer provides fitness training and entertainment for children, involving instruction in the use of hula hoops,[12] in the context of school assemblies and other gatherings of children;[13] and that in connection with such services Opposer uses the phrase HOOP IT UP as "a catch

---

[10] Opposer's reply brief at 10, 56 TTABvue at 11 of 16.

[11] Applicant's brief at 3, 55 TTABvue at 4 of 13.

[12] McQuinn 6:12-20, 44 TTABvue at 9 of 63.

[13] *Id*. at 8:4-7, 12:7-21, 16:8-17:12, 44 TTABvue at 11, 15 and 19 of 63.

Opposition No. 91201062

phrase slogan"[14] that is included in songs and cheers performed as part of the services,[15] and has done so since a date prior to any use by Applicants of their mark. Opposer has thus shown that it has a real interest in the outcome of this proceeding. *See Ritchie v. Simpson*, 170 F.3d 1092, 1095, 50 USPQ2d 1023, 1026 (Fed. Cir. 1999); *Jewelers Vigilance Committee, Inc. v. Ullenberg Corp.*, 823 F.2d 490, 492-493, 2 USPQ2d 2021, 2023-24 (Fed. Cir. 1987). Opposer has therefore established its standing to oppose registration of Applicants' mark. *See First Niagara Insurance Brokers Inc. v. First Niagara Financial Group Inc.*, 476 F.3d 867, 81 USPQ2d 1375, 1378 (Fed. Cir. 2007); *Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1022 (TTAB 2009) (standing established by showing of common law rights).

III.    The merits.

Under Trademark Act § 2(d), the Patent and Trademark Office must refuse registration of a mark that "so resembles … a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods [or services] of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). In view of the parties' stipulation, the only element of this test that remains for trial is the question of priority.[16]

The earliest date of use that Applicants claim, for their part, is September 30, 2010, the date on which their application was filed. Applicants are entitled to rely

---

[14] *Id.* at 27:21-23, 44 TTABvue at 30 of 63.

[15] *Id.* at 12:7-21, 14:7-9, 44 TTABvue at 15 and 17 of 63; and Exhibit 6 (audio recording of the "Hoop It Up song"), 53 TTABvue.

[16] *See* Joint Stipulation of the Parties, 16 TTABvue.

Opposition No. 91201062

on that date as their date of constructive use. *Levi Strauss & Co. v. R. Josephs Sportswear*, 28 U.S.P.Q.2d 1464, 1467 (TTAB 1993), *reconsideration denied*, 36 USPQ2d 1328 (TTAB 1994); *Larami Corp. v. Talk To Me Programs Inc.*, 36 USPQ2d 1840 (TTAB 1995). Applicants have stipulated that they will not attempt to prove an earlier date of first use.

Opposer's witness testified that Opposer first made use of the expression HOOP IT UP in connection with services at a school assembly in the "2004, 2005 school year."[17] Opposer's service consists of live performances that involve instruction in use of the hula hoop, provided primarily for the benefit and entertainment of children;[18] however, Opposer also provides instruction to adults, such as teachers, to assist them in guiding children's activities.[19] Opposer's programs have been marketed under the titles "Hoopapalooza"[20] and "Hoop-Hop."[21] One of Opposer's methods of using the expression HOOP IT UP in connection with its performances is vocal: one of Opposer's staff will shout the phrase in the form of a cheer, or sing the phrase in the context of a song. "So it's done in a big call-response like 'Are you ready to HOOP IT UP? I can't hear you. Are you ready to HOOP IT UP?' And there's a call and response going on back and forth with the kids."[22] This testimony is supported by the "Hoopapalooza Script," which includes, in a section entitled

---

[17] McQuinn 8:4-7, 44 TTABvue at 11 of 63.

[18] *Id*. at 7:8-21, 44 TTABvue at 10 of 63.

[19] *Id*. at 9:19-24, 44 TTABvue at 12 of 63.

[20] *Id*. at 18:25-19:1, 44 TTABvue at 21 of 63; *see also* Exhibit 8, 45 TTABvue at 5-8 of 117.

[21] McQuinn Exhibit 9, 45 TTABvue at 9-62 of 117.

[22] McQuinn 8:15-23; *see also id*. at 19:4-15, 44 TTABvue at 11 and 22 of 63.

Opposition No. 91201062

"Part 3: HOOP IT UP," the very lines "Are you ready to HOOP IT UP? I can't hear you! Are you ready to HOOP IT UP!!!"[23] The Hoopapalooza Script dates from approximately 2008.[24]

Opposer's performances are accompanied by recorded music; the music includes popular songs as well as at least one recording entitled "Hoop it up,"[25] created by Opposer's principal, Kellee McQuinn Maginness. Ms. McQuinn composed the lyrics of the song in 2008,[26] and first played a recording of the song at school assemblies "around, you know, 2008, 2009."[27] A recording of the song is of record.[28] The song is in a hip-hop style in which the words are declaimed in complex rhythms. In the course of a repetitive refrain that appears four times in the course of the song, the expression "Hoop it up" is sung at least 33 times, usually in the phrase "Hoop it up hoop hoop hoop it up yeah."[29] By means of rhythm and repetition, the phrase is given particular emphasis compared to the other lyrics of the song, with the exception of the single word "hoop" which, in itself, is sung countless times.[30]

---

[23] McQuinn Exhibit 8 at 1, 45 TTABvue at 5 of 117.

[24] McQuinn 18:10-12, 44 TTABvue at 21 of 63.

[25] McQuinn Exhibit 8, 45 TTABvue at 5-8 of 117. *See also* McQuinn Exhibit 9 (Hoop-Hop Guide Book at 23), 45 TTABvue at 31 of 117.

[26] Opposer's supplemental responses to Interrogatory No. 3, Applicants' notice of reliance at 35 TTABvue.

[27] McQuinn 45:22-25; *see also id.* at 29:11, 44 TTABvue at 48 and 32 of 63.

[28] McQuinn Exhibit 6 (audio recording KT00066).

[29] The lyrics are set forth in McQuinn Exhibit 7, 46 TTABvue at 3-4 of 117; however, the lyric sheet does not indicate the extent of repetition of the phrase "Hoop it up hoop hoop hoop it up yeah."

[30] Another recording of the song (with different music) is also of record (Applicants' notice of reliance at 40 TTABvue), although it apparently was produced after 2010 and Opposer does not rely on it to demonstrate priority. While the lyrics of the two versions are essentially

Opposition No. 91201062

Opposer has made of record a video recording of a 2006 television interview of Ms. McQuinn on ABC7 News (Chicago), in which, in discussion with the anchorwoman, Ms. McQuinn interjects, in a raised voice, "we hoop it up," pumping her fist twice and making a dance move.[31] She then joins some children and begins a demonstration by declaiming rhythmically, "Alright let's hoop it up everybody grab your hoop here we go."[32] Also of record is an E! Network video segment from January 2006 in which Ms. McQuinn leads children in exercise and explains "six tips for a healthy 2006." "Tip number 3: you've got to hoop it up. You've got to make exercise fun."[33]

Finally, Opposer has made of record two forms of written materials that include reference to the phrase "hoop it up" and have been distributed to customers.[34] The first is the "Hoop-Hop Guide Book," a lengthy manual of instructions for an exercise program.[35] Ms. McQuinn described this as "our curriculum guidebook," saying, "when I do a teacher training … this is the teaching resource. So everything that the teacher needs to implement the ongoing KidTribe program…."[36] Part 4 of the

---

the same, in the later recording the chant "Hoop it up hoop hoop hoop it up" has less prominence and has been replaced by many iterations of the phrase "All I wanna do is hoop it up."

[31] McQuinn Exhibit 6 (video recording KT00067 at 1:57-2:02).

[32] *Id*. It is not clear from the video whether these words are actually spoken by Ms. McQuinn or are part of the recorded music that begins playing at that point.

[33] McQuinn Exhibit 6 (video recording KT00068 at 1:43-46).

[34] We do not discuss here the "Hoop it up" lyric sheet or the "Hoopapalooza Script," as both appear to be for distribution only to Opposer's personnel.

[35] McQuinn Exhibit 9, 45 TTABvue at 9-62 of 117.

[36] McQuinn 20:22-21:3, 44 TTABvue at 23 of 63.

guide book is entitled "Hoop It Up!" These words appear as the chapter heading in a rectangular carrier at the beginning of Part 4, followed by the bold caption "Are you ready to HOOP IT UP?"[37] There follow 15 pages of instructions for hula hoop exercises. Immediately following is a section entitled "Expectations and Limits," which includes instructions for maintaining control of a crowd of children:

> By enthusiastically asking the following questions, the kids' answers affirm that they know the appropriate conduct. Encourage them to answer with feeling. Have fun with it… pretend you're a drill sergeant (a nice one, though):
>
> -    What class is this?
>
> -    Is this scream your head off like a crazy person class?
>
> -    Is this run around the playground class?
>
> …
>
> -    Is it OK to fight or be mean?
>
> -    Is it OK to make fun of someone?
>
> -    Is it OK to have fun?
>
> -    Are you ready to have fun?
>
> -    I can't hear you. ARE YOU READY TO HAVE FUN?
>
> -    ARE YOU READY TO HOOP IT UP?[38]

Another section of Part 4, entitled "Self-Expression Exercises," includes instructions for four exercises, one of which is entitled "Hoop It Up":

---

[37] Exhibit 9 at 27, 45 TTABvue at 35 of 117.

[38] *Id.* at 45, 45 TTABvue at 53 of 117.

These exercises do wonders for the emotional life of its participants. Kids support, witness, and respect each other as they all express their unique authenticity.

**Hoop It Up**

Form a circle with the class, with everyone holding their hoops in front of them and tapping the hoop on the floor to the beat of the song. Everyone chants "Hoop it up! Hoop it up!" Meanwhile 1-4 hoopers enter the circle and show off their most amazing trcks [*sic*] for 30-60 seconds. Students can pass but must participate as a supportive audience member. *Integration: Confidence Building, Individual Artistic Expression, Acceptance and Respect, Witnessing, Supporting, Inspiring One Another.*[39]

Finally, Opposer has made of record copies of the front and back covers of a DVD entitled "Hoopersize with Miss Kellee."[40] The text on the back cover begins as follows:

**get up, stand up and put your hands up**
**'cuz HOOPER-SIZE is in the house**

Hoop it up with Miss Kellee and the KidTribe Crew in this action packed fitness frenzy that's so much fun it feels like a party!

Opposer's characterization of its use of the mark HOOP IT UP is based upon the testimony of its one witness, Opposer's principal Ms. McQuinn. Applicants contend that Ms. McQuinn's testimony is "dubious" and lacking in veracity.[41] Applicants point out that in response to discovery requests, Opposer produced a sound recording of the song "Hoop it up" marked KT00065.[42] When, in the course of

---

[39] *Id.* at 52, 45 TTABvue at 60 of 117.

[40] McQuinn Exhibit 10, 44 TTABvue at 63-64 of 117.

[41] Applicant's brief at 11, 55 TTABvue at 12 of 13.

[42] Made of record under Applicants' notice of reliance, 40 TTABvue.

Opposition No. 91201062

discovery, Applicants argued that this recording could not have been made prior to 2011 (*i.e.*, a date later than Applicants' filing date), Opposer admitted that the recording "was mistakenly produced by Opposer as evidence of prior use,"[43] and thereafter placed no reliance on it. Applicants characterize Opposer, in this situation, as "caught in a lie."[44] We see nothing in this sequence of events that would indicate that Opposer or its principal is lacking in veracity. Opposer subsequently supplied to Applicants and made of record another sound recording of the "Hoop it up" song which, according to Ms. McQuinn, she created in 2008[45] and which, she admitted, was "not fully produced at all."[46] With respect to the timing of the disclosure of this recording, Applicants argue, "This would have given Opposer plenty of time to fabricate the musical sound recording in Exhibit 6, especially considering that the recording was only a rough and unmastered production that was 'not fully produced at all.'"[47] Lacking a better foundation, Applicants' contention that the recording was fabricated is, to say the least, a bald one, and does not persuade us to view Ms. McQuinn's testimony as "extremely difficult to believe."[48] Moreover, there is nothing about the quality of the recording in question to render implausible Ms. McQuinn's testimony that she used the recording as

---

[43] Opposer's supplemental response to request for admission No. 7.

[44] Applicants' brief at 9, 55 TTABvue at 10 of 13.

[45] McQuinn 14:7-9, 44 TTABvue at 17 of 63; and Exhibit 6, KT00066. Ms. McQuinn testified that she composed the lyrics and co-wrote the music in 2008.

[46] *Id.* at 29:8-12, 44 TTABvue at 32 of 63.

[47] Applicants' brief at 10, 55 TTABvue at 11 of 13.

[48] *Id.*

musical accompaniment for her presentations at school assemblies in 2008 or 2009.[49]

Applicants argue that the Board should give no probative value to the written lyrics of the "Hoop it up" song on the basis of Opposer's admission that the recording of the song marked KT00065 was not "evidence of prior use,"[50] arguing that "The lyrics are clearly set to the music and undoubtedly would not have preexisted the music."[51] This is a *non sequitur*. We see no reason why lyrics cannot exist prior to the music to which they are set.

Applicants seek to cast doubt on the "Hoopapalooza Script" on the ground that it includes a reference to a popular song that was released in May, 2009.[52] Ms. McQuinn testified that the script was created "around the 2008 realm."[53] This minor error hardly undermines the witness's reliability. Her answer, by its nature, expressed some degree of uncertainty and the witness clarified her answer by saying that the script was created in the period "when [Applicant] Kelly [Breaux] was starting to take the mic, so to speak, and perform the events without me."[54] Applicants' suggestion that the script "could have been created sometime after the September 30, 2010 filing date of Applicants' application"[55] is pure speculation.

---

[49] McQuinn 45:25, 44 TTABvue at 48 of 63.

[50] *See* fn.42 above.

[51] Applicants' brief at 8, 55 TTABvue at 9 of 13.

[52] *Id*. at 6, 55 TTABvue at 7 of 13.

[53] McQuinn 18:7-22, 44 TTABvue at 21 of 63.

[54] *Id*.

[55] Applicants' brief at 6, 55 TTABvue at 7 of 13.

Opposition No. 91201062

With respect to the "Hoop-Hop Guide Book," Applicants point out that there are two versions of it in the record which, according to Ms. McQuinn's testimony, were created in 2004 and 2008 respectively.[56] Applicants ask, "So, why is there no mention of HOOP IT UP in the original 2004 version of the curriculum guidebook? … If the phrase HOOP IT UP was a cornerstone of Opposer's live shows back in 2004, it most certainly would have been in a curriculum guidebook that instructs teachers on how to fully implement the KidTribe program."[57] Even though Opposer claims to have commenced use of the mark HOOP IT UP during the "2004, 2005 school year," the possible reasons for the mark's absence from a particular marketing document are too numerous for speculation. If anything, the two versions of the guidebook illustrate that Opposer's marketing materials evolved between 2004 and 2008.[58]

With respect to the two video clips included in McQuinn Exhibit 6 (ABC7 New Chicago and E! Network Style On-Demand), Applicants argue:

> these uses of HOOP IT UP do not function to indicate the source of Opposer's hula-hooping fitness and exercise programs. They are just motivational statements no different than a coach urging his players to "Give it your all," cheerleaders shouting "Go team!" from the sidelines, or the umpire yelling "Play ball!" at the commencement of a baseball game. There is simply no evidence from which one could conclude that these uses of HOOP IT UP as a

---

[56] McQuinn 21:7-10, 44 TTABvue at 24 of 63; Applicants' brief at 6, 55 TTABvue at 7 of 13. The 2008 guidebook is McQuinn Exhibit 9, 45 TTABvue at 9-62 of 117; Applicants made the 2004 guidebook of record as McQuinn Exhibit 11 during cross-examination, 45 TTABvue at 65-117 of 117.

[57] Applicants' brief at 6-7, 55 TTABvue at 7-8 of 13.

[58] We note -- but see no support for -- Applicants' contention that the 2008 guidebook was fabricated for purposes of trial. Applicants' brief at 7, 55 TTABvue at 8 of 13.

Opposition No. 91201062

> verb would be perceived by ordinary people as a slogan or
> tagline used exclusively by Opposer to advertise and sell
> its services.[59]

Similarly, with respect to the cover of the DVD "Hoopersize with Miss Kellee,"[60]

Applicants argue:

> This use of HOOP IT UP clearly does not function as a
> trademark, nor would it be recognized as a trademark by
> the average consumer. It is merely used as a verb and is
> not differentiated in terms of size, font, or color from any
> of the other words in the paragraph.[61]

Applicants also point out that:

> there is absolutely no evidence in the record as to how
> many DVDs were sold, how long the DVD was on the
> market, whether the DVD is currently available to the
> public, or whether the DVD was available for sale
> immediately preceding the filing of Applicants'
> application for HOOPITUP. In fact, there is no evidence
> in the record as to whether even a single copy of the DVD
> has ever been sold or distributed to the public.[62]

After careful consideration of all of the evidence and arguments of record, we

find that Opposer has substantiated its claim of prior use of the designation HOOP

IT UP to distinguish and identify its services and to identify the source thereof, as

contemplated by the definition of "service mark" in Section 45 of the Trademark

Act, 15 U.S.C. § 1127. In particular, we find that the manner in which the phrase

HOOP IT UP has been vocalized in live performances and has been presented in

audio recordings used during live performances constitutes use of Opposer's service

---

[59] Applicants' brief at 9, 55 TTABvue at 10 of 13.

[60] McQuinn Exhibit 10, 44 TTABvue at 63-64 of 117.

[61] Applicants' brief at 5, 55 TTABvue at 6 of 13.

[62] *Id.*

Opposition No. 91201062

mark. *In re Red Robin Enterprises, Inc.*, 222 USPQ 911, 913-14 (TTAB 1984) (a mark displayed during rendition of entertainment services was "used in the sale … of services" as required by definition of "service mark" in Trademark Act § 45); *accord, In re Eagle Fence Rentals, Inc.*, 231 USPQ 228 (TTAB 1986); *In re Metriplex Inc.*, 23 USPQ2d 1315 (TTAB 1992). The evidence, discussed above, shows that Opposer played one or more recordings of the "Hoop it up" song during its exercise instruction programs prior to September 30, 2010; and that Opposer's personnel vocalized the expression "Hoop it up" and led program participants in call-and-response chants of "Hoop it up" prior to that date. We find that the salient, emphatic and repetitive vocalization of HOOP IT UP in such contexts effectively distinguished Opposer's services in such a way as to indicate their source. We also find that printed displays of HOOP IT UP in Opposer's "Hoop-Hop Guide Book," as used in connection with instruction of educational professionals, constitute service mark use, in particular the displays of the mark on p. 27 of the guide, on which "Hoop It Up!" appears at the top of the page in a rectangular carrier and in the bold caption "Are you ready to HOOP IT UP?"; and that the "Hoop-Hop Guide Book" was distributed to educational professionals in connection with Opposer's educational services prior to September 30, 2010.

Applicants have stipulated that their mark HOOPITUP so resembles Opposer's mark as to be likely to cause confusion. Opposer has demonstrated, and we find, that Opposer's mark HOOP IT UP is a mark "previously used in the United States

Opposition No. 91201062

… and not abandoned," within the meaning of Trademark Act Section 2(d), 15 U.S.C. § 1052(d). Accordingly, we enter judgment for Opposer in this proceeding.

**Decision:** The opposition is sustained and registration is refused.

(3) The Director shall notify any applicant who files a statement of use of the acceptance or refusal thereof and, if the statement of use is refused, the reasons for the refusal. An applicant may amend the statement of use.

(4) The failure to timely file a verified statement of use under paragraph (1) or an extension request under paragraph (2) shall result in abandonment of the application, unless it can be shown to the satisfaction of the Director that the delay in responding was unintentional, in which case the time for filing may be extended, but for a period not to exceed the period specified in paragraphs (1) and (2) for filing a statement of use.

(e) If the applicant is not domiciled in the United States the applicant may designate, by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, or if the registrant does not designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served on the Director.

(Amended Oct. 9, 1962, 76 Stat. 769; Jan. 2, 1975, 88 Stat. 1949; Nov. 16, 1988, 102 Stat. 3935; Oct. 30, 1998, 112 Stat. 3064; Nov. 29, 1999, 113 Stat. 1501A; Nov. 2, 2002, 116 Stat. 1906.)

### § 2 (15 U.S.C. § 1052). Trademarks registrable on the principal register; concurrent registration

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

(a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute; or a geographical indication which, when used on or in connection with wines or spirits, identifies a place other than the origin of the goods and is first used on or in connection with wines or spirits by the applicant on or after one year after the date on which the WTO Agreement (as defined in section 3501(9) of title 19) enters into force with respect to the United States.

(b) Consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof.

(c) Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow.

(d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive: *Provided*, That if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of their concurrent lawful use in

commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this chapter; (2) July 5, 1947, in the case of registrations previously issued under the Act of March 3, 1881, or February 20, 1905, and continuing in full force and effect on that date; or (3) July 5, 1947, in the case of applications filed under the Act of February 20, 1905, and registered after July 5, 1947.   Use prior to the filing date of any pending application or a registration shall not be required when the owner of such application or registration consents to the grant of a concurrent registration to the applicant.   Concurrent registrations may also be issued by the Director when a court of competent jurisdiction has finally determined that more than one person is entitled to use the same or similar marks in commerce.   In issuing concurrent registrations, the Director shall prescribe conditions and limitations as to the mode or place of use of the mark or the goods on or in connection with which such mark is registered to the respective persons.

(e) Consists of a mark which, (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them, (2) when used on or in connection with the goods of the applicant is primarily geographically descriptive of them, except as indications of regional origin may be registrable under section 1054 of this title, (3) when used on or in connection with the goods of the applicant is primarily geographically deceptively misdescriptive of them, (4) is primarily merely a surname, or (5) comprises any matter that, as a whole, is functional.

(f) Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing herein shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce.   The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.   Nothing in this section shall prevent the registration of a mark which, when used on or in connection with the goods of the applicant, is primarily geographically deceptively misdescriptive of them, and which became distinctive of the applicant's goods in commerce before the date of the enactment of the North American Free Trade Agreement Implementation Act.   A mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 43(c), may be refused registration only pursuant to a proceeding brought under section 13. A registration for a mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 43(c), may be canceled pursuant to a proceeding brought under either section 14 or section 24.

(Amended Oct. 9, 1962, 76 Stat. 769; Jan. 2, 1975, 88 Stat. 1949; Nov. 16, 1988, 102 Stat. 3037; Dec. 8, 1993, 107 Stat. 2057; Dec. 8, 1994, 108 Stat. 4982; Oct. 30, 1998, 112 Stat. 3069; Aug. 5, 1999, 113 Stat. 218; Nov. 29, 1999, 113 Stat. 1501A-583; Oct. 6, 2006, 120 Stat. 1730.)

### § 3 (15 U.S.C. § 1053).  Service marks registrable

Subject to the provisions relating to the registration of trademarks, so far as they are applicable, service marks shall be registrable, in the same manner and with the same effect as are trademarks, and when registered they shall be entitled to the protection provided herein in the case of trademarks.   Applications and procedure under this section shall conform as nearly as practicable to those prescribed for the registration of trademarks.

(Amended Nov. 16, 1988, 102 Stat. 3938.)

### § 4 (15 U.S.C. § 1054).  Collective marks and certification marks registrable

Subject to the provisions relating to the registration of trademarks, so far as they are applicable, collective and certification marks, including indications of regional origin, shall be registrable under

(b) If the applicant is found not entitled to registration, the examiner shall advise the applicant thereof and of the reason therefor. The applicant shall have a period of six months in which to reply or amend his application, which shall then be reexamined. This procedure may be repeated until (1) the examiner finally refuses registration of the mark or (2) the applicant fails for a period of six months to reply or amend or appeal, whereupon the application shall be deemed to have been abandoned, unless it can be shown to the satisfaction of the Director that the delay in responding was unintentional, whereupon such time may be extended.

(c) A registrant of a mark registered under the provision of the Act of March 3, 1881, or the Act of February 20, 1905, may, at any time prior to the expiration of the registration thereof, upon the payment of the prescribed fee file with the Director an affidavit setting forth those goods stated in the registration on which said mark is in use in commerce and that the registrant claims the benefits of this chapter for said mark. The Director shall publish notice thereof with a reproduction of said mark in the Official Gazette, and notify the registrant of such publication and of the requirement for the affidavit of use or nonuse as provided for in subsection (b) of section 1058 of this title. Marks published under this subsection shall not be subject to the provisions of section 1063 of this chapter.

(Amended Oct. 9, 1962, 76 Stat. 770; Jan. 2, 1975, 88 Stat. 1949; Nov. 16, 1988, 102 Stat. 3940; Oct. 30, 1998, 112 Stat. 3066; Nov. 29, 1999, 113 Stat. 1501A-583.)

### § 13 (15 U.S.C. § 1063). Opposition

(a) Any person who believes that he would be damaged by the registration of a mark upon the principal register, including the registration of any mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefor, within thirty days after the publication under subsection (a) of section 1062 of this title of the mark sought to be registered. Upon written request prior to the expiration of the thirty-day period, the time for filing opposition shall be extended for an additional thirty days, and further extensions of time for filing opposition may be granted by the Director for good cause when requested prior to the expiration of an extension. The Director shall notify the applicant of each extension of the time for filing opposition. An opposition may be amended under such conditions as may be prescribed by the Director.

(b) Unless registration is successfully opposed—

(1) a mark entitled to registration on the principal register based on an application filed under section 1051(a) of this title or pursuant to section 1126 shall be registered in the Patent and Trademark Office, a certificate of registration shall be issued, and notice of the registration shall be published in the Official Gazette of the Patent and Trademark Office; or

(2) a notice of allowance shall be issued to the applicant if the applicant applied for registration under section 1051(b) of this title.

(Amended Oct. 9, 1962, 76 Stat. 771; Jan. 2, 1975, 88 Stat. 1949; Jan. 2, 1975, 88 Stat. 1955; Aug. 27, 1982, 96 Stat. 320; Nov. 16, 1988, 102 Stat. 3940; Aug. 5, 1999, 113 Stat. 218; Nov. 29, 1999, 113 Stat. 1501A-583; Oct. 6, 2006, 120 Stat. 1730.)

### § 14 (15 U.S.C. § 1064). Cancellation

A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution by blurring or dilution by tarnishment under section 1125(c) of this title, by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905:

## TITLE III - NOTICE OF REGISTRATION

### § 29 (15 U.S.C. § 1111).  Notice of registration; display with mark; recovery of profits and damages in infringement suit

Notwithstanding the provisions of section 1072 of this title, a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.

(Amended Oct. 9, 1962, 76 Stat. 773; Jan. 2, 1975, 88 Stat. 1949; Nov. 16, 1988, 102 Stat. 1343.)

*Note:  The amendment of the wording of this term by Public Law 93-596 became effective on January 2, 1975.  However, the amendment provides that any registrant may continue to give notice of his registration in accordance with § 29 of the Trademark Act of 1946, as amended Oct. 9, 1962, as an alternative to notice in accordance with § 29 of the Trademark Act as amended by Public Law 93-596, regardless of whether his mark was registered before or after January 2, 1975.*

## TITLE IV - CLASSIFICATION

### § 30 (15 U.S.C. § 1112).  Classification of goods and services; registration in plurality of classes

The Director may establish a classification of goods and services, for convenience of Patent and Trademark Office administration, but not to limit or extend the applicant's or registrant's rights. The applicant may apply to register a mark for any or all of the goods or services on or in connection with which he or she is using or has a bona fide intention to use the mark in commerce:  Provided, That if the Director by regulation permits the filing of an application for the registration of a mark for goods or services which fall within a plurality of classes, a fee equaling the sum of the fees for filing an application in each class shall be paid, and the Director may issue a single certificate of registration for such mark.

(Amended Oct. 9, 1962, 76 Stat. 773; Jan. 2, 1975, 88 Stat. 1949; Nov. 16, 1988, 102 Stat. 3943; Nov. 29, 1999, 113 Stat. 1501A-583.)

## TITLE V - FEES AND CHARGES

### § 31 (15 U.S.C. § 1113).  Fees

(a) The Director shall establish fees for the filing and processing of an application for the registration of a trademark or other mark and for all other services performed by and materials furnished by the Patent and Trademark Office related to trademarks and other marks.  Fees established under this subsection may be adjusted by the Director once each year to reflect, in the aggregate, any fluctuations during the preceding 12 months in the Consumer Price Index, as determined by the Secretary of Labor.  Changes of less than 1 percent may be ignored.  No fee established under this section shall take effect until at least 30 days after notice of the fee has been published in the Federal Register and in the Official Gazette of the Patent and Trademark Office.

Note:  Copies of regulations referred to in this section may be obtained from the Department of the Treasury.

## TITLE VIII - FALSE DESIGNATIONS OF ORIGIN, FALSE DESCRIPTIONS. AND DILUTION FORBIDDEN

### § 43 (15 U.S.C. § 1125).  False designations of origin; false description or representation

(a) (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2) As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

(3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

(b) Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized.

(c) Dilution by Blurring; Dilution by Tarnishment.--

(1) Injunctive relief.--Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

(2) Definitions.--(A) For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(B) For purposes of paragraph (1), `dilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

(C) For purposes of paragraph (1), `dilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.

(3) Exclusions.--The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

(A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with--

(i) advertising or promotion that permits consumers to compare goods or services; or

(ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

(B) All forms of news reporting and news commentary.

(C) Any noncommercial use of a mark.

(4) Burden of proof.--In a civil action for trade dress dilution under this Act for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that--

(A) the claimed trade dress, taken as a whole, is not functional and is famous; and

November 25, 2013

**U.S. Patent and Trademark Office, Commerce** §6.1

6.3  Schedule for certification marks.
6.4  Schedule for collective membership marks.

AUTHORITY: Secs. 30, 41, 60 Stat. 436, 440; 15 U.S.C. 1112, 1123.

## §6.1  International schedule of classes of goods and services.

GOODS

1. Chemicals used in industry, science and photography, as well as in agriculture, horticulture and forestry; unprocessed artificial resins, unprocessed plastics; manures; fire extinguishing compositions; tempering and soldering preparations; chemical substances for preserving foodstuffs; tanning substances; adhesives used in industry.

2. Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder form for painters, decorators, printers and artists.

3. Bleaching preparations and other substances for laundry use; cleaning, polishing, scouring and abrasive preparations; soaps; perfumery, essential oils, cosmetics, hair lotions; dentifrices.

4. Industrial oils and greases; lubricants; dust absorbing, wetting and binding compositions; fuels (including motor spirit) and illuminants; candles and wicks for lighting.

5. Pharmaceutical and veterinary preparations; sanitary preparations for medical purposes; dietetic substances adapted for medical use, food for babies; plasters, materials for dressings; material for stopping teeth, dental wax; disinfectants; preparations for destroying vermin; fungicides, herbicides.

6. Common metals and their alloys; metal building materials; transportable buildings of metal; materials of metal for railway tracks; non-electric cables and wires of common metal; ironmongery, small items of metal hardware; pipes and tubes of metal; safes; goods of common metal not included in other classes; ores.

7. Machines and machine tools; motors and engines (except for land vehicles); machine coupling and transmission components (except for land vehicles); agricultural implements other than hand-operated; incubators for eggs.

8. Hand tools and implements (hand-operated); cutlery; side arms; razors.

9. Scientific, nautical, surveying, photographic, cinematographic, optical, weighing, measuring, signalling, checking (supervision), life-saving and teaching apparatus and instruments; apparatus and instruments for conducting, switching, transforming, accumulating, regulating or controlling electricity; apparatus for recording, transmission or reproduction of sound or images; magnetic data carriers, recording discs; automatic vending machines and mechanisms for coin-operated apparatus; cash registers, calculating machines, data processing equipment and computers; fire-extinguishing apparatus.

10. Surgical, medical, dental and veterinary apparatus and instruments, artificial limbs, eyes and teeth; orthopedic articles; suture materials.

11. Apparatus for lighting, heating, steam generating, cooking, refrigerating, drying, ventilating, water supply and sanitary purposes.

12. Vehicles; apparatus for locomotion by land, air or water.

13. Firearms; ammunition and projectiles; explosives; fireworks.

14. Precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; jewellery, precious stones; horological and chronometric instruments.

15. Musical instruments.

16. Paper, cardboard and goods made from these materials, not included in other classes; printed matter; bookbinding material; photographs; stationery; adhesives for stationery or household purposes; artists' materials; paint brushes; typewriters and office requisites (except furniture); instructional and teaching material (except apparatus); plastic materials for packaging (not included in other classes); printers' type; printing blocks.

17. Rubber, gutta-percha, gum, asbestos, mica and goods made from these materials and not included in other classes; plastics in extruded form for use in manufacture; packing, stopping and insulating materials; flexible pipes, not of metal.

18. Leather and imitations of leather, and goods made of these materials and not included in other classes; animal skins, hides; trunks and travelling bags; umbrellas, parasols and walking sticks; whips, harness and saddlery.

19. Building materials (non-metallic); non-metallic rigid pipes for building; asphalt, pitch and bitumen; non-metallic transportable buildings; monuments, not of metal.

20. Furniture, mirrors, picture frames; goods (not included in other classes) of wood, cork, reed, cane, wicker, horn, bone, ivory, whalebone, shell, amber, mother-of-pearl, meerschaum and substitutes for all these materials, or of plastics.

21. Household or kitchen utensils and containers; combs and sponges; brushes (except paint brushes); brush-making materials; articles for cleaning purposes; steelwool; unworked or semi-worked glass (except glass used in building); glassware, porcelain and earthenware not included in other classes.

22. Ropes, string, nets, tents, awnings, tarpaulins, sails, sacks and bags (not included in other classes); padding and stuffing materials (except of rubber or plastics); raw fibrous textile materials.

23. Yarns and threads, for textile use.

24. Textiles and textile goods, not included in other classes; bed and table covers.

25. Clothing, footwear, headgear.

26. Lace and embroidery, ribbons and braid; buttons, hooks and eyes, pins and needles; artificial flowers.

27. Carpets, rugs, mats and matting, linoleum and other materials for covering existing floors; wall hangings (non-textile).

28. Games and playthings; gymnastic and sporting articles not included in other classes; decorations for Christmas trees.

29. Meat, fish, poultry and game; meat extracts; preserved, frozen, dried and cooked fruits and vegetables; jellies, jams, compotes; eggs, milk and milk products; edible oils and fats.

30. Coffee, tea, cocoa, sugar, rice, tapioca, sago, artificial coffee; flour and preparations made from cereals, bread, pastry and confectionery, ices; honey, treacle; yeast, baking-powder; salt, mustard; vinegar, sauces (condiments); spices; ice.

31. Agricultural, horticultural and forestry products and grains not included in other classes; live animals; fresh fruits and vegetables; seeds, natural plants and flowers; foodstuffs for animals, malt.

32. Beers; mineral and aerated waters and other non-alcoholic drinks; fruit drinks and fruit juices; syrups and other preparations for making beverages.

33. Alcoholic beverages (except beers).

34. Tobacco; smokers' articles; matches.

SERVICES

35. Advertising; business management; business administration; office functions.

36. Insurance; financial affairs; monetary affairs; real estate affairs.

37. Building construction; repair; installation services.

38. Telecommunications.

39. Transport; packaging and storage of goods; travel arrangement.

40. Treatment of materials.

41. Education; providing of training; entertainment; sporting and cultural activities.

42. Scientific and technological services and research and design relating thereto; industrial analysis and research services; design and development of computer hardware and software.

43. Services for providing food and drink; temporary accommodation.

44. Medical services; veterinary services; hygienic and beauty care for human beings or animals; agriculture, horticulture and forestry services.

45. Legal services; security services for the protection of property and individuals; personal and social services rendered by others to meet the needs of individuals.

[72 FR 28611, May 22, 2007]

§ 6.2  Prior U.S. schedule of classes of goods and services.

| Class | Title |
|---|---|
| | GOODS |
| 1 | Raw or partly prepared materials. |
| 2 | Receptacles. |
| 3 | Baggage, animal equipments, portfolios, and pocket books. |
| 4 | Abrasives and polishing materials. |
| 5 | Adhesives. |
| 6 | Chemicals and chemical compositions. |
| 7 | Cordage. |
| 8 | Smokers' articles, not including tobacco products. |
| 9 | Explosives, firearms, equipments, and projectiles. |
| 10 | Fertilizers. |
| 11 | Inks and inking materials. |
| 12 | Construction materials. |
| 13 | Hardware and plumbing and steamfitting supplies. |
| 14 | Metals and metal castings and forgings. |
| 15 | Oils and greases. |
| 16 | Protective and decorative coatings. |
| 17 | Tobacco products. |
| 18 | Medicines and pharmaceutical preparations. |
| 19 | Vehicles. |
| 20 | Linoleum and oiled cloth. |
| 21 | Electrical apparatus, machines, and supplies. |
| 22 | Games, toys, and sporting goods. |
| 23 | Cutlery, machinery, and tools, and parts thereof. |
| 24 | Laundry appliances and machines. |
| 25 | Locks and safes. |
| 26 | Measuring and scientific appliances. |
| 27 | Horological instruments. |
| 28 | Jewelry and precious-metal ware. |
| 29 | Brooms, brushes, and dusters. |
| 30 | Crockery, earthenware, and porcelain. |
| 31 | Filters and refrigerators. |
| 32 | Furniture and upholstery. |
| 33 | Glassware. |
| 34 | Heating, lighting, and ventilating apparatus. |
| 35 | Belting, hose, machinery packing, and nonmetallic tires. |
| 36 | Musical instruments and supplies. |
| 37 | Paper and stationery. |
| 38 | Prints and publications. |
| 39 | Clothing. |
| 40 | Fancy goods, furnishings, and notions. |
| 41 | Canes, parasols, and umbrellas. |
| 42 | Knitted, netted, and textile fabrics, and substitutes therefor. |
| 43 | Thread and yarn. |
| 44 | Dental, medical, and surgical appliances. |
| 45 | Soft drinks and carbonated waters. |
| 46 | Foods and ingredients of foods. |
| 47 | Wines. |
| 48 | Malt beverages and liquors. |
| 49 | Distilled alcoholic liquors. |
| 50 | Merchandise not otherwise classified. |
| 51 | Cosmetics and toilet preparations. |
| 52 | Detergents and soaps. |
| | SERVICES |
| 100 | Miscellaneous. |
| 101 | Advertising and business. |
| 102 | Insurance and financial. |
| 103 | Construction and repair. |
| 104 | Communication. |
| 105 | Transportation and storage. |
| 106 | Material treatment. |
| 107 | Education and entertainment. |

[24 FR 10383, Dec. 22, 1959. Redesignated at 38 FR 14681, June 4, 1973]

# APPENDIX

## TABLE OF CONTENTS

TTAB DOCKET SHEET ......................................................................... A001
STIPULATED PROTECTIVE ORDER ................................................. A005
TTAB DECISION................................................................................... A012
PLEADINGS—Relevant Portions:
    Opposer's notice of opposition........................................................... A030
    Applicant's answer ............................................................................. A033

TRADEMARK APPLICATIONS and REGISTRATIONS:
    Appellant's trademark application and specimen............................... A035
    Opposer's trademark application and specimen ................................. A039
    Examining attorney's office action of refusal.................................... A044
    Opposer's trademark certificates of registrations for Kidtribe
        KidTribe ® Class 41....................................................................... A047
        KidTribe® Class 9 .......................................................................... A048

OTHER PARTS OF RECORD—Relevant Portions:
    TTAB notification of discovery and trial dates .................................. A049
    Joint stipulation of facts...................................................................... A050
    Order extending discovery closure date ............................................. A051
    Order compelling Opposer's response.................................................. A053
    Joint Stipulation to extend closure of Opposer trial period................ A056
    KidTribe® Brochure attached to Opposer evidence admitted ........... A057
    HOOPER-SIZE™ DVD .................................................................... A059
    Hoop it Up song written lyrics............................................................ A061
    Hoop it Up written lyrics Document Property View .......................... A063
    Image of CD recording of song and news videos............................... A064
    Wav Property view Hoop it Up recording........................................... A065
    HOOP-A-LOOZA script for employees (redacted removing confidential
    information) ......................................................................................... A066
    HOOP A LOOZA script--document property view .......................... A070
    HOOP-HOP Guidebook (2008-present, redacted removing
    confidential information)................................................................... A071
    HOOP HOP Guidebook Document Property View .......................... A108
    HOOP-HOP Guidebook (2004-2008 version, redacted removing confidential
    information) ....................................................................................... A109

Kellee McQuinn Bio ........................................................................... A118
Relevant Portions of Testimony of Kellee Mcquinn Maginness ........ A119
Notice of Reliance on 2011 sound recording of Hoop it Up song ..... A148
Notice of Reliance on "Rock Party Anthem" (2011 release) ............. A149
Notice of Reliance "I Gotta Feeling" (2010 release) .......................... A150
Notice of Reliance—Opposer's Answers to Interrogatories .............. A151
Notice of Reliance--Opposer's Admissions ....................................... A155
Opposer's Final brief ......................................................................... A157
Applicant's Final Brief ...................................................................... A161
Opposer's Reply Brief ....................................................................... A168

Form PTO 55 (12-80)

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

October 27, 2014

(Date)

**THIS IS TO CERTIFY** that the annexed is an accurate statement of the content entries in the file of the trademark opposition proceeding and involved application identified below. The list was taken from the TSDR and TTABvue electronic databases of this Office and comprises the record before the United States Patent and Trademark Office.

**Kenneth W. Erickson and Kelly J. Breaux v. KidTribe, Inc.**

**Opposition No. 91201062**

**(Application No.: 85/142,516)**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Certifying Officer*

**A001**

## PROSECUTION HISTORY OF SERIAL NO. 85142516
### (Opposition No. 91201062)

| DATE | DESCRIPTION |
|---|---|
| 09/30/2010 | DRAWING |
| 09/30/2010 | APPLICATION |
| 10/06/2010 | NOTICE OF PSEUDO MARK |
| 01/10/2011 | XSEARCH SEARCH SUMMARY |
| 01/16/2011 | NON-FINAL OFFICE ACTION |
| 01/25/2011 | RESPONSE TO NON-FINAL OFFICE ACTION |
| 01/27/2011 | AMENDMENT AND MAIL PROCESSING COMPLETE |
| 02/16/2011 | TRAM SNAPSHOT OF APPLICATION AT PUBLICATION FOR OPPOSITION |
| 03/11/2011 | PUBLICATION AND ISSUE REVIEW COMPLETE |
| 04/12/2011 | NOTICE OF PUBLICATION |
| 08/09/2011 | NOTICE OF OPPOSITION |
| 08/10/2011 | NOTICE AND TRIAL DATES SENT; ANSWER DUE |
| 08/10/2011 | PENDING; INSTITUTED |
| 09/15/2011 | TEAS REVOCATION/APPOINTMENT OF ATTORNEY |
| 09/16/2011 | D'S ENTRY OF APPEARANCE |
| 09/16/2011 | ANSWER |
| 11/21/2011 | P'S MOTION TO SUSPEND PENDING SETTLEMENT NEGOTIATIONS |
| 11/29/2011 | PROCEEDINGS SUSPENDED |
| 06/12/2012 | STIPULATION FOR EXTENSION OF TIME |
| 06/12/2012 | EXTENSION OF TIME GRANTED |
| 07/03/2012 | STIPULATION FOR EXTENSION OF TIME |
| 07/03/2012 | EXTENSION OF TIME GRANTED |
| 09/25/2012 | STIPULATION FOR EXTENSION OF TIME |
| 09/25/2012 | EXTENSION OF TIME GRANTED |
| 10/19/2012 | D'S MOTION TO COMPEL DISCOVERY |
| 11/08/2012 | P'S OPPOSITION TO D'S MOTION TO COMPEL DISCOVERY |
| 12/17/2012 | STIPULATION OF FACTS |
| 12/17/2012 | STIPULATION FOR EXTENSION OF TIME |
| 12/18/2012 | EXTENSION OF TIME GRANTED |
| 01/26/2013 | TRIAL DATES RESET |
| 03/18/2013 | P'S MOTION FOR SUMMARY JUDGMENT (CONFIDENTIAL) |

| 03/18/2013 | P'S MOTION FOR SUMMARY JUDGMENT – EXHIBITS (CONFIDENTIAL) |
|---|---|
| 04/09/2013 | P'S MOTION FOR SUMMARY JUDGMENT DENIED AS UNTIMELY; TRIAL DATES RESET |
| 04/15/2013 | STIPULATION TO EXTEND OPPOSER'S TRIAL PERIOD |
| 04/26/2013 | P'S REDACTED VERSION OF MOTION FOR SUMMARY JUDGMENT |
| 05/16/2013 | EXTENSION OF TIME GRANTED |
| 05/20/2013 | D'S MOTION TO STRIKE TESTIMONY DEPOSITIONS |
| 05/31/2013 | PROCEEDINGS SUSPENDED PENDING DISPOSITION OF OUTSTANDING MOTION |
| 05/31/2013 | P'S OPPOSITION TO MOTION TO STRIKE TESTIMONY DEPOSITIONS |
| 06/20/2013 | D'S REPLY IN SUPPORT OF MOTION TO STRIKE TESTIMONY DEPOSITIONS |
| 09/16/2013 | MOTION TO STRIKE GRANTED; PROCEEDINGS RESUMED |
| 10/16/2013 | P'S MOTION FOR CLARIFICATION OF THE BOARD'S ORDER |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/06/2013 | D'S NOTICE OF RELIANCE |
| 11/18/2013 | D'S NOTICE OF RELIANCE |
| 12/30/2013 | D'S NOTICE OF RELIANCE |
| 12/30/2013 | D'S NOTICE OF RELIANCE |
| 12/30/2013 | D'S NOTICE OF RELIANCE |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S SUPPORTING EVIDENCE/EXHIBITS (CONFIDENTIAL) |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S DEPOSITION TESTIMONY |
| 02/25/2014 | P'S EXHIBITS TO DEPOSITION TESTIMONY |

| 02/28/2014 | P'S FINAL BRIEF |
| 03/21/2014 | D'S FINAL BRIEF |
| 04/17/2014 | P'S REPLY BRIEF |
| 05/13/2014 | SUBMITTED ON BRIEF |
| 07/23/2014 | BOARD DECISION: SUSTAINED |
| 09/19/2014 | NOTICE OF APPEAL TO CAFC |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| KidTribe, Inc., | Opposition No. 91201062 |
| Opposer, | |
| v. | **STIPULATED PROTECTIVE ORDER** |
| Kenneth W. Erickson and Kelly J. Breaux, | |
| Applicant. | |

It is hereby stipulated and agreed by and between counsel for the parties that the terms and conditions of this Protective Order shall govern the handling of documents, answers to interrogatories, depositions, pleadings, exhibits and all other information exchanged by the parties in this action.

It is hereby ODERED as follows:

1.     **Classes of Protected Information.**

The Rules of Practice in Trademark Cases provide that all *inter partes* proceeding files, as well as the involved registration and application files, are open to public inspection. The terms of this order are not to be used to undermine public access to files. When appropriate, however, a party or witness, on its own or through its attorney, may seek to protect the confidentiality of information by employing one of the following designations.

**Confidential** – Material to be shielded by the Board from public access.

**Highly Confidential** – Material to be shielded by the Board from public access <u>and</u> subject to agreed restrictions on access even as to the parties and/or their attorneys.

**Trade Secret/Commercially Sensitive** – Material to be shielded by the Board from public access, restricted from any access by the parties, and available for review by outside counsel for

the parties and, subject to the provisions of paragraph 4 and 5, by independent experts or consultants for the parties.

2.    **Information Not to Be Designated as Protected.**

Information may not be designated as subject to any form of protection if it (a) is, or becomes, public knowledge, as shown by publicly available writings, other than through violation of the terms of this document; (b) is acquired by a non-designating party or non-party witness from a third party lawfully possessing such information and having no obligation to the owner of the information; (c) was lawfully possessed by a non-designating party or non-party witness prior to the opening of discovery in this proceeding, and for which there is written evidence of the lawful possession; (d) is disclosed by a non-designating party or non-party witness legally compelled to disclose the information; or (e) is disclosed by a non-designating party with the approval of the designating party.

3.    **Access to Protected Information.**

The provisions of this order regarding access to protected information are subject to modification by written agreement of the parties or their attorneys, or by motion filed with and approved by the Board.

Judges, attorneys, and other employees of the Board are bound to honor the parties' designations of information as protected but are not required to sign forms acknowledging the terms and existence of this order. Court reporters, stenographers, video technicians or others who may be employed by the parties or their attorneys to perform services incidental to this proceeding will be bound only to the extent that the parties or their attorneys make it a condition of employment or obtain agreements from such individuals, in accordance with the provisions of paragraph 4.

- **Parties** are defined as including individuals, officers of corporations, partners of partnerships, and management employees of any type of business organization.

- **Attorneys** for parties are defined as including **in-house counsel** and **outside counsel** , including support staff operating under counsel's direction, such as paralegals or legal assistants, secretaries, and any other employees or independent contractors operating under counsel's instruction.

- **Independent experts or consultants** include individuals retained by a party for purposes related to prosecution or defense of the proceeding but who are not otherwise employees of either the party or its attorneys.

- **Non-party witnesses** include any individuals to be deposed during discovery or trial, whether willingly or under subpoena issued by a court of competent jurisdiction over the witness.

**Parties** and their **attorneys** shall have access to information designated as **confidential** or **highly confidential**, subject to any agreed exceptions.

**Outside counsel, but not in-house counsel,** shall have access to information designated as **trade secret/commercially sensitive**.

**Independent experts or consultants** , **non-party witnesses** , and **any other individual** not otherwise specifically covered by the terms of this order may be afforded access to **confidential** or **highly confidential** information in accordance with the terms that follow in paragraph 4. Further, **independent experts or consultants** may have access to **trade secret/commercially sensitive** information if such access is agreed to by the parties or ordered by the Board, in accordance with the terms that follow in paragraph 4 and 5.

4.    **Disclosure to Any Individual.**

Prior to disclosure of protected information by any party or its attorney to any individual not already provided access to such information by the terms of this order, the individual shall be informed of the existence of this order and provided with a copy to read. The individual will then be required to certify in writing that the order has been read and understood and that the terms shall be binding on the individual. No individual shall receive any protected information until the party or attorney proposing to disclose the information has received the signed certification from the individual. A form for such certification is attached to this order. The party or attorney receiving the completed form shall retain the original.

5.    **Disclosure to Independent Experts or Consultants.**

In addition to meeting the requirements of paragraph 4, any party or attorney proposing to share disclosed information with an independent expert or consultant must also notify the party which designated the information as protected. Notification must be personally served or forwarded by certified mail, return receipt requested, and shall provide notice of the name, address, occupation and professional background of the expert or independent consultant.

The party or its attorney receiving the notice shall have ten (10) business days to object to disclosure to the expert or independent consultant. If objection is made, then the parties must negotiate the issue before raising the issue before the Board. If the parties are unable to settle their dispute, then it shall be the obligation of the party or attorney proposing disclosure to bring the matter before the Board with an explanation of the need for disclosure and a report on the efforts the parties have made to settle their dispute. The party objecting to disclosure will be expected to respond with its arguments against disclosure or its objections will be deemed waived.

6.    **Responses to Written Discovery.**

Responses to interrogatories under Federal Rule 33 and requests for admissions under Federal Rule 36, and which the responding party reasonably believes to contain protected information shall be prominently stamped or marked with the appropriate designation from paragraph 1. Any inadvertent disclosure without appropriate designation shall be remedied as soon as the disclosing party learns of its error, by informing all adverse parties, in writing, of the error. The

parties should inform the Board only if necessary because of the filing of protected information not in accordance with the provisions of paragraph 12.

7.    **Production of Documents.**

If a party responds to requests for production under Federal Rule 34 by making copies and forwarding the copies to the inquiring party, then the copies shall be prominently stamped or marked, as necessary, with the appropriate designation from paragraph 1. If the responding party makes documents available for inspection and copying by the inquiring party, all documents shall be considered protected during the course of inspection. After the inquiring party informs the responding party what documents are to be copied, the responding party will be responsible for prominently stamping or marking the copies with the appropriate designation from paragraph 1. Any inadvertent disclosure without appropriate designation shall be remedied as soon as the disclosing party learns of its error, by informing all adverse parties, in writing, of the error. The parties should inform the Board only if necessary because of the filing of protected information not in accordance with the provisions of paragraph 12.

8.    **Depositions.**

Protected documents produced during a discovery deposition, or offered into evidence during a testimony deposition shall be orally noted as such by the producing or offering party at the outset of any discussion of the document or information contained in the document. In addition, the documents must be prominently stamped or marked with the appropriate designation.

During discussion of any non-documentary protected information, the interested party shall make oral note of the protected nature of the information.

The transcript of any deposition and all exhibits or attachments shall be considered protected for 30 days following the date of service of the transcript by the party that took the deposition. During that 30-day period, either party may designate the portions of the transcript, and any specific exhibits or attachments, that are to be treated as protected, by electing the appropriate designation from paragraph 1. Appropriate stampings or markings should be made during this time. If no such designations are made, then the entire transcript and exhibits will be considered unprotected.

9.    **Filing Notices of Reliance.**

When a party or its attorney files a notice of reliance during the party's testimony period, the party or attorney is bound to honor designations made by the adverse party or attorney, or non-party witness, who disclosed the information, so as to maintain the protected status of the information.

10.    **Briefs.**

When filing briefs, memoranda, or declarations in support of a motion, or briefs at final hearing, the portions of these filings that discuss protected information, whether information of the filing

party, or any adverse party, or any non-party witness, should be redacted. The rule of reasonableness for redaction is discussed in paragraph 12 of this order.

11.    **Handling of Protected Information.**

Disclosure of information protected under the terms of this order is intended only to facilitate the prosecution or defense of this case. The recipient of any protected information disclosed in accordance with the terms of this order is obligated to maintain the confidentiality of the information and shall exercise reasonable care in handling, storing, using or disseminating the information.

12.    **Redaction; Filing Material With the Board.**

When a party or attorney must file protected information with the Board, or a brief that discusses such information, the protected information or portion of the brief discussing the same should be redacted from the remainder. A rule of reasonableness should dictate how redaction is effected.

Redaction can entail merely covering a portion of a page of material when it is copied in anticipation of filing but can also entail the more extreme measure of simply filing the entire page under seal as one that contains primarily confidential material. If only a sentence or short paragraph of a page of material is confidential, covering that material when the page is copied would be appropriate. In contrast, if most of the material on the page is confidential, then filing the entire page under seal would be more reasonable, even if some small quantity of non-confidential material is then withheld from the public record. Likewise, when a multi-page document is in issue, reasonableness would dictate that redaction of the portions or pages containing confidential material be effected when only some small number of pages contain such material. In contrast, if almost every page of the document contains some confidential material, it may be more reasonable to simply submit the entire document under seal. **Occasions when a whole document or brief must be submitted under seal should be very rare**.

Protected information, and pleadings, briefs or memoranda that reproduce, discuss or paraphrase such information, shall be filed with the Board under seal. The envelopes or containers shall be prominently stamped or marked with a legend in substantially the following form:

<div align="center">

**CONFIDENTIAL**

</div>

*This envelope contains documents or information that are subject to a protective order or agreement. The confidentiality of the material is to be maintained and the envelope is not to be opened, or the contents revealed to any individual, except by order of the Board.*

13.    **Acceptance of Information; Inadvertent Disclosure.**

Acceptance by a party or its attorney of information disclosed under designation as protected shall not constitute an admission that the information is, in fact, entitled to protection. Inadvertent disclosure of information which the disclosing party intended to designate as

<div align="center">

**A009**

</div>

protected shall not constitute waiver of any right to claim the information as protected upon discovery of the error.

14.    **Challenges to Designations of Information as Protected.**

If the parties or their attorneys disagree as to whether certain information should be protected, they are obligated to negotiate in good faith regarding the designation by the disclosing party. If the parties are unable to resolve their differences, the party challenging the designation may make a motion before the Board seeking a determination of the status of the information.

A challenge to the designation of information as protected must be made substantially contemporaneous with the designation, or as soon as practicable after the basis for challenge is known. When a challenge is made long after a designation of information as protected, the challenging party will be expected to show why it could not have made the challenge at an earlier time.

The party designating information as protected will, when its designation is timely challenged, bear the ultimate burden of proving that the information should be protected.

15.    **Board's Jurisdiction; Handling of Materials After Termination.**

The Board's jurisdiction over the parties and their attorneys ends when this proceeding is terminated. A proceeding is terminated only after a final order is entered and either all appellate proceedings have been resolved or the time for filing an appeal has passed without filing of any appeal.

The parties may agree that archival copies of evidence and briefs may be retained, subject to compliance with agreed safeguards. Otherwise, within 30 days after the final termination of this proceeding, the parties and their attorneys shall return to each disclosing party the protected information disclosed during the proceeding, and shall include any briefs, memoranda, summaries, and the like, which discuss or in any way refer to such information. In the alternative, the disclosing party or its attorney may make a written request that such materials be destroyed rather than returned.

16.    **Other Rights of the Parties and Attorneys.**

This order shall not preclude the parties or their attorneys from making any applicable claims of privilege during discovery or at trial. Nor shall the order preclude the filing of any motion with the Board for relief from a particular provision of this order or for additional protections not provided by this order.

[Continued on next page]

**By Agreement of the Following, effective June 20, 2012:**

Morris E. Turek

Steven M. Weinberg

YOURTRADEMARKATTORNEY.COM
Attorneys for Applicants
Kenneth W. Erickson and Kelly J. Breaux

HOLMES WEINBERG, PC
Attorneys for Opposer
KidTribe, Inc.

**A011**

This opinion is not a
Precedent of the TTAB

Mailed: July 23, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
―――

Trademark Trial and Appeal Board
―――

*KidTribe, Inc.*
*v.*
*Kenneth W. Erickson and Kelly J. Breaux*
―――

Opposition No. 91201062
―――

Steven M. Weinberg and Michael J. Salvatore of Holmes Weinberg, PC for KidTribe, Inc.

Morris E. Turek of Yourtrademarkattorney.com for Kenneth W. Erickson and Kelly J. Breaux.

―――

Before Bucher, Wolfson and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Kenneth W. Erickson and Kelly J. Breaux ("Applicants"), two individuals, filed

jointly an application[1] to register the mark HOOPITUP in standard characters for

the following services:

> Education services, namely, classes and events in the
> nature of seminars and workshops in the field of health,
> exercise, dance and hoop dance; physical fitness
> instruction using the hoop; dance instruction using the

―――

[1] Application Serial No. 85142516, filed on September 30, 2010 under Trademark Act § 1(b), 15 U.S.C. § 1051(b), on the basis of Applicants' *bona fide* intent to use the mark in commerce.

**A012**

Opposition No. 91201062

> hoop; physical fitness instruction with children; physical fitness instruction with children using the hoop; entertainment in the nature of live hoop dance performances; training fitness instructors and teachers, namely, in the field of health, fitness and motivation; training fitness instructors and teachers, namely, in the field of health, fitness and motivation using the hoop and distribution of course material in connection therewith; educational services for children in the field of fitness, health, and nutrition, namely, party planning, arranging, organizing, conducting, and hosting social entertainment events and assemblies in the nature of physical fitness workshops for children utilizing motivation, dance and the hoop; entertainment in the nature of on-going television programs in the field of health, fitness, dance and the hoop; all of the foregoing specifically excluding the sport of basketball, in International Class 41.

KidTribe, Inc. ("Opposer") opposed registration of the mark on the ground that Opposer owns common law service mark rights in the mark HOOP IT UP and that use of Applicants' mark in connection with the identified services will cause consumers to "mistakenly believe that [Applicants' mark] … is connected to, endorsed by, sponsored by or is otherwise associated with [Opposer] or its well-known educational and entertainment services."[2] Opposer also alleges that Applicant Kelly J. Breaux worked for Opposer and, with the intent to cause confusion, began a business directly competitive with Opposer under the HOOPITUP mark.[3]

In answering the notice of opposition, Applicants admit "that their mark is identical in sound to Opposer's alleged HOOP IT UP mark."[4] They also admit "that

---

[2] Notice of opposition ¶ 6, 1 TTABvue at 5 of 6.

[3] *Id.* at ¶ 7.

[4] Answer ¶ 5, 5 TTABvue at 3 of 4.

Opposition No. 91201062

Kelly J. Breaux once worked for Opposer and later started a business under the HOOPITUP mark."[5] Applicants deny the other salient allegations of the notice of opposition. The parties have stipulated as follows:

> 1)    With respect to the issue of priority, Applicants will rely on the filing date of September 30, 2010, and will not attempt to prove an earlier first use date of the HOOPITUP trademark (App. No. 85142516).
>
> 2)    Applicants stipulate that a likelihood of confusion exists between Opposer's HOOP IT UP trademark and Applicants' HOOPITUP trademark if Opposer proves priority of use of its HOOP IT UP trademark. Accordingly, if Opposer proves priority of use in this Opposition, the Board may enter judgment against Applicant [*sic*] without further proceedings in this Opposition.
>
> 3)    Applicants hereby waive with prejudice the right to assert any defenses or affirmative defenses in this Opposition, whether or not already asserted, other than the defense that Opposer does not have priority of use.[6]

The case has been fully briefed.

I.    <u>The record</u>.

The record includes the pleadings and, by operation of Trademark Rule 2.122, 37 C.F.R. § 2.122, the application file for the opposed mark. The record also includes the following testimony and evidence:

A.    Opposer's evidence.

> 1.    Testimony deposition of Kellee McQuinn Maginness, Opposer's founder and CEO, and attached exhibits ("McQuinn")  44, 45 and 52 TTABvue.

---

[5] *Id.* ¶ 7.

[6] Joint Stipulation of the Parties, 16 TTABvue.

Opposition No. 91201062

Opposer also submitted three notices of reliance which, for the reasons discussed below, we exclude from the record.[7]

    B.    Applicants' evidence.

        1.    Notice of reliance on Opposer's objections and supplemental response to Request No. 7 of Applicants' second set of requests for admission. 33 TTABvue.

        2.    Notice of reliance on the Wikipedia entry for "Party Rock Anthem." 34 TTABvue.

        3.    Notice of reliance on the Wikipedia entry for "I Gotta Feeling." 35 TTABvue.

        4.    Notice of reliance on Opposer's supplemented responses to Applicants' second set of interrogatories. 36 TTABvue.

        5.    Notice of reliance on Opposer's responses to Applicants' second set of requests for admission. 37 TTABvue.

        6.    Notice of reliance on Opposer's supplemented responses to Requests Nos. 1-3 of Applicants' first set of requests for production of documents and things. 38 TTABvue.

        7.    Notice of reliance on a sound recording produced by Opposer during discovery. 39 and 40 TTABvue.[8]

---

[7] We note that Opposer filed, during its rebuttal period, transcripts of the depositions of Pamela Brasher, Anne Gaffney, Rita Henderson, Geoffry Iannello, and Michael Torchia (47-51 TTABvue). All of these depositions were taken on May 9, 2013, during Opposer's main testimony period, and were stricken on Applicants' motion by the Board's order of September 16, 2013 (31 TTABvue). The factor of surprise in Opposer's calling of these witnesses, which was one of the primary reasons for the Board's decision to strike the testimony, may have affected Applicants' ability to prepare for the depositions and cannot be cured merely by filing the same transcripts as rebuttal testimony instead of testimony in chief. Accordingly, we have not considered the testimony of these witnesses.

[8] Generally, a party that has obtained documents or things from another party through discovery may not make the produced documents or things of record by notice of reliance alone (except to the extent that they are admissible by notice of reliance under 37 CFR § 2.122(e)). 37 C.F.R. § 2.120(j)(3)(ii). However, in the present case, Opposer authenticated the sound recording in question in response to Request # 1 of Applicants' second set of requests for admission. 37 TTABvue. Accordingly, it may be admitted in evidence. *See* TBMP § 704.11.

Opposition No. 91201062

C.    Applicants' evidentiary objections.

Applicants, in their brief, objected to the admission of documents submitted by Opposer under notices of reliance at 41-43 TTABvue on a number of grounds. Opposer characterizes one of them (41 TTABvue) as a "Media Alert" that "was distributed to relevant media outlets in Southern California…." This document is in the nature of a press release and, as such, cannot be made of record under notice of reliance alone. Press releases are not "Printed publications … available to the general public in libraries or of general circulation among members of the public" within the meaning of 37 C.F.R. § 2.122(e). *Hard Rock Café Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1403 (TTAB 1998). Accordingly, we exclude it.

Two of the documents submitted (42 and 43 TTABvue) are offered as official records of the State of California Labor Commissioner. A copy of an official record offered under 37 C.F.R. § 1.122(e) must be one "whose authenticity is established under the Federal Rules of Evidence." Generally, an official record (other than an official record of the USPTO) must be certified as correct under Fed. R. Evid. 902(4) in order to be offered under a notice of reliance. As the copies submitted in this case have not been certified, nor otherwise authenticated, we exclude them. *See* TBMP § 704.07.

Applicants have objected to admission of Exhibit 6 to the deposition of Kellee McQuinn Maginness, which consists of two video recordings and one audio recording, on the ground that they were not timely disclosed to Applicants.[9] Opposer

---

[9] Applicants' brief at 2-3, 55 TTABvue at 3-4 of 13.

Opposition No. 91201062

produced the materials in question on March 4, 2013, more than six weeks prior to the opening of Opposer's testimony period, to supplement its discovery responses. Opposer contends that it produced the materials "as soon as those materials were discovered by Opposer."[10] Applicants contend that they were deprived of the opportunity to depose Ms. McQuinn and others with respect to the recordings, inasmuch as the discovery period had closed.[11] Yet at the time of disclosure Applicants made no motion to reopen requesting an opportunity for such discovery. Applicants' objection to admission of Exhibit 6 is overruled.

Finally, Applicants object to admission of the screenshot from Opposer's website shown on page 4 of Applicant's brief. Evidentiary materials attached to a party's brief on the case can be given no consideration unless they were properly made of record during the time for taking testimony. TBMP § 704.05(b) and cases cited therein. Accordingly, we have given no consideration to the screenshot.

II.    Standing.

Opposer's witness has testified that Opposer provides fitness training and entertainment for children, involving instruction in the use of hula hoops,[12] in the context of school assemblies and other gatherings of children;[13] and that in connection with such services Opposer uses the phrase HOOP IT UP as "a catch

---

[10] Opposer's reply brief at 10, 56 TTABvue at 11 of 16.

[11] Applicant's brief at 3, 55 TTABvue at 4 of 13.

[12] McQuinn 6:12-20, 44 TTABvue at 9 of 63.

[13] *Id.* at 8:4-7, 12:7-21, 16:8-17:12, 44 TTABvue at 11, 15 and 19 of 63.

Opposition No. 91201062

phrase slogan"[14] that is included in songs and cheers performed as part of the
services,[15] and has done so since a date prior to any use by Applicants of their mark.
Opposer has thus shown that it has a real interest in the outcome of this
proceeding. *See Ritchie v. Simpson*, 170 F.3d 1092, 1095, 50 USPQ2d 1023, 1026
(Fed. Cir. 1999); *Jewelers Vigilance Committee, Inc. v. Ullenberg Corp.*, 823 F.2d
490, 492-493, 2 USPQ2d 2021, 2023-24 (Fed. Cir. 1987). Opposer has therefore
established its standing to oppose registration of Applicants' mark. *See First
Niagara Insurance Brokers Inc. v. First Niagara Financial Group Inc.*, 476 F.3d
867, 81 USPQ2d 1375, 1378 (Fed. Cir. 2007); *Giersch v. Scripps Networks Inc.*, 90
USPQ2d 1020, 1022 (TTAB 2009) (standing established by showing of common law
rights).

III.   The merits.

Under Trademark Act § 2(d), the Patent and Trademark Office must refuse
registration of a mark that "so resembles … a mark or trade name previously used
in the United States by another and not abandoned, as to be likely, when used on or
in connection with the goods [or services] of the applicant, to cause confusion, or to
cause mistake, or to deceive." 15 U.S.C. § 1052(d). In view of the parties' stipulation,
the only element of this test that remains for trial is the question of priority.[16]

The earliest date of use that Applicants claim, for their part, is September 30,
2010, the date on which their application was filed. Applicants are entitled to rely

---

[14] *Id.* at 27:21-23, 44 TTABvue at 30 of 63.

[15] *Id.* at 12:7-21, 14:7-9, 44 TTABvue at 15 and 17 of 63; and Exhibit 6 (audio recording of
the "Hoop It Up song"), 53 TTABvue.

[16] *See* Joint Stipulation of the Parties, 16 TTABvue.

Opposition No. 91201062

on that date as their date of constructive use. *Levi Strauss & Co. v. R. Josephs Sportswear*, 28 U.S.P.Q.2d 1464, 1467 (TTAB 1993), *reconsideration denied*, 36 USPQ2d 1328 (TTAB 1994); *Larami Corp. v. Talk To Me Programs Inc.*, 36 USPQ2d 1840 (TTAB 1995). Applicants have stipulated that they will not attempt to prove an earlier date of first use.

Opposer's witness testified that Opposer first made use of the expression HOOP IT UP in connection with services at a school assembly in the "2004, 2005 school year."[17] Opposer's service consists of live performances that involve instruction in use of the hula hoop, provided primarily for the benefit and entertainment of children;[18] however, Opposer also provides instruction to adults, such as teachers, to assist them in guiding children's activities.[19] Opposer's programs have been marketed under the titles "Hoopapalooza"[20] and "Hoop-Hop."[21] One of Opposer's methods of using the expression HOOP IT UP in connection with its performances is vocal: one of Opposer's staff will shout the phrase in the form of a cheer, or sing the phrase in the context of a song. "So it's done in a big call-response like 'Are you ready to HOOP IT UP? I can't hear you. Are you ready to HOOP IT UP?' And there's a call and response going on back and forth with the kids."[22] This testimony is supported by the "Hoopapalooza Script," which includes, in a section entitled

---

[17] McQuinn 8:4-7, 44 TTABvue at 11 of 63.

[18] *Id*. at 7:8-21, 44 TTABvue at 10 of 63.

[19] *Id*. at 9:19-24, 44 TTABvue at 12 of 63.

[20] *Id*. at 18:25-19:1, 44 TTABvue at 21 of 63; *see also* Exhibit 8, 45 TTABvue at 5-8 of 117.

[21] McQuinn Exhibit 9, 45 TTABvue at 9-62 of 117.

[22] McQuinn 8:15-23; *see also id*. at 19:4-15, 44 TTABvue at 11 and 22 of 63.

Opposition No. 91201062

"Part 3: HOOP IT UP," the very lines "Are you ready to HOOP IT UP? I can't hear you! Are you ready to HOOP IT UP!!!"[23] The Hoopapalooza Script dates from approximately 2008.[24]

Opposer's performances are accompanied by recorded music; the music includes popular songs as well as at least one recording entitled "Hoop it up,"[25] created by Opposer's principal, Kellee McQuinn Maginness. Ms. McQuinn composed the lyrics of the song in 2008,[26] and first played a recording of the song at school assemblies "around, you know, 2008, 2009."[27] A recording of the song is of record.[28] The song is in a hip-hop style in which the words are declaimed in complex rhythms. In the course of a repetitive refrain that appears four times in the course of the song, the expression "Hoop it up" is sung at least 33 times, usually in the phrase "Hoop it up hoop hoop hoop it up yeah."[29] By means of rhythm and repetition, the phrase is given particular emphasis compared to the other lyrics of the song, with the exception of the single word "hoop" which, in itself, is sung countless times.[30]

---

[23] McQuinn Exhibit 8 at 1, 45 TTABvue at 5 of 117.

[24] McQuinn 18:10-12, 44 TTABvue at 21 of 63.

[25] McQuinn Exhibit 8, 45 TTABvue at 5-8 of 117. *See also* McQuinn Exhibit 9 (Hoop-Hop Guide Book at 23), 45 TTABvue at 31 of 117.

[26] Opposer's supplemental responses to Interrogatory No. 3, Applicants' notice of reliance at 35 TTABvue.

[27] McQuinn 45:22-25; *see also id.* at 29:11, 44 TTABvue at 48 and 32 of 63.

[28] McQuinn Exhibit 6 (audio recording KT00066).

[29] The lyrics are set forth in McQuinn Exhibit 7, 46 TTABvue at 3-4 of 117; however, the lyric sheet does not indicate the extent of repetition of the phrase "Hoop it up hoop hoop hoop it up yeah."

[30] Another recording of the song (with different music) is also of record (Applicants' notice of reliance at 40 TTABvue), although it apparently was produced after 2010 and Opposer does not rely on it to demonstrate priority. While the lyrics of the two versions are essentially

Opposition No. 91201062

Opposer has made of record a video recording of a 2006 television interview of Ms. McQuinn on ABC7 News (Chicago), in which, in discussion with the anchorwoman, Ms. McQuinn interjects, in a raised voice, "we hoop it up," pumping her fist twice and making a dance move.[31] She then joins some children and begins a demonstration by declaiming rhythmically, "Alright let's hoop it up everybody grab your hoop here we go."[32] Also of record is an E! Network video segment from January 2006 in which Ms. McQuinn leads children in exercise and explains "six tips for a healthy 2006." "Tip number 3: you've got to hoop it up. You've got to make exercise fun."[33]

Finally, Opposer has made of record two forms of written materials that include reference to the phrase "hoop it up" and have been distributed to customers.[34] The first is the "Hoop-Hop Guide Book," a lengthy manual of instructions for an exercise program.[35] Ms. McQuinn described this as "our curriculum guidebook," saying, "when I do a teacher training … this is the teaching resource. So everything that the teacher needs to implement the ongoing KidTribe program…."[36] Part 4 of the

---

the same, in the later recording the chant "Hoop it up hoop hoop hoop it up" has less prominence and has been replaced by many iterations of the phrase "All I wanna do is hoop it up."

[31] McQuinn Exhibit 6 (video recording KT00067 at 1:57-2:02).

[32] *Id.* It is not clear from the video whether these words are actually spoken by Ms. McQuinn or are part of the recorded music that begins playing at that point.

[33] McQuinn Exhibit 6 (video recording KT00068 at 1:43-46).

[34] We do not discuss here the "Hoop it up" lyric sheet or the "Hoopapalooza Script," as both appear to be for distribution only to Opposer's personnel.

[35] McQuinn Exhibit 9, 45 TTABvue at 9-62 of 117.

[36] McQuinn 20:22-21:3, 44 TTABvue at 23 of 63.

Opposition No. 91201062

guide book is entitled "Hoop It Up!" These words appear as the chapter heading in a rectangular carrier at the beginning of Part 4, followed by the bold caption "Are you ready to HOOP IT UP?"[37] There follow 15 pages of instructions for hula hoop exercises. Immediately following is a section entitled "Expectations and Limits," which includes instructions for maintaining control of a crowd of children:

> By enthusiastically asking the following questions, the kids' answers affirm that they know the appropriate conduct. Encourage them to answer with feeling. Have fun with it... pretend you're a drill sergeant (a nice one, though):
>
> -    What class is this?
>
> -    Is this scream your head off like a crazy person class?
>
> -    Is this run around the playground class?
>
> ...
>
> -    Is it OK to fight or be mean?
>
> -    Is it OK to make fun of someone?
>
> -    Is it OK to have fun?
>
> -    Are you ready to have fun?
>
> -    I can't hear you. ARE YOU READY TO HAVE FUN?
>
> -    ARE YOU READY TO HOOP IT UP?[38]

Another section of Part 4, entitled "Self-Expression Exercises," includes instructions for four exercises, one of which is entitled "Hoop It Up":

---

[37] Exhibit 9 at 27, 45 TTABvue at 35 of 117.

[38] *Id.* at 45, 45 TTABvue at 53 of 117.

Opposition No. 91201062

These exercises do wonders for the emotional life of its participants. Kids support, witness, and respect each other as they all express their unique authenticity.

**Hoop It Up**

Form a circle with the class, with everyone holding their hoops in front of them and tapping the hoop on the floor to the beat of the song. Everyone chants "Hoop it up! Hoop it up!" Meanwhile 1-4 hoopers enter the circle and show off their most amazing trcks [sic] for 30-60 seconds. Students can pass but must participate as a supportive audience member. *Integration: Confidence Building, Individual Artistic Expression, Acceptance and Respect, Witnessing, Supporting, Inspiring One Another.*[39]

Finally, Opposer has made of record copies of the front and back covers of a DVD entitled "Hoopersize with Miss Kellee."[40] The text on the back cover begins as follows:

**get up, stand up and put your hands up**
**'cuz HOOPER-SIZE is in the house**

Hoop it up with Miss Kellee and the KidTribe Crew in this action packed fitness frenzy that's so much fun it feels like a party!

Opposer's characterization of its use of the mark HOOP IT UP is based upon the testimony of its one witness, Opposer's principal Ms. McQuinn. Applicants contend that Ms. McQuinn's testimony is "dubious" and lacking in veracity.[41] Applicants point out that in response to discovery requests, Opposer produced a sound recording of the song "Hoop it up" marked KT00065.[42] When, in the course of

---

[39] *Id.* at 52, 45 TTABvue at 60 of 117.

[40] McQuinn Exhibit 10, 44 TTABvue at 63-64 of 117.

[41] Applicant's brief at 11, 55 TTABvue at 12 of 13.

[42] Made of record under Applicants' notice of reliance, 40 TTABvue.

Opposition No. 91201062

discovery, Applicants argued that this recording could not have been made prior to 2011 (*i.e.*, a date later than Applicants' filing date), Opposer admitted that the recording "was mistakenly produced by Opposer as evidence of prior use,"[43] and thereafter placed no reliance on it. Applicants characterize Opposer, in this situation, as "caught in a lie."[44] We see nothing in this sequence of events that would indicate that Opposer or its principal is lacking in veracity. Opposer subsequently supplied to Applicants and made of record another sound recording of the "Hoop it up" song which, according to Ms. McQuinn, she created in 2008[45] and which, she admitted, was "not fully produced at all."[46] With respect to the timing of the disclosure of this recording, Applicants argue, "This would have given Opposer plenty of time to fabricate the musical sound recording in Exhibit 6, especially considering that the recording was only a rough and unmastered production that was 'not fully produced at all.'"[47] Lacking a better foundation, Applicants' contention that the recording was fabricated is, to say the least, a bald one, and does not persuade us to view Ms. McQuinn's testimony as "extremely difficult to believe."[48] Moreover, there is nothing about the quality of the recording in question to render implausible Ms. McQuinn's testimony that she used the recording as

---

[43] Opposer's supplemental response to request for admission No. 7.

[44] Applicants' brief at 9, 55 TTABvue at 10 of 13.

[45] McQuinn 14:7-9, 44 TTABvue at 17 of 63; and Exhibit 6, KT00066. Ms. McQuinn testified that she composed the lyrics and co-wrote the music in 2008.

[46] *Id.* at 29:8-12, 44 TTABvue at 32 of 63.

[47] Applicants' brief at 10, 55 TTABvue at 11 of 13.

[48] *Id.*

**A024**

Opposition No. 91201062

musical accompaniment for her presentations at school assemblies in 2008 or 2009.[49]

Applicants argue that the Board should give no probative value to the written lyrics of the "Hoop it up" song on the basis of Opposer's admission that the recording of the song marked KT00065 was not "evidence of prior use,"[50] arguing that "The lyrics are clearly set to the music and undoubtedly would not have preexisted the music."[51] This is a *non sequitur*. We see no reason why lyrics cannot exist prior to the music to which they are set.

Applicants seek to cast doubt on the "Hoopapalooza Script" on the ground that it includes a reference to a popular song that was released in May, 2009.[52] Ms. McQuinn testified that the script was created "around the 2008 realm."[53] This minor error hardly undermines the witness's reliability. Her answer, by its nature, expressed some degree of uncertainty and the witness clarified her answer by saying that the script was created in the period "when [Applicant] Kelly [Breaux] was starting to take the mic, so to speak, and perform the events without me."[54] Applicants' suggestion that the script "could have been created sometime after the September 30, 2010 filing date of Applicants' application"[55] is pure speculation.

_____

[49] McQuinn 45:25, 44 TTABvue at 48 of 63.

[50] *See* fn.42 above.

[51] Applicants' brief at 8, 55 TTABvue at 9 of 13.

[52] *Id*. at 6, 55 TTABvue at 7 of 13.

[53] McQuinn 18:7-22, 44 TTABvue at 21 of 63.

[54] *Id*.

[55] Applicants' brief at 6, 55 TTABvue at 7 of 13.

Opposition No. 91201062

With respect to the "Hoop-Hop Guide Book," Applicants point out that there are two versions of it in the record which, according to Ms. McQuinn's testimony, were created in 2004 and 2008 respectively.[56] Applicants ask, "So, why is there no mention of HOOP IT UP in the original 2004 version of the curriculum guidebook? … If the phrase HOOP IT UP was a cornerstone of Opposer's live shows back in 2004, it most certainly would have been in a curriculum guidebook that instructs teachers on how to fully implement the KidTribe program."[57] Even though Opposer claims to have commenced use of the mark HOOP IT UP during the "2004, 2005 school year," the possible reasons for the mark's absence from a particular marketing document are too numerous for speculation. If anything, the two versions of the guidebook illustrate that Opposer's marketing materials evolved between 2004 and 2008.[58]

With respect to the two video clips included in McQuinn Exhibit 6 (ABC7 New Chicago and E! Network Style On-Demand), Applicants argue:

> these uses of HOOP IT UP do not function to indicate the source of Opposer's hula-hooping fitness and exercise programs. They are just motivational statements no different than a coach urging his players to "Give it your all," cheerleaders shouting "Go team!" from the sidelines, or the umpire yelling "Play ball!" at the commencement of a baseball game. There is simply no evidence from which one could conclude that these uses of HOOP IT UP as a

---

[56] McQuinn 21:7-10, 44 TTABvue at 24 of 63; Applicants' brief at 6, 55 TTABvue at 7 of 13. The 2008 guidebook is McQuinn Exhibit 9, 45 TTABvue at 9-62 of 117; Applicants made the 2004 guidebook of record as McQuinn Exhibit 11 during cross-examination, 45 TTABvue at 65-117 of 117.

[57] Applicants' brief at 6-7, 55 TTABvue at 7-8 of 13.

[58] We note -- but see no support for -- Applicants' contention that the 2008 guidebook was fabricated for purposes of trial. Applicants' brief at 7, 55 TTABvue at 8 of 13.

**A026**

Opposition No. 91201062

> verb would be perceived by ordinary people as a slogan or tagline used exclusively by Opposer to advertise and sell its services.[59]

Similarly, with respect to the cover of the DVD "Hoopersize with Miss Kellee,"[60]

Applicants argue:

> This use of HOOP IT UP clearly does not function as a trademark, nor would it be recognized as a trademark by the average consumer. It is merely used as a verb and is not differentiated in terms of size, font, or color from any of the other words in the paragraph.[61]

Applicants also point out that:

> there is absolutely no evidence in the record as to how many DVDs were sold, how long the DVD was on the market, whether the DVD is currently available to the public, or whether the DVD was available for sale immediately preceding the filing of Applicants' application for HOOPITUP. In fact, there is no evidence in the record as to whether even a single copy of the DVD has ever been sold or distributed to the public.[62]

After careful consideration of all of the evidence and arguments of record, we find that Opposer has substantiated its claim of prior use of the designation HOOP IT UP to distinguish and identify its services and to identify the source thereof, as contemplated by the definition of "service mark" in Section 45 of the Trademark Act, 15 U.S.C. § 1127. In particular, we find that the manner in which the phrase HOOP IT UP has been vocalized in live performances and has been presented in audio recordings used during live performances constitutes use of Opposer's service

---

[59] Applicants' brief at 9, 55 TTABvue at 10 of 13.

[60] McQuinn Exhibit 10, 44 TTABvue at 63-64 of 117.

[61] Applicants' brief at 5, 55 TTABvue at 6 of 13.

[62] *Id.*

Opposition No. 91201062

mark. *In re Red Robin Enterprises, Inc.*, 222 USPQ 911, 913-14 (TTAB 1984) (a mark displayed during rendition of entertainment services was "used in the sale … of services" as required by definition of "service mark" in Trademark Act § 45); *accord, In re Eagle Fence Rentals, Inc.*, 231 USPQ 228 (TTAB 1986); *In re Metriplex Inc.*, 23 USPQ2d 1315 (TTAB 1992). The evidence, discussed above, shows that Opposer played one or more recordings of the "Hoop it up" song during its exercise instruction programs prior to September 30, 2010; and that Opposer's personnel vocalized the expression "Hoop it up" and led program participants in call-and-response chants of "Hoop it up" prior to that date. We find that the salient, emphatic and repetitive vocalization of HOOP IT UP in such contexts effectively distinguished Opposer's services in such a way as to indicate their source. We also find that printed displays of HOOP IT UP in Opposer's "Hoop-Hop Guide Book," as used in connection with instruction of educational professionals, constitute service mark use, in particular the displays of the mark on p. 27 of the guide, on which "Hoop It Up!" appears at the top of the page in a rectangular carrier and in the bold caption "Are you ready to HOOP IT UP?"; and that the "Hoop-Hop Guide Book" was distributed to educational professionals in connection with Opposer's educational services prior to September 30, 2010.

Applicants have stipulated that their mark HOOPITUP so resembles Opposer's mark as to be likely to cause confusion. Opposer has demonstrated, and we find, that Opposer's mark HOOP IT UP is a mark "previously used in the United States

Opposition No. 91201062

… and not abandoned," within the meaning of Trademark Act Section 2(d), 15 U.S.C. § 1052(d). Accordingly, we enter judgment for Opposer in this proceeding.

    ***Decision:*** The opposition is sustained and registration is refused.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| | |
|---|---|
| In re Serial No. 85142516 | Opposition No._____ |
| | **NOTICE OF OPPOSITION** |
| KIDTRIBE, INC., | |
| Opposer, | |
| v. | |
| KELLY J. BREAUX, an individual, and KENNETH W. ERICKSON, an individual, | |
| Applicants. | |

TO:     ASSISTANT COMMISSIONER FOR TRADEMARKS
       **BOX TTAB –FEE**
       2900 Crystal Drive
       Arlington, VA 22202-3513

Opposer KidTribe, Inc. ("KidTribe"), a corporation organized and existing under the laws

of the State of California, believes that it would be damaged by registration of the above-

referenced mark, and hereby opposes the same.  As grounds for this Opposition, KidTribe

respectfully alleges as follows:

1.     Opposer KidTribe is a corporation organized and existing under the laws of the

State of California having a place of business at 3435 Ocean Park Boulevard, Suite 107-438,

Santa Monica, CA 90405.

2.     KidTribe has made extensive, exclusive and continuous use of the service mark

HOOP IT UP  (the "KidTribe Mark") in various forms at common law since at least as early as

2007 in connection with educational services in the nature of providing classes, seminars, and

workshops in the field of child education, health, fitness and motivation using the hoola-hoop,

and entertainment in the nature of live music concerts, conducting assemblies in the field of

1

**A030**

health and fitness for children, conducting parties for children, and live show performances featuring music, songs and dialogue incorporating the hoola-hoop as the focus of each of the foregoing; and of HOOP IT UP as a trademark for recorded educational and entertainment performances.

3.      The mark subject to this Opposition is HOOPITUP, Serial No. 85142516 (the "Opposed Mark") for "Education services, namely, classes and events in the nature of seminars and workshops in the field of health, exercise, dance and hoop dance; physical fitness instruction using the hoop; dance instruction using the hoop; physical fitness instruction with children; physical fitness instruction with children using the hoop; entertainment in the nature of live hoop dance performances; training fitness instructors and teachers, namely, in the field of health, fitness and motivation; training fitness instructors and teachers, namely, in the field of health, fitness and motivation using the hoop and distribution of course material in connection therewith; educational services for children in the field of fitness, health, and nutrition, namely, party planning, arranging, organizing, conducting, and hosting social entertainment events and assemblies in the nature of physical fitness workshops for children utilizing motivation, dance and the hoop; entertainment in the nature of on-going television programs in the field of health, fitness, dance and the hoop; all of the foregoing specifically excluding the sport of basketball" in International Class 041.

4.      By virtue of KidTribe's continuous and exclusive use of its educational and entertainment services under the KidTribe Mark, the KidTribe Mark has come to be recognized by the relevant public as identifying educational and entertainment services and commercially related products and services as having their origin in or as otherwise being associated exclusively with KidTribe.

5.    The Opposed Mark is identical in sound and meaning to the KidTribe Mark, and is used for services that are commercially related to KidTribe's educational and entertainment services.

6.    Accordingly, it is likely that consumers will mistakenly believe that the Opposed Mark for the International Class 041 services is connected to, endorsed by, sponsored by or is otherwise associated with KidTribe or its well-known educational and entertainment services.

7.    Applicant Kelly J. Breaux worked for Opposer KidTribe, and with the intent to cause confusion, and without any notice to or permission of KidTribe, and with knowledge of KidTribe's prior rights in the HOOP IT UP marks, began a business directly competitive with KidTribe and in connection with same adopted the mark HOOPITUP for the purpose of wrongfully benefitting from the recognition and goodwill of that mark as associated with KidTribe and for causing confusion.

8.    The registration of the Opposed Mark for International Class 041 would be inconsistent with KidTribe's rights in its HOOP IT UP Mark and will cause damage to KidTribe.

WHEREFORE, KidTribe respectfully prays that registration of the Opposed Mark not be permitted in International Class 041.


DATED this 9th day of August, 2011.

Respectfully submitted,

By:/Steven M. Weinberg/

Steven M. Weinberg
Holmes Weinberg, PC
30765 Pacific Coast Highway, Suite 411
Malibu, CA 90265
Tel:  (310) 457-6100
Email: smweinberg@holmesweinberg.com

Counsel for Opposer KidTribe, Inc.

3

**A032**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

|  |  |  |
|---|---|---|
| **KidTribe, Inc.** | ) | |
| Opposer, | ) | |
|  | ) | |
| v. | ) | Opposition No._____**91201062**_____ |
|  | ) | |
| **Kenneth W. Erickson and** | ) | |
| **Kelly J. Breaux** | ) | |
| Applicants. | ) | |

## APPLICANTS' ANSWER TO OPPOSER'S
## NOTICE OF OPPOSITION

In answer to the Notice of Opposition filed by Opposer KidTribe, Inc. ("Opposer"),

Applicants Kenneth W. Erickson and Kelly J. Breaux ("Applicants") state the following:

1.    Applicants are without knowledge or information sufficient to form a belief as to

the truth of the allegations set forth in Paragraph 1 of the Notice of Opposition and, accordingly,

deny each and every allegation set forth therein.

2.    Applicants are without knowledge or information sufficient to form a belief as to

the truth of the allegations set forth in Paragraph 2 of the Notice of Opposition and, accordingly,

deny each and every allegation set forth therein.

3.    Applicants admit the allegations set forth in Paragraph 3 of the Notice of

Opposition.

4.    Applicants are without knowledge or information sufficient to form a belief as to

the truth of the allegations set forth in Paragraph 4 of the Notice of Opposition and, accordingly,

deny each and every allegation set forth therein.

## A033

5.      Applicants admit that their mark is identical in sound to Opposer's alleged HOOP IT UP mark. Applicants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 5 of the Notice of Opposition and, accordingly, deny each and every remaining allegation set forth therein.

6.      Applicants deny each and every allegation set forth in Paragraph 6 of the Notice of Opposition.

7.      Applicants admit that Kelly J. Breaux once worked for Opposer and later started a business under the HOOPITUP mark. Applicants deny each and every remaining allegation set forth in Paragraph 7 of the Notice of Opposition.

8.      Applicants deny each and every allegation set forth in Paragraph 8 of the Notice of Opposition.

<div align="center">

**DENIAL OF PRAYER FOR RELIEF**

</div>

Applicants deny that Opposer is entitled to any of the relief sought in its prayer for relief against Applicants.

Respectfully submitted,

KENNETH W. ERICKSON
KELLY J. BREAUX

By:_____/met20/_____          Dated:_____9/16/2011_____
Morris E. Turek
YourTrademarkAttorney.com
167 Lamp & Lantern Village, #220
Chesterfield, MO 63017-8208
Tel: (314) 749-4059
Toll-Free: (800) 974-4827
Fax: (800) 961-0363
morris@yourtrademarkattorney.com

<div align="center">

2

**A034**

</div>

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2011)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 85142516
### Filing Date: 09/30/2010

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85142516 |
| **MARK INFORMATION** | |
| **\*MARK** | HOOPITUP |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | HOOPITUP |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | Erickson, Kenneth W. |
| **\*STREET** | 9715 Venice Blvd. #4 |
| **\*CITY** | Los Angeles |
| **\*STATE** (Required for U.S. applicants) | California |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants only) | 90034 |
| **PHONE** | 323-600-5341 |
| **EMAIL ADDRESS** | tubacken@yahoo.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | individual |
| **COUNTRY OF CITIZENSHIP** | United States |

| APPLICANT INFORMATION | |
|---|---|
| **\*OWNER OF MARK** | Breaux, Kelly J. |
| **\*STREET** | 8555 Cashio St. #PH1 |
| **\*CITY** | Los Angeles |
| **\*STATE** (Required for U.S. applicants) | California |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants only) | 90035 |
| **PHONE** | 323-449-0938 |
| **EMAIL ADDRESS** | kellybreauxfitness@gmail.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | individual |
| **COUNTRY OF CITIZENSHIP** | United States |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | |
| **\*IDENTIFICATION** | Services, namely, classes and events in the field of health, exercise, dance and hoop dance; fitness instruction using the hoop; dance instruction using the hoop; fitness instruction with children; fitness instruction with children using the hoop; entertainment in the nature of live hoop dance performances; training fitness instructors and teachers, namely, in the field of health, fitness and motivation; training fitness instructors and teachers, namely, in the field of health, fitness and motivation using the hoop and distribution of course material in connection therewith; educational services for children in the field of fitness, health, and nutrition, namely, parties, events and assemblies for children utilizing motivation, dance and the hoop; entertainment in the nature of on-going television programs in the field of health, fitness, dance and the hoop; all of the foregoing specifically excluding the sport of basketball. |

**A036**

| FILING BASIS | SECTION 1(b) |
|---|---|
| **CORRESPONDENCE INFORMATION** | |
| **NAME** | Kelly J. Breaux |
| **STREET** | 8555 Cashio St. #PH1 |
| **CITY** | Los Angeles |
| **STATE** | California |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 90035 |
| **PHONE** | 323-449-0938 |
| **EMAIL ADDRESS** | kellybreauxfitness@gmail.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **FEE INFORMATION** | |
| **NUMBER OF CLASSES** | 1 |
| **FEE PER CLASS** | 325 |
| ***TOTAL FEE DUE** | 325 |
| ***TOTAL FEE PAID** | 325 |
| **SIGNATURE INFORMATION** | |
| **SIGNATURE** | /Ken Erickson/ |
| **SIGNATORY'S NAME** | Kenneth W. Erickson |
| **SIGNATORY'S POSITION** | Owner |
| **DATE SIGNED** | 09/30/2010 |
| **SIGNATURE** | /Kelly Breaux/ |
| **SIGNATORY'S NAME** | Kelly J. Breaux |
| **SIGNATORY'S POSITION** | Owner |
| **DATE SIGNED** | 09/30/2010 |

# HOOPITUP

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 86347446
### Filing Date: 07/24/2014

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86347446 |
| **MARK INFORMATION** | |
| ***MARK** | HOOP IT UP |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | HOOP IT UP |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| ***OWNER OF MARK** | KidTribe, Inc. |
| **INTERNAL ADDRESS** | Suite 107-438 |
| ***STREET** | 3435 Ocean Park Blvd. |
| ***CITY** | Santa Monica |
| ***STATE** (Required for U.S. applicants) | California |
| ***COUNTRY** | United States |
| ***ZIP/POSTAL CODE** (Required for U.S. applicants only) | 90405 |
| | |

**A039**

| PHONE | 310-457-6100 |
|---|---|

## LEGAL ENTITY INFORMATION

| TYPE | corporation |
|---|---|
| STATE/COUNTRY OF INCORPORATION | California |

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| INTERNATIONAL CLASS | 041 |
|---|---|
| * IDENTIFICATION | Education services, namely, classes and events in the nature of seminars and workshops in the field of health, exercise, dance and hoop dance; physical fitness instruction using the hoop; dance instruction using the hoop; physical fitness instruction with children; physical fitness instruction with children using the hoop; entertainment services in the nature of live hoop dance performances; training fitness instructors and teachers, namely, in the field of health, fitness and motivation; training fitness instructors and teachers, namely, in the field of health, fitness and motivation using the hoop and distribution of course material in connection therewith; educational services for children in the field of fitness, health, and nutrition, namely, party planning, arranging, organizing, conducting, and hosting social entertainment events and assemblies in the nature of physical fitness workshops for children utilizing motivation, dance and the hoop; all of the foregoing specifically excluding the sport of basketball |
| FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 12/31/2004 |
| FIRST USE IN COMMERCE DATE | At least as early as 12/31/2004 |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | SPE0-108478020-172309698_._HOOP_IT_UP_Specimen.pdf |
| CONVERTED PDF FILE(S) (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\863\474\86347446\xml1\APP0003.JPG |
| SPECIMEN DESCRIPTION | PDF of website at and through which applicant's services are offered. |

## ATTORNEY INFORMATION

| NAME | Steven M. Weinberg |
|---|---|
| FIRM NAME | Holmes Weinberg, PC |
| STREET | 30765 Pacific Coast Highway, Suite 411 |

**A040**

| CITY | Malibu |
|---|---|
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 90265 |
| PHONE | 310-457-6100 |
| EMAIL ADDRESS | hwtrademarks@gmail.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | Michael J. Salvatore, and all other attorneys at Holmes Weinberg, PC |

## CORRESPONDENCE INFORMATION

| NAME | Steven M. Weinberg |
|---|---|
| FIRM NAME | Holmes Weinberg, PC |
| STREET | 30765 Pacific Coast Highway, Suite 411 |
| CITY | Malibu |
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 90265 |
| PHONE | 310-457-6100 |
| EMAIL ADDRESS | hwtrademarks@gmail.com;msalvatore@holmesweinberg.com; smweinberg@holmesweinberg.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |

## SIGNATURE INFORMATION

**A041**

# HOOP IT UP



| | |
|---|---|
| **To:** | KidTribe, Inc. (hwtrademarks@gmail.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86347446 - HOOP IT UP - N/A |
| **Sent:** | 11/5/2014 9:45:29 PM |
| **Sent As:** | ECOM104@USPTO.GOV |
| **Attachments:** | Attachment - 1<br>Attachment - 2<br>Attachment - 3 |

### UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)
### OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION

| | |
|---|---|
| **U.S. APPLICATION SERIAL NO.** 86347446<br><br>**MARK:** HOOP IT UP | **\*86347446\*** |
| **CORRESPONDENT ADDRESS:**<br>  STEVEN M. WEINBERG<br>  HOLMES WEINBERG, PC<br>  30765 PACIFIC COAST HWY STE 411<br>  MALIBU, CA 90265-3646 | **CLICK HERE TO RESPOND TO THIS** l<br>http://www.uspto.gov/trademarks/teas/response_<br><br>VIEW YOUR APPLICATION FILE |
| **APPLICANT:** KidTribe, Inc. | |
| **CORRESPONDENT'S REFERENCE/DOCKET NO :**<br>  N/A<br>**CORRESPONDENT E-MAIL ADDRESS:**<br>  hwtrademarks@gmail.com | |

## OFFICE ACTION

### STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.

**ISSUE/MAILING DATE: 11/5/2014**

The referenced application has been reviewed by the assigned trademark examining attorney. Applicant must respond timely and completely to the issue(s) below. 15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

**Specimen Refusal**

## A044

Registration is refused because the specimen does not show the applied-for mark in the drawing in use in commerce. Trademark Act Sections 1 and 45, 15 U.S.C. §§1051, 1127; 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a), 1301.04(g)(i). Specifically, the specimen displays the mark as GET FIT. HAVE FUN. HOOP IT UP! However, the drawing displays the mark as HOOP IT UP.

The drawing shows the mark sought to be registered, and must be a substantially exact representation of the mark as used on or in connection with the goods and/or services, as shown by the specimen. 37 C.F.R. §2.51(a); TMEP §807.12(a). Because the mark in the drawing is not a substantially exact representation of the mark on the specimen, applicant has failed to provide the required evidence of use of the applied-for mark in commerce on or in connection with applicant's goods and/or services. *See* TMEP §807.12(a).

An application based on Trademark Act Section 1(a) must include a specimen showing the applied-for mark in use in commerce for each international class of goods and/or services identified in the application or amendment to allege use. 15 U.S.C. §1051(a)(1); 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a).

Examples of specimens for goods include tags, labels, instruction manuals, containers, photographs that show the mark on the actual goods or packaging, and displays associated with the actual goods at their point of sale. *See* TMEP §§904.03 *et seq.* Webpages may also be specimens for goods when they include a picture or textual description of the goods associated with the mark and the means to order the goods. TMEP §904.03(i). Examples of specimens for services include advertising and marketing materials, brochures, photographs of business signage and billboards, and webpages that show the mark used in the actual sale, rendering, or advertising of the services. *See* TMEP §1301.04(a), (h)(iv)(C).

Regarding whether applicant may submit an amended drawing in response to this refusal, applicant is advised that the drawing of a mark can be amended only if the amendment does not materially alter the mark as originally filed. 37 C.F.R. §2.72(a)(2); *see* TMEP §§807.12(a), 807.14 *et seq.* In this case, amending the mark in the drawing to conform to the mark on the specimen would be a material alteration and would not be accepted, because the difference between the mark in the specimen and the drawing is significant and each mark creates a different commercial impression. Specifically, the specimen of use indicates that the wording "HOOP IT UP" is part of a unitary phrase that also directs consumers to "GET FIT" and "HAVE FUN." However, this differs from the commercial impression of the proposed mark on the drawing, which only conveys to consumers that they should "HOOP IT UP." The addition of the wording "GET FIT" and "HAVE FUN" changes the meaning and commercial impression of the wording "HOOP IT UP."

Applicant may respond to this refusal by satisfying one of the following for each applicable international class:

(1) Submit a different specimen (a verified "substitute" specimen) that (a) was in actual use in commerce at least as early as the filing date of the application or prior to the filing of an amendment to allege use and (b) shows the applied-for mark in actual use in commerce for the goods and/or services identified in the application or amendment to allege use.

(2) Amend the filing basis to intent to use under Section 1(b), for which no specimen is required. This option will later necessitate additional fee(s) and filing requirements such as providing a specimen at a subsequent date.

For an overview of *both* response options referenced above and instructions on how to satisfy either option online using the Trademark Electronic Application System (TEAS) form, please go to

**A045**

http://www.uspto.gov/trademarks/law/J3_1.jsp.

## Search Results-Prior Pending Application
The trademark examining attorney has searched the USPTO's database of registered and pending marks and has found no similar registered marks that would bar registration under Trademark Act Section 2(d). TMEP §704.02; *see* 15 U.S.C. §1052(d). However, a mark in a prior-filed pending application may present a bar to registration of applicant's mark.

The filing date of pending U.S. Application Serial No. 85142516 precedes applicant's filing date. See attached referenced application. If the mark in the referenced application registers, applicant's mark may be refused registration under Trademark Act Section 2(d) because of a likelihood of confusion between the two marks. *See* 15 U.S.C. §1052(d); 37 C.F.R. §2.83; TMEP §§1208 *et seq.* Therefore, upon receipt of applicant's response to this Office action, action on this application may be suspended pending final disposition of the earlier-filed referenced application.

In response to this Office action, applicant may present arguments in support of registration by addressing the issue of the potential conflict between applicant's mark and the mark in the referenced application. Applicant's election not to submit arguments at this time in no way limits applicant's right to address this issue later if a refusal under Section 2(d) issues.

## Advisory-Improper Use of the Federal Registration Symbol
The specimen shows use of the federal registration symbol ® with the applied-for mark. However, the USPTO records do not show that the mark is registered. Applicant may not use the federal registration symbol until its mark is registered in the USPTO. TMEP §§906, 906.03. After registration, applicant may use this symbol in connection with the specific goods and/or services listed in the registration. *Id.*

This information is advisory only. Applicant need not respond to this issue.

Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration.

## Conclusion
If applicant has questions regarding this Office action, please telephone or e-mail the assigned trademark examining attorney. All relevant e-mail communications will be placed in the official application record; however, an e-mail communication will not be accepted as a response to this Office action and will not extend the deadline for filing a proper response. *See* 37 C.F.R. §2.191; TMEP §§304.01-.02, 709.04-.05. Further, although the trademark examining attorney may provide additional explanation pertaining to the refusal(s) and/or requirement(s) in this Office action, the trademark examining attorney may not provide legal advice or statements about applicant's rights. *See* TMEP §§705.02, 709.06.

> /Linda M. Estrada/
> Trademark Examining Attorney
> Law Office 104
> (571) 272-9298
> (571) 273-9104 Fax
> Linda.Estrada@USPTO.gov

Int. Cl.: 41

Prior U.S. Cls.: 100, 101 and 107

**United States Patent and Trademark Office**

Reg. No. 3,462,323
Registered July 8, 2008

## SERVICE MARK
## PRINCIPAL REGISTER

# KidTribe

KIDTRIBE, INC. (CALIFORNIA CORPORATION)
3435 OCEAN PARK BLVD.
SUITE 107-438
SANTA MONICA, CA 90405

FOR: EDUCATION SERVICES, NAMELY, PRO-
VIDING CLASSES, SEMINARS, AND WORKSHOPS
IN THE FIELD OF CHILD EDUCATION, HEALTH,
FITNESS AND MOTIVATION; ENTERTAINMENT
IN THE NATURE OF LIVE MUSIC CONCERTS,
CONDUCTING ASSEMBLIES IN THE FIELD OF
HEALTH AND FITNESS FOR CHILDREN, CON-
DUCTING PARTIES FOR CHILDREN, AND LIVE
SHOW PERFORMANCES FEATURING MUSIC,
SONGS AND DIALOGUE; ALL OF THE FOREGO-

ING SPECIFICALLY EXCLUDING THE SPORT OF
BASEBALL, IN CLASS 41 (U.S. CLS. 100, 101 AND
107).

FIRST USE 3-30-2002; IN COMMERCE 3-30-2002.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-861,915, FILED 4-14-2006.

ANDREA K. NADELMAN, EXAMINING ATTOR-
NEY

**A047**

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

**United States Patent and Trademark Office**

Reg. No. 3,385,481
Registered Feb. 19, 2008

## TRADEMARK
### PRINCIPAL REGISTER

# KidTribe

MAGINNESS, KELLEE MCQUINN (UNITED STATES INDIVIDUAL)
3435 OCEAN PARK BLVD.
SUITE 107
SANTA MONICA, CA 90405

FOR: PRE-RECORDED CD'S, VIDEO TAPES, LASER DISKS AND DVD'S FEATURING MUSICAL PERFORMANCES AND EXERCISE ACTIVITIES AND INSTRUCTIONS , IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-28-2004; IN COMMERCE 2-28-2004.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-861,898, FILED 4-14-2006.

ANDREA K. NADELMAN, EXAMINING ATTORNEY

**A048**

through any other means discovers a newer correspondence address for the defendant, then such address must be provided to the Board. Likewise, if by voluntary investigation or other means the plaintiff discovers information indicating that a different party may have an interest in defending the case, such information must be provided to the Board. The Board will then effect service, by publication in the Official Gazette if necessary. *See* Trademark Rule 2.118. In circumstances involving ineffective service or return of defendant's copy of the Board's institution order, the Board may issue an order noting the proper defendant and address to be used for serving that party.

**Defendant's ANSWER IS DUE FORTY DAYS after the mailing date of this order.** (*See* Patent and Trademark Rule 1.7 for expiration of this or any deadline falling on a Saturday, Sunday or federal holiday.) **Other deadlines the parties must docket or calendar are either set forth below (if you are reading a mailed paper copy of this institution order) or are included in the electronic copy of this institution order viewable in the Board's TTABVUE system at the following web address: http://ttabvue.uspto.gov/ttabvue/.**

Defendant's answer and any other filing made by any party must include proof of service. *See* Trademark Rule 2.119. **If they agree to, the parties may utilize electronic means, e.g., e-mail or fax, during the proceeding for forwarding of service copies.** *See* Trademark Rule 2.119(b)(6).

The parties also are referred in particular to Trademark Rule 2.126, which pertains to the form of submissions. **Paper submissions, including but not limited to exhibits and transcripts of depositions, not filed in accordance with Trademark Rule 2.126 may not be given consideration or entered into the case file.**

| | |
|---|---|
| Time to Answer | 9/19/2011 |
| Deadline for Discovery Conference | 10/19/2011 |
| Discovery Opens | 10/19/2011 |
| Initial Disclosures Due | 11/18/2011 |
| Expert Disclosures Due | 3/17/2012 |
| Discovery Closes | 4/16/2012 |
| Plaintiff's Pretrial Disclosures | 5/31/2012 |
| Plaintiff's 30-day Trial Period Ends | 7/15/2012 |
| Defendant's Pretrial Disclosures | 7/30/2012 |
| Defendant's 30-day Trial Period Ends | 9/13/2012 |
| Plaintiff's Rebuttal Disclosures | 9/28/2012 |
| Plaintiff's 15-day Rebuttal Period Ends | 10/28/2012 |

**As noted in the schedule of dates for this case, the parties are required to have a conference to discuss: (1) the nature of and basis for their respective claims and defenses, (2) the possibility of settling the case or at least narrowing the scope of claims or**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| | |
|---|---|
| KIDTRIBE, INC., | Opposition No. 91201062 |
| Opposer, | |
| v. | **JOINT STIPULATION OF THE PARTIES** |
| KENNETH W. ERICKSON and KELLY J. BREAUX, | |
| Applicants. | |

KidTribe, Inc. ("Opposer") and Kenneth W. Erickson and Kelly J. Breaux ("Applicants"), by and through their respective undersigned counsel, hereby stipulate and agree as follows:

1)       With respect to the issue of priority, Applicants will rely on the filing date of September 30, 2010, and will not attempt to prove an earlier first use date of the HOOPITUP trademark (App. No. 85142516).

2)       Applicants stipulate that a likelihood of confusion exists between Opposer's HOOP IT UP trademark and Applicants' HOOPITUP trademark if Opposer proves priority of use of its HOOP IT UP trademark.  Accordingly, if Opposer proves priority of use in this Opposition, the Board may enter judgment against Applicant without further proceedings in this Opposition.

3)       Applicants hereby waive with prejudice the right to assert any defenses or affirmative defenses in this Opposition, whether or not already asserted, other than the defense that Opposer does not have priority of use.

WHEREFORE, Opposer and Applicant respectfully request that the Trademark Trial and Appeal Board enter the proposed stipulation.

Dated:  December 17, 2012                         Respectfully submitted,

                                                                    HOLMES WEINBERG, PC

                                                                    By:   /Steven M. Weinberg/_____

**A050**

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| ESTTA Tracking number: | **ESTTA481342** |
|---|---|
| Filing date: | **07/03/2012** |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding. | 91201062 |
|---|---|
| Applicant | Defendant<br>Kenneth W. Erickson and Kelly J. Breaux |
| Other Party | Plaintiff<br>KidTribe, Inc. |

# Motion for an Extension of Answer or Discovery or Trial Periods With Consent

The Close of Discovery is currently set to close on 07/16/2012. Kenneth W. Erickson and Kelly J. Breaux requests that such date be extended for 30 days, or until 08/15/2012, and that all subsequent dates be reset accordingly.

| | |
|---|---|
| Time to Answer : | CLOSED |
| Deadline for Discovery Conference : | CLOSED |
| Discovery Opens : | CLOSED |
| Initial Disclosures Due : | CLOSED |
| Expert Disclosure Due : | 07/16/2012 |
| Discovery Closes : | 08/15/2012 |
| Plaintiff's Pretrial Disclosures : | 09/29/2012 |
| Plaintiff's 30-day Trial Period Ends : | 11/13/2012 |
| Defendant's Pretrial Disclosures : | 11/28/2012 |
| Defendant's 30-day Trial Period Ends : | 01/12/2013 |
| Plaintiff's Rebuttal Disclosures : | 01/27/2013 |
| Plaintiff's 15-day Rebuttal Period Ends : | 02/26/2013 |

The grounds for this request are as follows:

- *Parties are unable to complete discovery/testimony during assigned period*

Kenneth W. Erickson and Kelly J. Breaux has secured the express consent of all other parties to this proceeding for the extension and resetting of dates requested herein.

Kenneth W. Erickson and Kelly J. Breaux has provided an e-mail address herewith for itself and for the opposing party so that any order on this motion may be issued electronically by the Board.

# Certificate of Service

The undersigned hereby certifies that a copy of this paper has been served upon all parties, at their address record by Facsimile or email (by agreement only) on this date.

Respectfully submitted,
/met20/
Morris E. Turek
morris@yourtrademarkattorney.com
SFinkelstein@holmesweinberg.com,smweinberg@holmesweinberg.com
07/03/2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA  22313-1451**

**July 3, 2012**

PROCEEDING NO. **91201062**
**KidTribe, Inc.**

v.

**Kenneth W. Erickson and  Kelly J. Breaux**

<u>**MOTION TO EXTEND GRANTED**</u>

**By the Board:**

**Kenneth W. Erickson and  Kelly J. Breaux's** consent motion to extend, filed **Jul 03, 2012**, is granted.  Dates are reset as set out in the motion.

.oOo.

Opposition No. 91201062

earlier date of first use than its filing date of September 30, 2010.

Bearing these stipulations in mind, the Board now addresses applicants' motion to test the sufficiency of opposer's response to the following request for admission:

> **REQUEST FOR ADMISSION NO. 7**
> The music as performed in the document labeled Bates #KT00065 is based on the music from a song titled "Party Rock Anthem" by the musical group known as LMFAO.

Opposer has objected to the request as not relevant to this proceeding.

Applicants have certified that good faith efforts have been made via email correspondence to resolve this issue with opposer's counsel thereby satisfying the good faith requirement imposed under Trademark Rule 2.120(h). As to the merits of the motion, applicants contend that the request is relevant as the request goes to a song produced by opposer in response to discovery in support of opposer's claim of priority prior to September 30, 2010, that the LMFAO song was created in 2011 and that an admission would "call into question Opposer's claim of priority in the trademark being opposed by Opposer in this proceeding." *Applicants' Motion*, p. 2. Opposer contends otherwise, arguing that it has "responded, under oath, that 'the music to the song produced under Bates No. KT00065 was composed in or around March through May 2008'" and that the request for admission that is the subject of applicants' motion

2

**A053**

Opposition No. 91201062

was propounded "solely for the purpose of impeaching Opposer's prior sworn statement." *Opposer's Response*, pp. 2-3.

Fed. R. Civ. P. 36 allows a party to serve on the other requests for admission relating to "facts, the application of law to fact, or opinion about either" as well as "the genuineness of any described documents." The purpose of the rule is "to facilitate proof with respect to issues that cannot be eliminated from the case [and] to narrow the issues by eliminating those that can be." *Notes of Advisory Committee* on Fed. R. Civ. P. 36 *(*1970 Amendment).

By the parties' stipulations, the issues in this proceeding have been reduced to that of priority. Opposer has proffered, *inter alia*, a song (Bates No. KT00065) in support of its claim of priority. Applicants' Request No. 7 relates to the accuracy of the dates provided by opposer in connection with the song. Accordingly, the request is a relevant one. Opposer's objection that the sole purpose of the request is to impeach opposer and is, therefore, irrelevant to this proceeding is not well taken. The mere fact that a response to a request may have an impeaching effect on previously made statements does not necessitate a finding that the request pertains to matters that are not relevant. Furthermore, the relatively small burden placed on opposer to respond to the request is clearly outweighed by applicants' need for

3

**A054**

Opposition No. 91201062

information relating to their defense.  *See* Fed. R. Civ. P.
26(b).

In view thereof, applicants' motion is hereby **GRANTED** and
opposer is ordered to serve its response to applicants' Request
No. 7 no later than **February 6, 2013**.  As agreed to by the
parties and approved by the Board, dates are **RESET** as follows:

| | |
|---|---|
| Plaintiff's Pretrial Disclosures Due | **2/27/2013** |
| Plaintiff's 30-day Trial Period Ends | **4/13/2013** |
| Defendant's Pretrial Disclosures Due | **4/28/2013** |
| Defendant's 30-day Trial Period Ends | **6/12/2013** |
| Plaintiff's Rebuttal Disclosures Due | **6/27/2013** |
| Plaintiff's 15-day Rebuttal Period Ends | **7/27/2013** |

**IN EACH INSTANCE**, a copy of the transcript of testimony
together with copies of documentary exhibits, must be served on
the adverse party within **thirty days** after completion of taking
of testimony.  Trademark Rule 2.125.

Briefs shall be filed in accordance with Trademark Rule
2.128(a) and (b).  An oral hearing will be set only upon
request filed as provided by Trademark Rule 2.129.

* * *

4

**A055**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| | |
|---|---|
| KIDTRIBE, INC., | Opposition No. 91201062 |
| Opposer, | |
| v. | **JOINT STIPULATION TO EXTEND OPPOSER'S TRIAL PERIOD** |
| KENNETH W. ERICKSON and KELLY J. BREAUX, | |
| Applicants. | |

Opposer KidTribe, Inc. and Applicants Kenneth W. Erickson and Kelly J. Breaux hereby jointly stipulate and agree that Opposer's Trial Period be extended by eleven (11) days from April 29, 2013 to May 10, 2013, and that all subsequent dates also be extended by eleven (11) days. The extension will permit the parties to accommodate their deposition and travel schedules.

KidTribe, Inc. has secured the express consent of all other parties to this proceeding for the extension and resetting of dates requested herein, and has provided an e-mail address herewith for itself and for the opposing party so that any order on this motion may be issued electronically by the Board.

Dated: April 15, 2013

Respectfully submitted,

HOLMES WEINBERG, PC

By:  /Steven M. Weinberg/
Steven M. Weinberg
30765 Pacific Coast Highway, Suite 411
Malibu, CA 90265
Tel.: 310.457.6100
Email: smweinberg@holmesweinberg.com

Attorneys for KidTribe, Inc.

YourTrademarkAttorney.com
By:  /met20/
Morris E. Turek
167 Lamp and Lantern Village, #220
St. Louis, MO 63017-8208
morris@yourtrademarkattorney.com

Attorneys Kenneth W. Erickson and Kelly J. Breaux

**A056**



## KidTribe

is an international health and wellness
organization whose mission is to
elevate self-esteem,
create community,
and promote health
for the children in today's world.

## What We Do

We offer turn-key solutions to obesity
prevention through providing an environment
where it's hip to be healthy.

We fructify fitness by producing cutting-edge
physical activity content,
nutrition education,
staff training, and support.

We create community through KidTribe's
concert events and assemblies.

We motivate kids to take charge of their health.

We change lives.

## Integrating

Education, Entertainment, and Exercise.
Focus, Freedom, and Fun.
Leadership, Learning, and Living.

Embracing the total child.
Empowering the adults who guide them.
Impacting the whole world.
For a happier, healthier tomorrow.



**A057**



KidTribe
3435 Ocean Park Blvd.
Suite 107 - PMB 433
Santa Monica, CA 90405



# it's a movement.
kidtribe.com

# 310.455.0580



## BE PART OF THE TRIBE!

### The New Paradigm of Physical Activity

KidTribe's trend setting programs are one-of-a-kind... a cornucopia of progressive activities compliant with the latest NASPE physical education content standards.

Featured on TV with Discovery Kids, PBS, ABC7, BBC, and E!, KidTribe has impacted the lives of over half a million kids. Exercise, nutrition and self-esteem are at the root of KidTribe's message, helping to build both healthy bodies and healthy minds.

These programs were designed specifically for the children of this new millennium.

.... and the results are a smiling, sweaty success!

### Implementation Made Easy

Highly adaptable, KidTribe wins the hearts of all who participate. Suitable for Grades K – 8.

- School Celebrations and Assemblies
- Community Outreach
- After-School Enrichment
- Breakfast and Lunch Clubs
- School Day Physical Education
- Summer Programs
- Research Development and Evaluations
- Integrated Cross-Curricular Learning
- Teacher Trainings
- Facilitation Tools
- Equipment Packages
- Fit-Kits







## Fitness Assemblies

### Hoop-A-Pa-Loo-Za!

"Hoopapalooza!" is a high-octane, wildly interactive, positively contagious concert that activates up to 350 participants at a time! Never a dry armpit in the house... Guaranteed!

KidTribe founder, Kellee McQuinn, rhymes and shines on the mike with her band of pied pipers as they hoop-it-up-to-the-max. Featuring the fabulous Food Pyramid, the 411 on H2O & the skinny on daily exercise, Miss Kellee gets the crowd going & teaches over 30 Hooper-Size moves while integrating positive messages of self-esteem, empowering choices, peer acceptance, and non-violence.

Fully loaded with KidTribe's unparalleled energy, original music, a kickin' sound system, a portable stage, and hundreds of hoops, "Hoopapalooza" rocks!

## Featured Programs

### Hooper-Size Me!™

Nicknamed *"the X-Games of hula-hooping"*, Hooper-Size Me! is KidTribe's hippest program. Participants learn dynamic tricks and revolutionary skills that strengthen, lengthen, and tone every major muscle group. It's a core-conditioning, low-impact, cardio-vascular work-out that produces major results... did you know that hooping for 10 minutes burns the same amount of calories as running a mile? Well come on in, get your hoop on, and see for yourself!

### S.L.I.M.™ – Students Living In Motion

KidTribe's signature high-energy free-style dance program moves and grooves its participants. Kids get jiggy with it as they develop a deep and lasting relationship with their bodies and music, creating a "do it yourself" form of daily exercise.

 310.455.0580

## Trainings



Inspiring, in-depth and experiential, these unforgettably fun trainings ensure immediate and successful program implementation. Affordable and adaptable, KidTribe gives teachers cutting edge activities to add to their toolboxes and create a long-lived, thriving program for the student body.

Tiered intensives of 2-3 hours, these hands-on play-shops are complemented with indispensable facilitation resources.

- Curriculum Guide-Book jam-packed with activities, games, and inspiration.
- Hooper-Size Me! DVD
- Hooper-Size Me! Music CD
- Activity Cards



## Equipment

### HooperSized-Hoops™

Made with a heavier plastic and larger diameter than flimsy toy-store hoops, KidTribe's ultra-durable Hoops last. Their unique design makes amazing tricks nearly effortless while your muscles are getting the ultimate workout. Hooper-Sized Hoop packages have what you need to get your class hooping it up. Check the website for details.

## KidTribe Fit-Kits

### Hooper-Size Me!™

This award-winning Fit-Kit includes everything you need to become a Hooper-Star! The ultra-cool, ultra-instructional DVD will knock your socks off and teach you over 30 tricks. The CD will give you the grooves you need to get hoopy. The Activity Cards are filled with tips, skills, games, and pictures. And it all comes in an indestructible case. This Fit-Kit is so fun, we might as well call it a party in a box!

shop@kidtribe.com





# get up, stand up and put your hands up 'cuz HOOPER-SIZE is in the house!

Hoop it up with Miss Kellee and the KidTribe Crew in this action packed fitness frenzy that's so much fun, it feels like a party! Become a Hooper-Star and learn over 25 amazing tricks with a super-tight music video of the epic instructional rap, "Hooper's Delight." Nicknamed the "X-Games of Hula-Hooping." Hooper-Size is cool for boys and girls, ages 6 – 60! This full-body workout is the hippest way to stay healthy, burn calories, strengthen muscles and have a blast. So come on and get your hoop on!

Sweaty smiles guaranteed.

## DVD includes:
- ○ "How to Hoop" with Dr. Hoopenstein
- ○ "Hooper's Delight" Instructional Music Video Featuring 25 Easy-to-Learn Hoop Tricks!
- ○ "Choose Your Move" Chapter Looping
- ○ Hilarious "Hooper Blooper" Outtakes
- ○ A Message from Miss Kellee

### Miss Kellee is an international
children's fitness expert and television personality who has led millions of kids to healthier, happier lives with her trend-setting programs and cutting edge-approach. The creator of KidTribe and a pioneer in preventing childhood obesity, Miss Kellee is called "the Pied Piper with a Boom Box" by the LA Times.

## also available at Kidtribe.com:
- ○ Hooper-Sized Hoops
- ○ "Hooper-Size Me!" Music CD
- ○ "What Up? Warm-Up!" DVD
- ...and much more!

**KidTribe**

**Kidtribe.com**

Contains: 1 DVD / Running time: 30 minutes / 16x9 / Color / NTSC
© 2007 KidTribe, Inc
All rights reserved. Unauthorized duplication is a violation of applicable laws.
Always consult with your physician before beginning any exercise video.

6 31597 20339 2

**A060**



**HOOP IT UP**

© KidTribe 2008

HOOP PARTY!
HOOP IT UP!

Everyday I wanna hoop
Everybody wanna hoop
Everywhere I wanna hoop
There it is
*(4 times)*

*Chorus:*
All I wanna do is hoop it up
Hooper-star, rock the house
Don't stop
*(2 times)*


Step right up
1-2 - Get infected by the hoop flu
Yoo hoo!
How do you do?
You threw me for a loop
With that hoop dee hoop
Makes me wanna skip to my lou

Yo'

Go crazy
Go hoop crazy
No lackadaizy
No but no maybe
No need to save me
Don't gotta pay me
Cuz all I wanna do is Hoop

Hooperific
Hoopalistic
Espee alla
Mostest
A toast to the
Host
Of this
HOOP HOOP PARTY!!!!

**A061**

KT00061



**HOOP IT UP**
© KidTribe 2008

Hooper heros
Super weirdos
Get inside your spinning zeros
Come and join the fun
In this
HOOP HOOP PARTY!!!!

*(Dance Break)*
Hoop it up. Hoop it up. Hoop hoop hoop hoop it up!
Hoop it up. Hoop it up. Hoop hoop hoop hoop it up!

*CHORUS*
*(2 times)*

H to the double O-P
In the hoop is
Where I gots ta be
Happy, hoopy
I'm a hoop groupie

Round and round
Never, never let it hit the ground
All right
Consider this your invite

Party time
Winding up your spine
Shake and shine
And feeling fine

At the

HOOP PARTY!
HOOP IT UP!

Everyday I wanna hoop
Everybody wanna hoop
Everywhere I wanna hoop
There it is
*(2 times)*

*CHORUS*

HOOP IT UP!

**A062**

KT00062

Document Property View KT00061-00062 7/16/2012





Wav Property View of KT00066 (New).wav HOOP IT UP RECORDING creation date of March 12,2013.





# Hoopapalooza Script

### PART 1: INTRO

We're KidTribe! And we're all about exercise!

Well let me introduce myself – my name is _____.

*********************************************************

### PART 2: WARM UP

*********************************************************

### Part 3: HOOP IT UP

HIGHLY CONFIDENTIAL

**A066**



PLAINTIFF'S
EXHIBIT NO. ____
FOR IDENTIFICATION
KIDTRIBE 912010062
DATE 5/9  RPTR: SC.

KT00055



Ready! 1-2-3- GO!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### Part 4: PEACE OUT HOOP BATTLE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### Part 5: HOOP-HOP TRICKS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### Part 5: FREE-STYLE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Part 6: PROMISE*



************************************************
*Part 7: FREE-STYLE GAMES*

**Hoop Contest**

************************************************
*Part 8: HOOPS IN PILES*

************************************************
*Part 9: SMELL CHECK*

*******************************************************

*Part 10: EXTRA ACTIVITIES*

███████
██████████████████

*******************************************************

*Part 11: PEACE OUT HANDSHAKE*

███████
██████████

████████████████████████████████████

███
██
████████

██████████████████████████████████████████████
████████████████████████████████

*******************************************************

*Part 12: CLOSING*

████████

██████████████████████████████████████████████
████████████████

Peace Out!

kidtribe.com

*******************************************************

HIGHLY CONFIDENTIAL

**A069**

KT00058

Document Property View KT00055-00058 6/11/2012



# KidTribe™

## Presents:



Hoop - Hop Guide Book
A Pied Piper's Companion
Level One

More than just a fitness program, it's a movement!



Conceived,Created, and Written by Kellee McQuinn
© KidTribe 2004 All Rights Reserved
Unauthorized Duplication is Strictly Prohibited
Under Penalty of Law

**www.kidtribe.org**

KT00001





**"If you dream about twirling a hoop, it means that you have come to the end of your troubles and abundant happiness will follow."**

- Artemidorus
The Greek Philosopher
300 B.C.

# *Index*

1. Introduction
   - KidTribe's Mission…………………………………………………………........4
   - KidTribe's Philosophy……………………………………………………………5
   - What Kids Need…………………………………………………………………...6
   - National Standards
     - Physical Education………………………………………… …..8
     - Dance Education……………………………………………………… 9

2. What's All the Hoopla About?
   - Hoop-Hop…………………………………………………………………………10
   - Hoopy Tales……………………………………………………………………….11
   - A Call to the Pied Pipers………………………………………………………...12

3. Get Ready, Get Set
   - Kid Management………………………………………………………………….14
     - Consistency Is a Virtue……………………………………………15
     - Safety First………………………………………………………16
     - Do Unto Others…………………………………………………17
     - Cross-Curriculum Ideas………………………………………….18
   - Party Time: Keeping It Fun………………………………………………………20
     - Call and Response………………………………………………....21
   - Music…………………………………………………………………… …22
   - Class Composition………………………………………………………………..24
   - Set Up…………………………………………………………………………….25

4. Hoop It Up!.........................................................................................27
   - Basic Hooping……………………………………………………………………28
   - Easy Variations…………………………………………………………………..29
   - Arm Actions………………………………………………………………………30
   - Upper Body Skills………………………………………………………………...32
   - Spins………………………………………………………………………………35
   - Movin' It………………………………………………………………………….36
   - Lower Body Skills………………………………………………………………...38
   - Jumping Through Hoops………………………………………………………….39
   - Advanced Skills…………………………………………………………………...40
   - Dances…………………………………………………………………………….41
   - Creating a Routine………………………………………………………………...42
   - Choreography Combinations……………………………………………………...43
   - Opening Circle…………………………………………………………………....44
   - Expectations and Limits…………………………………………………………..45
   - Warm-Up………………………………………………………………………….46
   - Closing Circle....………………………………………………………………….47

5. Games……………………………………………………………………………….48
   - Loco-motor Challenges…………………………………………………………...49
   - Partner and Group Games………………………………………………………...50
   - Races and Competitions…………………………………………………………...51
   - Self Expression Exercises…………………………………………………………52

6. KidTribe Contact Info……………………………………………………………….53

# The Mission
*It Speaks For Itself…*

KidTribe's mission is to elevate self-esteem, create community, and promote health for the children in today's world.

We offer Turn-Key solutions to America's obesity epidemic through delivering a cornucopia of progressive physical activity programs…

where kids discover their groove and bust a move…

where it's cool to be healthy…

where everyone's invited.

It's hip. It's happening.

And it's so much fun,

It hardly feels like exercise at all!

An integrated life-style approach...

Designed specifically for the youth of this new millennium,

we call it "Stealth Fitness"

… and the kids love it.





© 2004 KidTribe™

# Philosophy

**"One generation plants the trees; another gets the shade."**
**-Chinese Proverb**



KidTribe isn't just planting the trees.
KidTribe is the orchard.

It's a non-competitive oasis where
Each child's body, mind, and spirit can
Grow, thrive, and shine.

Children are our most valuable resource.
They are the fore-founders of the future.
And they need positive programs
So they can make positive choices.

They need role models.
They need community.
They need tools.

Integrating
Education, Entertainment, and Exercise.
Focus, Freedom, and Fun.
Leadership, Learning, and Living.

Embracing the total child.
Empowering the adults who guide them.
Impacting the whole world.
For a happier, healthier tomorrow.



# National Dance Content Standards

The National Association for Dance (NAD) constitutes the national standards for the Dance portion of the Fine Arts education requirements. The NAD has determined that a child who has proficiency in dance is literate in the language of movement and uses this natural facility as a means of communication and self-expression along with respecting the expression of others. Dancing and making dances provide the children with skills and knowledge necessary for all future learning as it stimulates their creativity, activates their minds, and gives them a way to celebrate their humanity.

### National Standards for Dance Education

*Standard 1*    The student identifies and demonstrates movement elements and skills in performing dance.

*Standard 2*    The student understands choreographic principles, processes, and structures.

*Standard 3*    The student understands that dance is a way to create and communicate meaning.

*Standard 4*    The student applies and demonstrates critical and creative thinking skills in dance.

*Standard 5*    The student demonstrates and understands dance in various cultures and historical periods.

*Standard 6*    The student makes connections between dance and healthful living.

*Standard 7*    The student makes connections between dance and other disciplines.

# HOOP-HOP



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dynamic choreography, upbeat popular music, high-energy games, and challenging tricks for every level, this class is might as well be a party!

But it's so much more…

▮▮▮▮▮▮▮▮▮. A true wellness program, Hoop-Hop complies with all of the National Standards for Physical Education as well as Dance. The goal is for children to obtain and maintain high levels of fitness so that they can carry out daily tasks without undue fatigue, respond to emergency situations, and possess sufficient energy to enjoy active and productive lifestyles

Hoop-Hop's revolutionary skills strengthen. lengthen, and tone every major muscle group. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

And there's even more…

Hoop-Hop is designed to engage all genders and generations. This activity joyously brings diverse people together. The hoop, as a metaphor, is simply a circle…. a circle that has no beginning or end…. a circle that includes everyone. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Undeniably cool and empowering, it's a stealth combination of fitness and fun for all!

Now <u>that's</u> revolutionary!

**TRADE SECRET/COMMERCIALLY SENSITIVE**          **A077**          **KT00010**

# Kid Management

Most of you have been working with, organizing, and inspiring large groups of children for some time. However, because of Hoop-Hop's high-energy nature, along with the blasting music, large numbers of participants, hoops, and other variables, special techniques need to be addressed, employed, and continually reinforced to ensure everyone's safety, success, and enjoyment.

The following pages consist of KidTribe's tried and true methods for implementing order in your classes. Explore techniques in leadership. Find what works best and use it.



**TRADE SECRET/COMMERCIALLY SENSITIVE**   **A078**                    **KT00014**



# Consistency Is a Virtue

15

© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

A079

KT00015

# Cross-Curriculum Ideas

KidTribe strives to support students in every area of their lives. More than just a fitness program, KidTribe understands that children need assistance in assimilating the abundance of information that they learn in school. Knowing that not all children learn the same way, it is important to introduce and employ concepts while they're exercising and their minds are open.

Keep it fresh. Invoke everyone's imaginations. Find out what they're learning and what subjects interest them. Then make a developmentally appropriate activity around the topic.

**Nutrition:**



**Language Arts:**



**TRADE SECRET/COMMERCIALLY SENSITIVE**    **A080**    **KT00018**

# It's Party Time: Keeping It Fun!

As mentioned before, Hoop-Hop is a fitness program stealthily disguised as a party… and you're the host!





# Call and Response

These signature Call and Response activities instantly unify and focus the group as all extraneous talking stops.



### KidTribe Cheer



### Hoop-Hop Chant



### Respect, Mon

**TRADE SECRET/COMMERCIALLY SENSITIVE** A082 **KT00021**

## Some guidelines concerning music:

- A CD can be purchased for you to use in your classes. It is an original compilation full of high-energy, positive, instructional music for easy facilitation and group hooping enjoyment.

- It is OK to choose to use different music, especially music that your group particularly relates to. However:



# Class Composition

The following is a format structure that has been proven successful with thousands of children in hundreds of Hoop-Hop classes. Of course every group will be different and have diverse needs, but if you consistently adhere to this guide, you will have greater ease in getting every goal accomplished while saving plenty of time for fun and free-play.





**TRADE SECRET/COMMERCIALLY SENSITIVE**        **A084**        **KT00024**



**TRADE SECRET/COMMERCIALLY SENSITIVE**

**A085**

KT00025



## Hip Fitness!



KidTribe in Manchester, England
Summer 2005



# Hoop It Up!

**Are you ready to HOOP IT UP?**

Make friends with your hoop! It's an instrument of joy, not perfection. Hoop-Hop is not about doing it right. It's not about mastering the skills. It's about inviting the kid inside you to come out and play… to laugh loudly… to try new things at the risk of looking foolish… to be healthy… and to feel happy!

Don't get discouraged if your hoop falls. That's just gravity doing its thing. Just keep smiling, keep trying, and learn at your own pace. It can take some time to get the feel for hooping… so be patient and fun-loving with yourself.



**TRADE SECRET/COMMERCIALLY SENSITIVE**    **A087**    **KT00027**







© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**    **A088**    **KT00028**

## Basic Skills

# Easy Variations



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

**A089**

**KT00029**

# Arm Actions



TRADE SECRET/COMMERCIALLY SENSITIVE

A090

KT00030

# Upper Body Skills

© 2004 **KidTribe™**

**TRADE SECRET/COMMERCIALLY SENSITIVE**          **A091**                    **KT00032**

# Spins



35 © 2004 KidTribe™

TRADE SECRET/COMMERCIALLY SENSITIVE  A092  KT00035

# Movin' It



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

A093

KT00036







**TRADE SECRET/COMMERCIALLY SENSITIVE**　　**A094**　　　**KT00038**

# Jumping Through Hoops



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**　　**A095**　　**KT00039**



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**    **A096**     **KT00040**

# Dances



**TRADE SECRET/COMMERCIALLY SENSITIVE**          **A097**                    **KT00041**

# Creating a Routine

Now that you've got the moves down-pat, it's time to create your own routines. Hoop-Hop routines give the group a goal to work towards as the kids show off their amazing talents to their peers, their families, and to each other. These performances, however informal, additionally help evaluate students' comprehension, abilities, and progress.





**TRADE SECRET/COMMERCIALLY SENSITIVE**

A098

KT00042

# Choreography Combinations





© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

**A099**

**KT00043**

# Opening Circle





**TRADE SECRET/COMMERCIALLY SENSITIVE**

© 2004 **KidTribe**™

A100

**KT00044**



It's very important to always warm up and stretch before any physical activity. Firstly,



**TRADE SECRET/COMMERCIALLY SENSITIVE**                    A101                    **KT00046**

# Closing Circle



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

A102

KT00047





Games are fun!



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

**KT00048**

# Loco-Motor Challenges



**TRADE SECRET/COMMERCIALLY SENSITIVE**

**KT00049**

# Partner and Group Games



© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

A105

**KT00050**



# Races and Contests

**TRADE SECRET/COMMERCIALLY SENSITIVE**    **A106**    **KT00051**

**Hoop Island**



# Self - Expression  Exercises





© 2004 **KidTribe**™

Document Property View KT00001-00054 5/31/2012

Document Properties

Description | Security | Fonts | Initial View | Custom | Advanced

Description

File: KT00001-00054 (trade secret) (Hoop-Hop Guide Book).pdf

Title: KidTribe Hoop Hop Guidebook

Author: Kellee McQuinn

Subject:

Keywords:

Created: 5/31/2012 11:53:07 PM

Modified: 7/16/2012 10:16:49 AM

Application: Microsoft Word

Additional Metadata...

Advanced

PDF Producer: Mac OS X 10.5.8 Quartz PDFContext

PDF Version: 1.5 (Acrobat 6.x)

Location: C:\resources\

File Size: 11.08 MB (11,623,287 Bytes)

Page Size: 8.50 x 11.00 in — Number of Pages: 54

Tagged PDF: No — Fast Web View: No

Help | OK | Cancel



# HOOP-HOP



"If you dream about twirling a hoop, it means that you have come to the end of your troubles and abundant happiness will follow."

- Artemidorus
The Greek Philosopher
300 B.C.

© 2004 KidTribe™

**A109**

# *Index*

1.   Introduction
   - KidTribe's Mission.................................................................................................4
   - KidTribe's Philosophy............................................................................................5
   - What Kids Need....................................................................................................6
   - National Standards
     - o   Physical Education........................................................................... ...8
     - o   Dance Education.............................................................................. 9

2.   What's All the Hoopla About?
   - Hoop-Hop...........................................................................................................10
   - Hoopy Tales........................................................................................................11
   - A Call to the Pied Pipers......................................................................................12

3.   Get Ready, Get Set
   - Kid Management..................................................................................................14
     - o   Consistency Is a Virtue..........................................................................15
     - o   Safety First...........................................................................................16
     - o   Do Unto Others.....................................................................................17
     - o   Cross-Curriculum Ideas..........................................................................18
   - Party Time: Keeping It Fun...................................................................................20
     - o   Call and Response..................................................................................21
   - Music................................................................................................................ 22
   - Class Composition...............................................................................................24
   - Set Up...............................................................................................................25

4.   Get Your Hoop On: Level 1 Skills...........................................................................27
   - Basic Hooping.....................................................................................................28
   - Easy Variations...................................................................................................29
   - Arm Actions........................................................................................................30
   - Upper Body Skills................................................................................................32
   - Spins.................................................................................................................35
   - Movin' It............................................................................................................36
   - Lower Body Skills................................................................................................38
   - Jumping Through Hoops........................................................................................39
   - Advanced Skills...................................................................................................40
   - Dances...............................................................................................................41
   - Creating a Routine...............................................................................................42
   - Choreography Combinations...................................................................................43
   - Opening Ceremony...............................................................................................44
   - Expectations and Limits........................................................................................45
   - Warm-Up............................................................................................................46
   - Cool Down..........................................................................................................47

5.   Games...............................................................................................................48
   - Locomotor Challenges..........................................................................................49
   - Partner and Group Games......................................................................................50
   - Races and Competitions........................................................................................51
   - Self Expression Exercises......................................................................................52

6.   KidTribe's Founder, Kellee McQuinn.......................................................................53

A110

# HOOP-HOP



like exercise at all! Dynamic choreography, upbeat popular music, high-energy games, and challenging tricks for every level, this class is might as well be a party!

But it's so much more...

Standards for Physical Education as well as Dance. The goal is for children to obtain and maintain high levels of fitness so that they can carry out daily tasks without undue fatigue, respond to emergency situations, and possess sufficient energy to enjoy active and productive lifestyles

While practicing locomotor, object manipulation, and isometric skills, students shed

And there's even more...

Hoop-Hop is designed to engage all genders and generations. This activity joyously brings diverse people together. The hoop, as a metaphor, is simply a circle.... a circle that has no beginning or end.... a circle that includes everyone. Integrated into the program is

Now that's revolutionary!



**TRADE SECRET/COMMERCIALLY SENSITIVE**

**A111**

# Hoopy Tales

## Hoop History

Hoops are nothing new. They've been around for thousands of years. There are records documenting that Egyptian children played with large hoops of dried grapevines more than three thousand years ago. They were also quite the rage in ancient Greece, 300 B.C. During the fourteenth century, a hooping craze swept England, and was as popular among adults as children. Everywhere in the streets people of all ages were seen hooping. Doctors of that time attributed unexplainable deaths to this widespread fad. The word hula became associated with the toy in the early 1800s when British sailors visited the Hawaiian Islands and noted the similarity between hooping and hula dancing. And then in 1957, an Australian company began making wood rings for sale in retail stores. The Pasadena toy company, Wham-O, capitalized on the idea, manufactured the hoops out of a new plastic material, and sold a staggering 24 million Hula Hoops within the first 4 months!

## What's Hooping Today



Everything old is certainly new again. Nearly 50 years after the initial American trend, hoops are now popping up everywhere. From gyms to Cirque du Soleil, the current hooping craze is gaining momentum. Fitness chains such as Bally's and Gold's Gyms offer Hoop Aerobics for adults. Originally only spotted in the "underground scene", hooping is becoming a mainstream art form. Hoop dancers can be seen on MTV, in prestigious performance companies, and in numerous national commercials.

Meanwhile, Hoop-Hop is breaking traditional molds and using hoops in a cutting-edge, new millennium fashion. KidTribe's Hoop-Hop is solving a major social health problem

## A Hoopy Future



TRADE SECRET/COMMERCIALLY SENSITIVE

A112

# It's Party Time: Keeping It Fun!

As mentioned before, Hoop-Hop is a fitness program stealthily disguised as a party… and





**TRADE SECRET/COMMERCIALLY SENSITIVE**

A113

# Call and Response

These signature Call and Response activities instantly unify and focus the group as all



**TRADE SECRET/COMMERCIALLY SENSITIVE**

A114

# Some guidelines concerning music:

- A CD is being provided for you to use in your classes. It is full of high-energy, positive, popular music and artists for your hooping enjoyment.

- It is OK to choose to use different music, especially music that your group particularly relates to. However:



**TRADE SECRET/COMMERCIALLY SENSITIVE**

**A115**

# Class Composition

The following is a format structure that has been proven successful with thousands of children in hundreds of Hoop-Hop classes. Of course every group will be different and have diverse needs, but if you consistently adhere to this guide, you will have greater ease in getting every goal accomplished while saving plenty of time for fun and free-play.





© 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

**A116**



## Get Your Hoop On

**We're ready to hoop!**



Make friends with your hoop! It's an instrument of joy, not perfection. Hoop-Hop is not about doing it right. It's not about mastering the skills. It's about inviting the kid inside you to come out and play... to laugh loudly... to try new things at the risk of looking foolish... to be healthy... and to feel happy!

Don't get discouraged if your hoop falls. That's just gravity doing its thing. Just keep smiling, keep trying, and learn at your own pace. It can take some time to get the feel for hooping... so be patient and fun-loving with yourself.



**Hoop-Hop**                        27                        © 2004 **KidTribe**™

**TRADE SECRET/COMMERCIALLY SENSITIVE**

A117





# Kellee McQuinn

*KidTribe Founder*

Kid expert and entrepreneur, Kellee McQuinn is nicknamed "...*the Pied-Piper with a Boom Box*" by the Los Angeles Times.

Dancing since she was in the womb, Kellee is the daughter of a successful dancer and began teaching at her mother's studio when she was fourteen years old.

After studying with top choreographers in New York, she headed to Colorado State University to explore her love of nature and philosophy. It was there that she began her studies for child development and dance therapy.

Caught by "the bug", McQuinn migrated west after college to pursue fame and fortune.
While studying with master artists, she was featured in several television shows, commercials, and Equity theatre productions.

But then came 9-11.
And Kellee took a long, honest look at her life.
Re-inspired, she returned to her roots... dancing with kids.

In September 2002 Kellee founded KidTribe and has single-handedly evoked a new paradigm in physical education and creative childcare.

Lovingly known as Miss Kellee by her tribe of kids, McQuinn moves thousands of children a week. Her innovative fitness programs are found in national organizations, schools, camps, parks and recreation departments, after-school programs, and at major community events.

Thirty-three years old, Kellee resides in Venice, CA with her dog, Macy. When she's not being Peter Pan, she enjoys writing poetry, making music, traveling, sipping on green tea, and sharing a hearty laugh with friends.

1      Q     And by whom?

2      A     KidTribe, Incorporated.

3      Q     And you're the founder of KidTribe.

4            Is that correct?

5      A     Yes.  Founder and CEO.

6      Q     Was there any other founder?

7      A     No.

8      Q     What is the -- when did you found KidTribe?

9      A     In September of 2002.

10     Q     And did you have a certain purpose in mind for

11     what KidTribe would do?

12     A     Yes.  KidTribe was -- the purpose of it, the

13     mission, is to create a happier, healthier world for kids.

14     We do this through events, school assemblies, teacher

15     trainings.  We create curriculum, write songs, produce and

16     direct music videos and educational musicals, keynote and

17     present in conferences, and the whole intention is to

18     create an environment where being healthy is cool, and

19     counteracting and solving the child obesity epidemic,

20     namely through hula hoops.

21     Q     So the idea is through hula hooping, one can

22     become more healthy and not be obese or at least lose some

23     weight?

24     A     Absolutely.  When you hoop for ten minutes, you

25     burn the same amount of calories as running an 8-minute

hg

**A119**

1  mile.  I personally have lost two dress sizes from hooping

2  alone.

3  **Q    Well, given the shape of my knees, so I can't run**

4  **anymore, I guess we have to start hula hooping.**

5  **     So you said that you do assemblies and educate or**

6  **conferences and teachings and a number of other**

7  **activities.  What do you mean by the term "assemblies"?**

8  A    Well, it's a live interactive performance where

9  we go to the school or the after-school program, the

10  community-based organization, whoever our client is.  We

11  partner with county offices of education, school

12  districts, after-school -- multi-site after school

13  programs, community-based organizations, the like, and we

14  go in a van filled to the brim with hula hoops and set up

15  the stage and sound system and have the hoops all out and

16  we HOOP IT UP.  We put on our show.  It's about 45 minutes

17  to 55 minutes in length, and the routine ranges from

18  warming them up to teaching them a whole bunch of tricks

19  to doing a whole bunch of activities and games to a whole

20  freestyle component, and I've worked with millions of

21  children through the years.

22  **Q    About how many assemblies do you think you've**

23  **done since you started the program?**

24  A    We do hundreds of assemblies during the school

25  year each year.  So thousands.  It's definitely into

hg

**A120**

Page 8

1   the -- I mean, a lot.

2     **Q     And at some point, did you start using the phrase**

3   **"HOOP IT UP"?**

4     A     We've been using the phrase since the first

5   assembly.

6     **Q     And when was that?**

7     A     2004, 2005 school year.  Our first client was the

8   Alhambra Unified School District, but even prior to that,

9   I was working with L.A.'s Best after-school program in our

10  training program.  So 2004, 2005 school year.

11    **Q     So it may have been sometime in 2004 is when you**

12  **first started using the phrase "HOOP IT UP"?**

13    A     Yes.  In our live shows, yes.

14    **Q     And how did you use the phrase "HOOP IT UP"?**

15    A     Well, it's an intrinsic cornerstone phrase that's

16  used throughout.  So -- I mean, there's a whole -- it's

17  certainly the big epiphany of the segue between the --

18  getting the kids started, the introduction to the actual

19  activities.  So it's done in a big call-response like "Are

20  you ready to HOOP IT UP?  I can't hear you.  Are you ready

21  to HOOP IT UP?"  And there's a call and response going on

22  back and forth with the kids.  We use the HOOP IT UP

23  throughout.  I mean, it's intrinsic catch phrase

24  throughout the entire assembly.  It's our main slogan

25  repeated over songs that are from other artists, call and

hg

**A121**

1  response between, you know, time -- even when there is no

2  music playing, even within the songs that I've written and

3  recorded and performed.

4      **Q    You also mentioned that you do educator**

5  **conferences.**

6      A    Uh-huh.

7      **Q    What are those?**

8      A    Well, whether it's for obesity education, after

9  school, anywhere from hundreds to thousands of

10 professionals will come in for additional staff

11 development, (inaudible) development, being inspired.

12 So -- and the conferences can range anywhere from one day

13 to three days in length all over the country, all over the

14 world, actually, and --

15     **Q    You don't mean every country in the world, do**

16 **you?**

17     A    No, but, I mean, I've been to conferences all

18 throughout the U.K.  I've -- you know, I've been outside

19 of the U.S. for sure, certainly in several states, and I

20 present workshops to help professionals have a

21 plug-and-play program and bring it back to their sites to

22 bring it back to their students.  I also keynote.  So I'll

23 speak to the larger general session where everyone is in

24 attendance.  I exhibit as well.

25     **Q    And do you use the term "HOOP IT UP" in any**



**A122**

1  written materials?

2     A    It's in our curriculum that we hand out to

3  teachers.  It's in our songs.  Our songs and music videos

4  also serve as additional resources for -- you know, to

5  help teachers because not every classroom teacher has the

6  same skill set that I have going in with our PE

7  curriculum, our shows, our ability to come in in large

8  groups -- especially with hula hoops -- of kids at once.

9     Q    Now, when you do these assemblies with the kids

10 and they're all using the hula hoops, do you use HOOP IT

11 UP during each of those performances?

12    A    Always have, continue to do so and will continue,

13 yes.  It's an intrinsic catch phrase used throughout.

14    Q    And is it your understanding that people

15 associate that name with you?

16    A    They absolutely do.

17    Q    When I say "you," I mean KidTribe or

18 Kellee McQuinn --

19    A    Yes.

20    Q    -- or anyone working on behalf of Kellee McQuinn?

21    A    Absolutely.

22    Q    Have there been others, in the history of

23 KidTribe, who have performed on behalf of KidTribe and

24 also used the phrase "HOOP IT UP"?

25    A    Yes.  It's -- it is a part of our show,



**A123**

Page 11

1   absolutely.

2       Q    And others who have been working for KidTribe

3   would include the two applicants in this case.

4            Is that correct?

5       A    Yes.

6       Q    And they used HOOP IT UP as well when they were

7   performing on behalf of KidTribe?

8       A    They most certainly did.

9            MR. WEINBERG:  We're going to show some short

10  videos that will be marked as exhibits.  And so we'll take

11  a minute or two to set those up.  The first is marked --

12  they're on a disc, and they're marked KT00066, KT00067,

13  and KT00068.  Why don't we just mark this as a single

14  exhibit.  That's probably the easiest way to do it.  And

15  that would be Exhibit 6.

16            (Opposer's Exhibit 6 was marked for

17            identification.)

18            (Pause in the proceedings.)

19            MR. WEINBERG:  We're going to show the video and

20  then -- the first video, and then I'll ask you some

21  questions -- a few questions and then a second video and

22  so forth.

23            MR. TUREK:  For the record, to the extent that

24  these -- 00066, 00067 and 00068 -- will be admitted to

25  evidence, I object as being produced late, outside of the

1  discovery period.

2         MR. WEINBERG:  For the record, it's my

3  understanding that these have been produced and timely.

4         (Video playing.)

5  BY MR. WEINBERG:

6      Q    Can you tell me what that was?

7      A    That was an ABC7 News interview before we

8  performed the Lollapalooza kids stage called Kidspalooza

9  in August of 2006.

10     Q    And how did you get a copy of this interview?

11     A    The news team provided me with a DVD that day.

12     Q    And this is ABC7 Chicago?

13     A    Uh-huh.

14     Q    To the best of your recollection, was that an

15  accurate --

16     A    Yes.

17     Q    -- depiction of what occurred during the

18  interview?

19     A    Yes.

20     Q    And you did use the term "HOOP IT UP"?

21     A    Yes.

22         MR. WEINBERG:  Let's look at the next video.

23         (Video playing.)

24  BY MR. WEINBERG:

25     Q    Now, can you please explain to us what we just

Page 13

1    saw as part of Exhibit 6?

2        A    That was a segment produced by E! network for

3    their Style On-Demand Web series about tips for a healthy

4    2006.

5        Q    And do you know when that was shot?

6        A    That was shot in January of 2006.

7        Q    And where was it shot?

8        A    At Madison Elementary in the -- I want to say

9    Anaheim Hills School District.  I think it's in Anaheim.

10   It's Southern California.

11       Q    How did you get a copy of the video we just saw?

12       A    The network, E! network, provided me with that

13   copy.

14       Q    And was that an accurate depiction of what they

15   gave you?

16       A    Yes.

17       Q    Have you altered that video or the video before

18   it in any way?

19       A    No.

20       Q    Now, we did stop playing it before it ended.

21            Correct?

22       A    Yes.

23       Q    And you did use the term "HOOP IT UP" during the

24   course of that video.

25            Is that correct?



**A126**

KELLEE MCQUINN MAGINNESS

1      A    Yes.

2           MR. WEINBERG:  Let's go to the next, Mike.

3           MR. SALVATORE:  Yes.

4           (Video playing.)

5  BY MR. WEINBERG:

6      **Q    Now, what did we just hear?**

7      A    That was a -- the first version of the HOOP IT UP

8  song that I wrote the lyrics and co-wrote the music to

9  back in 2008.

10     **Q    Did someone co-author it with you?**

11     A    Yes.

12     **Q    And who was that?**

13     A    My -- one of my guys who, you know, helped

14  produce the music.  His name is George Black.

15     **Q    And where was the song produced?**

16     A    In George's studio in -- here in L.A.

17     **Q    It was recorded here as well?**

18     A    Yeah.

19     **Q    What use of that recording, if any, have you made**

20  **in connection with KidTribe services?**

21     A    Well, you know, we were playing that in some of

22  the assemblies; the production really wasn't the greatest.

23  Songs go through evolutions.  So since then there's

24  been -- the lyrics have remained the same, the musicality,

25  the production, the instrumentation has evolved.  Now

1   it's -- you know, it's fully produced, mastered along with

2   a music video that's, you know, produced at the very high

3   production value.

4       Q    To the best of your knowledge, is what we just

5   heard the original version of the song?

6       A    That was the original version.  Yeah.

7       Q    And what's the song called?

8       A    "HOOP IT UP."

9       Q    And -- okay.

10          MR. WEINBERG:  Let me show you what we'll mark as

11  Exhibit 7, which -- again, it's KidTribe 7, which has been

12  marked KT00061 and KT00062.

13          (Opposer's Exhibit 7 was marked for

14          identification.)

15  BY MR. WEINBERG:

16      Q    Can you tell me what it is we're looking at?

17      A    We're looking at the lyrics for the HOOP IT UP

18  song.

19      Q    And was that the lyrics that you said that you

20  wrote?

21      A    Yeah.

22      Q    And no one else helped you with those lyrics?

23      A    No.  I write all my own lyrics.

24      Q    And is this song still used?

25      A    Yes, it is.

Page 16

1    Q    Do you use it during the performances?

2    A    Yes.  We just recently used it at the White

3  House, even.

4    Q    When did you use it at the White House?  The

5  White House in D.C. --

6    A    Yes.

7    Q    -- where the president is?

8    A    Yes.  We've been invited to HOOP IT UP at the

9  White House for the last four years in a row with 35 --

10  for the Easter Egg Roll, 35,000 families come and our

11  hoops are really -- they've become the -- you know, the

12  big attraction where thousands of kids are hooping

13  throughout the day.  We did the HOOP IT UP song.  I bring

14  a lot of kids with me, my whole hoop star KidTribe crew.

15  And so we performed quite extensively for ten hours

16  throughout the day at the White House, and this is in

17  conjunction with the First Lady's "Let's Move" initiative.

18    Q    And do you use the term HOOP IT UP during the

19  course of those events?

20    A    Every single show I've ever done, the term "HOOP

21  IT UP" is used repeatedly and extensively and constantly

22  through the years, especially when we -- we're definitely

23  using the term "HOOP IT UP" at the White House.

24    Q    And what was the first year that you performed at

25  the White House?



**A129**

KELLEE MCQUINN MAGINNESS

1    BY MR. WEINBERG:

2        Q    **Could you please take a look at Exhibit -- what's**

3    **been marked as Exhibit 8, which is KT00055 through**

4    **KT00058, and tell me what this is?**

5        A    Me tell you?

6        Q    **Please.**

7        A    This is our script that is the -- this fitness

8    assembly that we've been discussing that I created.

9        Q    **And do you recall when you created this document?**

10       A    This one was around the 2008 realm which -- when

11   Kelly was starting to take the mic, so to speak, and

12   perform the events without me.

13       Q    **And what is this a script for?**

14       A    This is our school assembly.  So this is the

15   basic guideline of -- you know, of what happens within the

16   duration of the 45- to 55-minute interactive fitness

17   assembly.

18       Q    **And does this more or less reflect the programs**

19   **that you put on prior to 2008?**

20       A    Oh, absolutely.  It hasn't deviated very much,

21   just in the context of maybe switching out some songs and

22   things like that.

23       Q    **Now, you use the term "Hoopapalooza."  What is**

24   **Hoopapalooza?**

25       A    Well, it's you know, kind of the over-arching

1  name of the actual show.

2     **Q    And how does HOOP IT UP relate to the overall**

3  **show?**

4     A    HOOP IT UP is the catch phrase.  It's the slogan.

5  It's the call and response, call to action that is used

6  utterly and completely throughout.  We -- it's the

7  introduction of the whole hooping portion of the show.

8  When the kids first arrive, they're sitting in the hoops,

9  we'll, you know -- we may or may not do a warmup,

10  depending on certain factors but we're always hooping, and

11  it's always "Are you ready to HOOP IT UP?  Let's HOOP IT

12  UP," and HOOP IT UP using -- being used throughout.

13  It's -- if's there's one slogan, if there's one phrase

14  that is intrinsically connected and cannot be removed from

15  our show it is the term "HOOP IT UP."

16     **Q    And that's true since 2004?**

17     A    Since the very first, yes.

18     **Q    Now, I noticed in Part 3 it says, "HOOP IT UP,"**

19  **on the first page.**

20        **Is that correct?**

21     A    Yes.

22     **Q    And so if someone would -- whoever is performing**

23  **this would say, as it says here, "Are you ready to HOOP IT**

24  **UP?  I can't hear you!  Are you ready to HOOP IT UP?"**

25     A    Absolutely.  And that even sometimes bubbles up

1   into a whole HOOP IT UP chant.  You know, we go a little

2   crazy.

3       Q    Right.

4            As you said, the HOOP IT UP term was used

5   throughout those parts of the program.

6       A    Absolutely.

7       Q    So, for example, under Part 7, under "Freestyle

8   Game," I see hoop contest and the song that's used -- one

9   of the songs that's used is HOOP IT UP.

10           Is that correct?

11      A    Yeah.

12      Q    And is this still the script that's used pretty

13  much today?

14      A    Yes.

15           MR. WEINBERG:  Let's mark as Exhibit 9 a very

16  lengthy document, KT00001 through -54.

17           (Opposer's Exhibit 9 was marked for

18           identification.)

19  BY MR. WEINBERG:

20      Q    Ms. McQuinn, could you please tell us what this

21  document marked Exhibit 9 is?

22      A    Sure.  This is our curriculum guidebook.  So when

23  I do a teacher training -- my teacher trainings are

24  anywhere from three to five hours in length and this is

25  the companion that helps -- this is the teaching resource.

hg

**A132**

Page 21

1  So everything that the teacher needs to implement the

2  ongoing KidTribe program as it pertains to hoops and

3  obesity prevention is within this document.

4     **Q    Now, it says here that -- there's a copyright**

5  **notice that says "KidTribe 2004, all rights reserved."**

6         **Was this document created in 2004?**

7     A    I believe that this particular one that we're

8  holding right now is an updated version created in 2008.

9  The original was 2004.  That's when I started my first

10 training.

11    **Q    And what makes you believe that this was created**

12 **in 2008?**

13    A    Well, because as I'm going back and

14 cross-referencing, you know, some of the songs that I was

15 referring to, some of the pictures, you know, dating back,

16 there have been -- there have been, you know, variations

17 on this as it -- as the program expands and new, you know,

18 information is available.

19    **Q    Looking at Page 27 of this document, which is**

20 **also KT00027, is the HOOP IT UP title at the time.**

21         **Do you see that?**

22    A    Uh-huh.

23    **Q    And to the best of your knowledge, has the HOOP**

24 **IT UP section of this document been included since the**

25 **document was first created?**



**A133**

1    A    I don't think that's since the very, very first.

2  It was a lot skinnier.  So I don't recall that, but

3  certainly prior to -- prior to 2010, certainly.

4    **Q    And you believe this was created in 2008.**

5    **Is that correct?**

6    A    Yes.

7    **Q    And you were using HOOP IT UP in connection with**

8  **your programs certainly since prior to 2008?**

9    A    Yeah.  You know, there's a lot -- there's a

10  couple different versions that we have.  So what happens

11  in the live events, which is where Kelly Breaux and

12  Kenneth Erickson were working with us, that's definitely

13  where HOOP IT UP was constantly being used.  Within the

14  teacher trainings, they weren't present for as many of

15  them, but HOOP IT UP was always being used throughout

16  verbally.

17    **Q    And once you've trained teachers, then what**

18  **happens?**

19    A    Well, then they go and put the program on and

20  they adopt it as they need to.  Not every school, not

21  every after-school program is the same.  So I created a

22  highly adaptable program and they implement it and work

23  directly with their kids.

24    MR. WEINBERG:  Let's introduce as Exhibit 10 this

25  DVD.

hg

**A134**

Page 23

1              (Opposer's Exhibit 10 was marked for

2              identification.)

3    BY MR. WEINBERG:

**4        Q     This is what we'll be referring to.**

5        A     Thanks.

**6        Q     Let me show you what's just been marked as**

**7    Exhibit 10.  Can you tell us what that is?**

8        A     Sure.  Our first DVD, "Hooper-Size with

9    Miss Kellee."

**10       Q     Now, I notice you used a bunch of different names**

**11   on this DVD cover.  Who actually created this DVD cover?**

12       A     Well, I did with my art director, my art

13   designer.

**14       Q     And who is that?**

15       A     Lisa Savage-Katz.

**16       Q     Now, who wrote the copy of that song?**

17       A     I wrote the copy.

**18       Q     Now, I noticed that HOOP IT UP are the first**

**19   words that appear, but there are other phrases on this**

**20   box -- on this cover that are either in -- that are in**

**21   quote marks.**

**22            Any reason why HOOP IT UP is not shown in quote**

**23   marks?**

24       A     Well, given what I knew then and understood then

25   about all this, the quote marks were for a title of --

hg

**A135**

KELLEE MCQUINN MAGINNESS

1    like a section or a special feature or something that

2    someone had quoted out of -- you know, from the

3    "L.A. Times" or something like that.

4        Q    **Like, for example, what?**

5        A    Like the "X-Games of hula hopping" was a quote

6    from someone else.  HOOP IT UP wasn't quoted because it's

7    so, again, intrinsically connected with what we are doing.

8    It's -- you know, I wrote that very first because

9    there's -- it's the most -- "HOOP IT UP with Ms. Kellee

10   and the KidTribe Crew," it's always how it is, that's

11   always how I intended it, that's how it will always be,

12   "HOOP IT UP with Ms. Kellee and the KidTribe Crew."  It's

13   just an essential piece of the component of the whole

14   program from the very foundation.

15       Q    **It's your understanding, is it not, that**

16   **people -- when people hear HOOP IT UP, they associate it**

17   **with you?**

18       A    Absolutely.  You'll see from the other witnesses

19   that you can't take HOOP IT UP out of our hoop assemblies,

20   out of our shows, out of our program.  You cannot remove

21   HOOP IT UP.  That's how connected and much of a

22   centerpiece as it is.

23       MR. WEINBERG:  Thank you very much.  I have no

24   further questions.

25       MR. TUREK:  May I see the DVD itself?

Page 26

1   here, because I really didn't need to write anything down

2   prior to -- needing to ensure a quality control in my

3   absence.  And that was really the year that I took a

4   backseat to performing as many assemblies.

5       Q    Under Part 1, at the very top, it says, "Part 1,

6   Intro," and then it says, "Song:  KidTribe Theme."

7       A    Uh-huh.

8       Q    What is the KidTribe theme?

9       A    "When I say kid, you say tribe.  KidTribe."

10      Q    That's a call and response?

11      A    Uh-huh.

12      Q    And what's the "I Gotta Feeling"?

13      A    That's a Black Eyed Peas song.

14      Q    If I told you that "I Gotta Feeling" was released

15  by the Black Eyed Peas in May of 2009, would you -- would

16  that change your answer as to when this script was

17  produced?

18      A    Well, then, this particular one that we're

19  holding, yes.

20      Q    Okay.

21      A    That still doesn't, however, change anything

22  else.

23      Q    No further questions on Exhibit 8.  If you would,

24  would you please put in front of you Exhibit 10, please.

25           Can you again remind me what Exhibit 10 is?



**A137**

1  of the title of this or the title of, you know, special

2  features or, you know -- like a, you know, heading, title

3  of one of the components within the DVD, I put it in.  I

4  didn't have a title of a component with HOOP IT UP, but

5  "HOOP IT UP with Ms. Kellee and the KidTribe Crew," that

6  was always what we've done, "HOOP IT UP with Ms. Kellee

7  and the KidTribe Crew."  It's the very first sentence

8  because it's a very important sentence.

9      MR. TUREK:  No further questions on Exhibit 10.

10     If we could cue up Exhibit No. 000 -- I'm sorry.

11  It was Exhibit No. 6, the DVD, and if we could cue up what

12  was marked I believe is 00066.

13     MR. SALVATORE:  The sound recording?

14     MR. TUREK:  The sound recording, yes.

15     (DVD playing.)

16     MR. TUREK:  Can you stop it for one moment?  Can

17  you tell me approximately how long the recording is?

18     MR. SALVATORE:  Three minutes and six seconds, it

19  looks like.

20     MR. TUREK:  I'd like to begin the recording at

21  about two minutes and 45 seconds.

22     (DVD playing.)

23     MR. TUREK:  Stop it.  Thank you.

24  BY MR. TUREK:

25     Q    Did you hear something at the end of that?

Page 29

1     A     "That's good."

2     **Q     "That's good."**

3     **        Who were you speaking to at that time when you**

4     **said "that's good"?**

5     A     My music producer.

6     **Q     Was this a -- was this a rough production of this**

7     **song?**

8     A     Yeah.  This is not fully produced at all.

9     **Q     So this particular recording that was just played**

10    **was not released to the public?**

11    A     We played it in our events, but no, I didn't make

12    a final CD.  It was after we made the original CD.

13    **Q     So -- and correct me if I'm wrong -- what we just**

14    **played was an unmastered version that was not publicly**

15    **released?**

16    A     We played it in our shows.

17    **Q     That particular recording, that unmastered**

18    **recording?**

19    A     Uh-huh.

20          MR. WEINBERG:  You have to say yes or no.

21          THE WITNESS:  Yes.

22    BY MR. TUREK:

23    **Q     So you played a rough, unmastered recording for**

24    **your clients?**

25    A     Sometimes we did, yes, as songs take different

1          Hand you a copy.

2          MR. WEINBERG:  Are we going to mark this?

3          MR. TUREK:  Yes.  Mark it as Exhibit 11, I guess

4    would be the next one.

5          (Applicants' Exhibit 11 was marked for

6          identification.)

7    BY MR. TUREK:

8      **Q    I'm just going to give you a few moments to look**

9    **through that.**

10     A    Sure.

11          (Witness perusing documents.)

12   BY MR. TUREK:

13     **Q    Have you had ample time to look through it or are**

14   **you still --**

15     A    I have not.

16     **Q    Okay.**

17          (Pause in the proceedings.)

18          THE WITNESS:  Okay.  All right.

19   BY MR. TUREK:

20     **Q    Thank you.**

21          **In your cursory review of that document, did you**

22   **see any uses of HOOP IT UP?**

23     A    I did not.

24     **Q    And can you tell me what this document is, to the**

25   **best --**

hg

**A140**

Page 35

1   testimony.

2   BY MR. TUREK:

3        Q      What was your testimony, Ms. McQuinn?

4        A      I've been using HOOP IT UP in our live school

5   assemblies since its inception.

6        Q      Why was HOOP IT UP not in your original 2004

7   manual?

8        A      This manual was written prior to doing any school

9   assemblies and any trainings.  This manual -- the original

10  manual that has these very, very old pictures on it, I

11  didn't even have photos to take from an assembly or

12  training because they hadn't been done yet.  I wrote this

13  manual in the beginning to procure some partnership with

14  school districts.  This was prior to application in

15  working with kids and a lot of things evolved in the live

16  show and it comes out and then it becomes

17  institutionalized within our program.

18       Q      To your knowledge, did Applicant Kelly Breaux use

19  the 2004 manual in her performances for you?

20       A      No.  They are not directly connected in that.

21  This manual was given to teachers who were employed by

22  school districts, they were employed by after-school

23  programs, and I conducted the trainings and gave the

24  manuals to them.  This wasn't a -- this is not how to do

25  the assemblies.  Kelly Breaux and Kenneth Erickson were

hg

**A141**

Page 41

1          What -- in what year did you create these lyrics?

2      A    The lyrics, 2008.

3      Q    How do you know they were created in 2008?

4      A    Because I have a recollection of creating them in

5  2008.  That's right around -- right after when we produced

6  the "Whuttup? Warm-Up" DVD.  Right around that time.

7      Q    How have these lyrics been used in the course of

8  your business?

9      A    Well, I created the song, and then the song has

10  had different changes to it, the production side of it.

11      Q    When you say "the song," are you talking about

12  the lyrics or are you talking about the music?

13      A    I'm talking about the music- -- the musicality,

14  the production.  When I first did this, you know, hip-hop

15  was a lot more prevalent, the song never really -- I

16  didn't have the funds to really put into, you know,

17  producing it in a bigger way, and then it's, you know,

18  caught on since then.  We've got a version of it out now.

19      Q    I'm going to play you an audio recording, and I'd

20  like you to listen to it all and then I would like you to

21  tell me what it is, if you do know.

22          MR. WEINBERG:  Which recording is this?

23          MR. TUREK:  It was the recording that was

24  originally marked KT00065.

25          MR. WEINBERG:  That's the one that was replaced



**A142**

1   by the early version.

2           Right?

3           MR. TUREK:  It was produced originally.

4           MR. WEINBERG:  Right, mistakenly, and then it

5   was -- the original was substituted and sent to you.

6           Right?

7           MR. TUREK:  Another song was sent to me.  That is

8   correct.

9           MR. WEINBERG:  And the representation that was

10  made with that song was that that would be the -- the

11  one that was -- we were replacing was the early version.

12          Correct?

13          MR. TUREK:  You had indicated or -- I'm sorry.

14  Ms. Breaux -- Ms. McQuinn indicated that it was not

15  evidence of prior use in her response.

16          MR. WEINBERG:  What was it?

17          MR. TUREK:  The song that was produced under

18  KT00065.

19          MR. WEINBERG:  The one you're about to play?

20          MR. TUREK:  That is correct.

21          MR. WEINBERG:  Right.  Okay.

22          (Audio being played.)

23          MR. WEINBERG:  So my objection is since it's

24  already been stated by the plaintiff in this action that

25  it's not evidence of prior use -- the use of that

hg

**A143**

1   Exhibit 6, part of which was a recording of a song that

2   had lots of mention of HOOP IT UP.

3           Are you familiar with what I'm speaking about?

4       A    Yes.

5       Q    When did you first use that song in your -- in

6   the course of your business?

7       A    When you say "that song," are you referring to

8   that version that you just played?

9       Q    That is correct.

10      A    I --

11          MR. WEINBERG:  Wait.  The version not that you

12  just played.  The version that was earlier played.

13          MR. TUREK:  The version that was played as

14  Exhibit 6.

15          MR. WEINBERG:  Exhibit 6.  The one that Michael

16  played.

17          THE WITNESS:  The one that Michael played, the

18  original version, the hip-hop one?

19  BY MR. TUREK:

20      Q    Yes.

21          MR. WEINBERG:  Yes.

22          THE WITNESS:  Okay.  When did I start using that?

23  BY MR. TUREK:

24      Q    That is correct.

25      A    In the assemblies around, you know, 2008, 2009.

**hg**

1    I was just, you know, playing around to see if it would

2    work.

3        Q    **Did you use it at the White House in March of**

4    **2010?**

5        A    Use that song in the White House?

6        Q    **Right.**

7        A    No.  I did not use that song in the White House.

8        Q    **Did you ever use that song at any of your White**

9    **House perform- -- at any of your White House performances?**

10       A    I used the most recent version of that song,

11   which I'd be happy to play for you, so you can understand

12   the evolution of how a song is made.  At this most recent

13   performance at the White House, it's now locked, produced,

14   loaded, finalized.

15       Q    **When was that finalized song played?  Was it in**

16   **2012?  Was it in 2013?  Was it in 2011?**

17       A    Uh-huh.  2012, 2013.  At the White House, 2013.

18            MR. TUREK:  I have no further questions.

19

20                    FURTHER EXAMINATION

21   BY MR. WEINBERG:

22       Q    **Let me just get you back into Exhibit No. 10.  At**

23   **the time that -- the CD cover were created, were you**

24   **working with any trademark lawyers?**

25       A    I had only trademarked KidTribe.



**A145**

Page 47

1     Q     That wasn't my question.

2     A     Oh.

3     Q     Were you you working with any trademark lawyers

4  in designing this CD cover?

5     A     No.

6     Q     Was there anybody helping to explain to you what

7  a TM symbol was or what it wasn't?

8     A     No.

9     Q     Are you currently using TM symbols with the

10  slogan HOOP IT UP?

11    A     Yes.

12    Q     So, for example, in the KidTribe Web site, one

13  would see HOOP IT UP with a TM next to it?

14    A     Yes.

15    Q     Referring back to Exhibit 9, which was that

16  teachers instruction document that we introduced earlier,

17  there's -- it's -- both the table of contents in

18  Page 27 clearly say HOOP IT UP.

19          Correct?

20    A     Yes.

21    Q     And this was created in 2008.

22          Is that correct?

23    A     Yes.

24          MR. WEINBERG:  No further questions of this

25  witness, and I'm moving Exhibits 1 through 10 into

Page 48

1    evidence.

2            MR. TUREK:  I object to Exhibits 5 and 6 on the

3    basis that they were not timely disclosed.

4            MR. WEINBERG:  Of course, we take issue with that

5    and we'll deal with that at a later date.

6            Thank you.

7            THE WITNESS:  Thank you.

8            MR. WEINBERG:  Let's take a five-minute break and

9    we'll get the next witness on the phone.

10           MR. TUREK:  Okay.

11           (Recess taken.)

12

13           (WHEREUPON THE PROCEEDINGS WERE CONCLUDED AT

14           11:24 A.M.)

15

16           (CERTIFICATE OF DEPOSITION OFFICER ATTACHED ON

17           FOLLOWING PAGE HEREOF.)

18

19

20

21

22

23

24

25

hg

**A147**

**TTAB**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

|  |  |  |
|---|---|---|
| **KidTribe, Inc.** | ) | |
| Opposer, | ) | |
| | ) | |
| v. | ) | Opposition No.____**91201062**____ |
| | ) | |
| **Kenneth W. Erickson and** | ) | |
| **Kelly J. Breaux** | ) | |
| Applicants. | ) | |
| | ) | |

### APPLICANTS' NOTICE OF RELIANCE:
### SOUND RECORDING PRODUCED BY OPPOSER
### (KT00065)

Pursuant to 37 C.F.R. § 2.120(j), Applicants Kenneth W. Erickson and Kelly J. Breaux

("Applicants") hereby submit this Notice of Reliance during their testimony period. Specifically,

Applicants offer into evidence, and will rely upon, the attached sound recording produced by

Opposer during the discovery period (KT00065). Opposer admitted the authenticity of KT00065

in Opposer's Responses to Applicants' Second Set of Requests for Admissions (which has also

been filed under Notice of Reliance). This sound recording is relevant to impeach evidence

submitted by Opposer during its testimony period and, furthermore, to call into question the

veracity of Opposer's witness.

Applicants respectfully request that the attached be admitted in evidence.



11-08-2013

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #71

1

**A148**

# Party Rock Anthem

From Wikipedia, the free encyclopedia

"**Party Rock Anthem**" is a song performed by American dance pop recording duo LMFAO, featuring British singer Lauren Bennett and GoonRock. It was released as the first single from their second album, *Sorry for Party Rocking* in 2011. It interpolates lyrics from Rick Ross's song "Hustlin".[1]

The single has gone to number one in Australia, Belgium, Brazil, Canada, Denmark, France, Germany, Ireland, New Zealand, Switzerland, the United Kingdom and the United States. It also reached the top five in Norway and Italy. Worldwide, it was the third best-selling digital single of 2011 with sales of 9.7 million copies.[2] It is also the third best-selling digital song in US history.[3]

"Party Rock Anthem" is a mostly electronic composition. Being featured in the 2012 film *21 Jump Street,* it won the MTV Movie Award for Best Music.[4] The song also won for Favorite Song at the 2012 Kids' Choice Awards.



| "Party Rock Anthem" |
| --- |
| **Single by LMFAO featuring Lauren Bennett and GoonRock** |
| from the album *Sorry for Party Rocking* |

| | |
| --- | --- |
| **Released** | January 25, 2011 |
| **Format** | CD single, digital download |
| **Recorded** | 2010 |
| **Genre** | Dance-pop, electro house, acid house |
| **Length** | 4:23 (Main/Album Version)  3:52 (Radio Edit) |
| **Label** | will.i.am, Cherrytree, Interscope, Panther Records |
| **Writer(s)** | Stefan Gordy, Skyler Gordy, Jamahl Listenbee, Peter Schroeder |
| **Producer** | Redfoo, GoonRock |

| LMFAO singles chronology | | |
| --- | --- | --- |
| "Gettin' Over You" (2010) | "**Party Rock Anthem**" (2011) | "Champagne Showers" (2011) |

| Lauren Bennett singles chronology | |
| --- | --- |
| "**Party Rock Anthem**" (2011) | "I Wish I Wish" (2011) |

| Music sample |
| --- |
| "Party Rock Anthem" |
| ▶   0:00  ◀llll |

## Contents

- 1 Music video
  - 1.1 Background
  - 1.2 Synopsis
  - 1.3 Awards
- 2 Chart and sales performance
- 3 In popular culture
  - 3.1 Television, films and video games
  - 3.2 Advertisements
  - 3.3 Other
- 4 Track listings
- 5 Charts and certifications
  - 5.1 Weekly charts
  - 5.2 Certifications
  - 5.3 Year-end charts
- 6 References
- 7 External links

# Music video

## Background

The music video was released on March 8, 2011[5] and was produced by the two members of LMFAO, Redfoo and SkyBlu, with the assistance of Shinzu Ai. It was choreographed by, and featured, Quest Crew members Hokuto Konishi, Victor Kim, Ryan Conferido, Steve Terada, Aris Paracuelles, Brian Hirano and Ryan Feng. The video is a parody of the 2002 horror film *28 Days Later.* Lauren Bennett, featured in the song, also appeared in the music video. Director Mickey Finnegan described the concept: "there's been an epidemic, the world has gone crazy, as soon as the song came out, everyone got possessed and all they want to do is to shuffle, everyone is a shuffler."[*citation needed*] The video features the dancers performing the Melbourne Shuffle, which quickly gained popularity in the United States.

## Synopsis

The video's opening caption finds Redfoo and SkyBlu fell into a coma due to excessive party rocking and that their single was released

**A149**

# I Gotta Feeling

From Wikipedia, the free encyclopedia

"**I Gotta Feeling**" is the second single from The Black Eyed Peas' fifth album *The E.N.D.*, produced by the French DJ David Guetta.[2] The song was released on May 21, 2009[3] and debuted at number two on the Canadian and *Billboard* Hot 100 on the week of June 27, 2009, behind the group's "Boom Boom Pow", making the group one of 11 artists who have occupied the top two positions of the *Billboard* Hot 100 at the same time. The song later reached number one on the US charts and 20 charts worldwide. The song was nominated for Record of the Year at the 52nd Grammy Awards and won the Grammy for Best Pop Performance by a Duo or Group with Vocals.[4] "I Gotta Feeling" was 5th on the *Billboard* Hot 100 Songs of the Decade.[5] The song was also nominated as Song of the Year at the 2009 World Music Awards. In March 2011, it became the first song in digital history to sell over 7 million digital copies in the United States. As of June 2013, it has sold over 8.3 million downloads in this country.[6] This also makes it the highest selling digital as well as non-charity single in the US ever.[6]

"I Gotta Feeling" spent fourteen consecutive weeks atop the *Billboard* Hot 100, the longest-running number-one single of 2009. The song was the third most successful song of the decade in Australia, as announced on January 7, 2010.[7] As of February 2010, "I Gotta Feeling" holds the record as the most downloaded song on iTunes of all time.[8] Worldwide it has sold over 15 million units, becoming one of the most successful songs in the history of popular music.[9][10][11]



| "I Gotta Feeling" |
|---|
| **Single by The Black Eyed Peas** |
| **from the album *The E.N.D.*** |

| | |
|---|---|
| **Released** | May 21, 2009 |
| **Format** | CD single, digital download, vinyl |
| **Recorded** | Square Prod, Paris, France and Metropolis Studios, London, England |
| **Genre** | Dance-pop, house[1] |
| **Length** | 4:50 (Album Version) 4:05 (Radio Edit) |
| **Label** | Interscope |
| **Writer(s)** | The Black Eyed Peas, David Guetta, Frédéric Riesterer |
| **Producer** | David Guetta, Frédéric Riesterer |

| The Black Eyed Peas singles chronology | | |
|---|---|---|
| "Boom Boom Pow" (2009) | "**I Gotta Feeling**" (2009) | "Meet Me Halfway" (2009) |

| Music video |
|---|
| I Gotta Feeling (http://www.youtube.com /watch?v=uSD4vsh1zDA) at Youtube.com |

# Contents

- 1 Background
- 2 Composition
- 3 Critical reception
- 4 Chart performance
- 5 Live performance
- 6 Music video
- 7 Credits and personnel
- 8 Track listing
- 9 Charts and certifications
  - 9.1 Weekly charts
  - 9.2 Certifications
  - 9.3 Year-end charts
  - 9.4 Decade-end charts
  - 9.5 All-time charts
- 10 Other cover versions
- 11 See also
- 12 References
- 13 External links

# Background

"I Gotta Feeling" was written and composed by all the members of The Black Eyed Peas (credited as William Adams, Allan Pineda, Jaime Gomez, Stacy Ferguson) together with French producers David Guetta, Frederick Riesterer, both of who produced the song. will.i.am provided additional synthesizer work to the song. The song was recorded at Square Prod in Paris, France and Metropolis Studios in London, England, United Kingdom. "I Gotta Feeling" is the second single released from *The E.N.D.* (2009). Interscope Records serviced the song to contemporary hit and rhythmic crossover radios on June 15, 2009 in the United States.[12][13] In an

**A150**

In providing responses to the Interrogatories, Opposer does not waive and expressly reserves all objections to the competency, relevancy, materiality and admissibility of the responses or subject matter thereof, as well as all objections to any other discovery notices.

## RESPONSES TO SECOND SET OF INTERROGATORIES

### INTERROGATORY NO. 1

For each document and thing produced in response to Applicants' First Set of Requests for the Production of Documents and Things, please provide the approximate month **and** year in which the document or thing was created.

### RESPONSE TO INTERROGATORY NO. 1

Opposer objects to this Interrogatory to the extent that it consists of compound requests having discrete subparts in violation of Rule 33(a)(1) of the Federal Rules of Civil Procedure. Notwithstanding the foregoing General and Specific Objections and without waiving them, Opposer responds as follows: The documents produced were created over a period of time, and were altered, modified and amended on one or more occasions; accordingly, the dates provided herein reflect an approximation of the time period during which they were created. Upon information and belief after a diligent search and reasonable inquiry, Opposer responds that the documents produced were created on or around the following dates:

| Document Bates No. | Approximate Date of Creation |
|---|---|
| KT00001–KT00054 | Spring 2008 |
| KT00055-KT00058 | Fall 2009 |
| KT00059 | Fall 2007 |
| KT00060 | Fall 2007 |
| KT00061–KT00062 | Fall 2008-Spring 2009 |
| KT00063-KT00064 | Winter 2007 |

| KT00066 | Fall 2008 |
| KT00067 | Summer 2006 |
| KT00068 | Winter 2006 |

## INTERROGATORY NO. 2

For each document and thing produced in response to Applicants' First Set of Requests for the Production of Documents and Things, please provide the approximate month **and** year in which the document or thing was first distributed, performed, and/or displayed to someone outside of Opposer's organization, if at all.

## RESPONSE TO INTERROGATORY NO. 2

Opposer objects to this Interrogatory to the extent that it consists of compound requests having discrete subparts in violation of Rule 33(a)(1) of the Federal Rules of Civil Procedure. Notwithstanding the foregoing General and Specific Objections and without waiving them, Opposer responds as follows: The documents produced were created over a period of time, and were altered, modified and amended on one or more occasions; accordingly, the dates provided herein reflect an approximation of the time period during which they were first distributed, performed, and/or displayed to someone outside of Opposer's organization. Upon information and belief after a diligent search and reasonable inquiry, Opposer responds that the documents produced were first distributed, performed and/or displayed on or around the following dates:

| Document Bates No. | Approximate Date of Distribution, Performance, and/or Display |
| --- | --- |
| KT00001–KT00054 | Spring 2008 |
| KT00055-KT00058 | Fall 2009 |
| KT00059 | Fall 2007 |

| KT00060 | Fall 2007 |
|---|---|
| KT00061–KT00062 | Fall 2008-Spring 2009 |
| KT00063-KT00064 | Winter 2007 |
| KT00066 | Fall 2008 |
| KT00067 | Summer 2006 |
| KT00068 | Winter 2006 |

## INTERROGATORY NO. 3

In regard to the document labeled Bates #KT00065, please provide the approximate month **and** year in which the song lyrics were created.

## RESPONSE TO INTERROGATORY NO. 3

Subject to and without waiving the foregoing General Objections, Opposer responds as follows: the lyrics to the song produced under Bates No. KT00065 were written in or around December 2008.

## INTERROGATORY NO. 4

In regard to the document labeled Bates #KT00065, please provide the approximate month **and** year in which the music were created.

## RESPONSE TO INTERROGATORY NO. 4

Subject to and without waiving the foregoing General Objections, Opposer responds as follows: the music to the song produced under Bates No. KT00065 was composed in or around March through May 2008.

## INTERROGATORY NO. 5

In regard to the document labeled Bates #KT00065, please provide a representative list of where the music and lyrics were performed prior to September 30, 2010, if at all.

## RESPONSE TO INTERROGATORY NO. 5

Subject to and without waiving the foregoing General Objections, Opposer responds as follows: the music and lyrics to the song produced under Bates No. KT00065 were performed prior to September 30, 2010 at school assemblies, conferences, and employee training sessions.

**INTERROGATORY NO. 6**

In regard to the document labeled "Exhibit A" attached to Applicants' Second Set of Requests for Admissions, please provide the approximate month **and** year in which the document was created.

**RESPONSE TO INTERROGATORY NO. 6**

Subject to and without waiving the foregoing General Objections, Opposer responds as follows: the document labeled "Exhibit A" was created over a period of time, and was altered, modified and amended on one or more occasions. Upon information and belief after a diligent search and reasonable inquiry, Opposer responds that the document labeled "Exhibit A" is an early draft of KT0001-KT00054 and was created in 2004.

**INTERROGATORY NO. 7**

In regard to the document labeled "Exhibit B" attached to Applicants' Second Set of Requests for Admissions, please provide the approximate month **and** year in which the document was created.

**RESPONSE TO INTERROGATORY NO. 7**

Subject to and without waiving the foregoing General Objections, Opposer responds as follows: the document labeled "Exhibit B" was created over a period of time, and was altered, modified and amended on one or more occasions. Upon information and belief after a diligent search and reasonable inquiry, Opposer responds that the document labeled "Exhibit B" was created in or around 2005.

## RESPONSES TO REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1

All of the documents and things produced by Opposer in response to Applicants' First Set of Requests for the Production of Documents and Things (Bates # KT00001-KT00065) are genuine, authentic, true, accurate, and were in the possession, custody, and/or control of Opposer (NOTE: if Opposer requires actual copies of such documents, please notify Applicants).

### RESPONSE TO REQUEST FOR ADMISSION NO. 1

Opposer objects to this Request on the grounds that it is compound, and contains conjunctive and disjunctive statements. Opposer further objects to this Request on the grounds that it is ambiguous as to the meaning of the phrase "were in the possession, custody, and/or control of Opposer" to the extent that the time frame inquired about is unclear. Subject to and without waiving the foregoing, Opposer responds as follows: Opposer admits that the documents and things labeled KT00001 through KT000065 are genuine, authentic, true, and accurate. Except as otherwise admitted, Opposer denies this Request.

### REQUEST FOR ADMISSION NO. 2

The attached document (labeled as "Exhibit A") was produced and/or created by Opposer.

### RESPONSE TO REQUEST FOR ADMISSION NO. 2

Admit.

### REQUEST FOR ADMISSION NO. 3

The attached document (labeled as "Exhibit A") is genuine, authentic, true, and accurate.

### RESPONSE TO REQUEST FOR ADMISSION NO. 3

Admit.

### REQUEST FOR ADMISSION NO. 4

The attached document (labeled as "Exhibit B") was produced and/or created by Opposer.

### RESPONSE TO REQUEST FOR ADMISSION NO. 4

Admit.

### REQUEST FOR ADMISSION NO. 5

The attached document (labeled as "Exhibit B") is genuine, authentic, true, and accurate.

### RESPONSE TO REQUEST FOR ADMISSION NO. 5

Admit.

## REQUEST FOR ADMISSION NO. 6

The lyrics as shown in the document labeled Bates # KT00061-00062 were created in 2008.

## RESPONSE TO REQUEST FOR ADMISSION NO. 6

Admit.

## REQUEST FOR ADMISSION NO. 7

The music as performed in the document labeled Bates # KT00065 is based on the music from a song titled "Party Rock Anthem" by the musical group known as LMFAO.

## RESPONSE TO REQUEST FOR ADMISSION NO. 7

Opposer objects to this Request on the ground that it seeks the admission of a matter which is not relevant to the subject matter of this Opposition nor reasonably calculated to lead to the discovery of admissible evidence.


DATED: September 17, 2012            HOLMES WEINBERG, PC


                                     By: /Steven M. Weinberg/
                                       Steven M. Weinberg
                                       Attorneys for Opposer
                                       KidTribe, Inc.

KidTribe has conducted hula-hooping activities at hundreds of school assemblies throughout the United States since at least as early as 2004, and has designed educational curricula for implementation in classrooms, after-school programs and summer camps, including original songs and instructional videos. McQuinn Depo. 6:10-20, 7:5-8:1, 9:4-24, Ex. 6-10. The slogan and service mark HOOP IT UP extensively and repeatedly has been used in connection with the marketing and sale of the KidTribe services "since the first assembly" in the "2004, 2005 school year." McQuinn Depo. 8:2-9:3, 9:25-10:16. Use of the HOOP IT UP Mark has always been and remains a focal point of KidTribe's hula-hooping presentations. McQuinn Depo. 8:14-9:3, Ex. 7-8. During these presentations, both KidTribe performers and members of the audience interact by repeating the slogan HOOP IT UP. Id.

The HOOP IT UP Mark has been used in KidTribe's marketing materials, including on its promotional DVD covers since at least as early as 2008. McQuinn Depo. 23:6-24:22, 26:24-27:6, Ex. 10. Further, the HOOP IT UP Mark has been continuously featured in KidTribe's teacher training curricula since at least as early as 2008. McQuinn Depo. 20:20-22:6, Ex. 9. Ms. McQuinn has even written lyrics to a song entitled HOOP IT UP that has been set to various musical accompaniments and used during KidTribe assemblies since at least as early as 2008. McQuinn Depo. 14:6-16:3, Ex. 6-7. In fact, KidTribe's assemblies have become so successful that since April of 2010, KidTribe has been invited to perform, and has performed during the White House's annual Easter Egg Roll, always "using the term "HOOP IT UP" at the White House." McQuinn Depo. 16:2-17:12.

KidTribe continues to use the HOOP IT UP mark in connection with the marketing and sale of its services, including on its website, www.kidtribe.com. McQuinn Depo. 47:9-14. As

Notice of Reliance: Notice of Claim and Conference – Labor Commissioner, State of California (the "Notice of Claim and Conference"), Dkt. No. 43. Both Breaux and Erickson terminated their employment at will with KidTribe on July 1, 2010. Employment Complaint; Notice of Claim and Conference.

On September 30, 2010, without KidTribe's consent, Breaux and Erickson filed a USPTO application for the Opposed Mark for services directly competitive with KidTribe's business. USPTO App. No. 85/142,516.

Significantly, the uncontroverted testimony shows that Applicants Breaux and Erickson, during their employment with Opposer, used and witnessed other KidTribe performers and audience members use the HOOP IT UP Mark. McQuinn Depo. 10:22-11:8, 17:14-18.

## C.    The Joint Stipulation of the Parties in This Matter

On December 17, 2012, the parties to this action submitted to the Board a Joint Stipulation of the Parties (Dkt. No. 16). Pursuant to the Joint Stipulation, Applicants have agreed that with respect to the issue of priority of use, Applicants will rely as their first use date of the Opposed Mark on the filing date of App. No. 85/142,516, and will not attempt to prove an earlier first use date of the Opposed Mark. Joint Stipulation. Further, Applicants have stipulated that a likelihood of confusion exists between Opposer's HOOP IT UP Mark and the Opposed Mark. Id. Applicants also have waived their right with prejudice to assert any defense or affirmative defense in this Opposition, other than the defense that Opposer does not have priority of use. Id. Accordingly, if Opposer proves priority of use in the current Opposition, the Board may enter judgment against Applicants. Id.

### III.     ARGUMENT

**A.     Opposer Has Priority of Use and is Therefore Entitled to Judgment in Its Favor**

### 1.    KidTribe has Priority of Use

An application to register a mark must be denied if there is a likelihood of confusion with "a mark or trade name previously used in the United States and not abandoned." 15 U.S.C. § 1052(d). Here, KidTribe's priority of use in the HOOP IT UP Mark is unquestionable. The uncontroverted testimony of KidTribe's founder and CEO, Kellee McQuinn is that: "[w]e've been using the phrase [HOOP IT UP] since the first assembly" in the "2004, 2005 school year," and that "if there's one phrase that is intrinsically connected and cannot be removed from our show it is the term "HOOP IT UP."" McQuinn Depo. 8:2-7, 19:13-15. An August 2006 video of Ms. McQuinn performing on behalf of KidTribe on *ABC7 News Chicago* to promote KidTribe's upcoming appearance at "Lollapalooza" confirms this. During this short clip, Ms. McQuinn uses the service mark HOOP IT UP twice, as she demonstrates her hula hooping performance routine. McQuinn Depo. 12:7-21, Ex. 6. KidTribe has also been featured on an *E! Network Style On-Demand* web series in January of 2006, where Ms. McQuinn can be heard using the slogan HOOP IT UP during a performance at Madison Elementary School in Southern California. McQuinn Depo. 12:25-14:1, Ex. 6. Finally, KidTribe has performed at the White House Annual Easter Egg Roll since April, 2010, each time using the slogan HOOP IT UP in front of the 35,000 people in attendance. McQuinn Depo. 16:2-17:12.

KidTribe's customers understand the trademark significance of the HOOP IT UP slogan, and associate it exclusively with KidTribe. For example, the Elk Grove Unified School District issued a Media Alert press release to various local media outlets in Southern California on June

6, 2006, announcing KidTribe's upcoming performances at various Elk Grove Unified School District sites. Opposer's Notice of Reliance: Media Alert, Dkt. No. 41. The Media Alert was entitled "Students in the EGUSD "Hoop It Up" for Nutrition and Fitness." Id.[2]

There are also written materials that support KidTribe's priority of use in the HOOP IT UP Mark. Ms. McQuinn wrote the lyrics to a song entitled HOOP IT UP, which has been consistently performed with various musical accompaniments as part of KidTribe's assemblies and concerts since its creation in 2008. McQuinn Depo. 15:10-25, 41:1-6. In 2008, KidTribe memorialized the content of its exercise assemblies into a written script. "This one was around the 2008 realm which – when [Applicant] Kelly [Breaux] was starting to take the mic." McQuinn Depo. 18:10-11. The script consists of a section entitled HOOP IT UP, which represents the "one phrase that is intrinsically connected and cannot be removed" from KidTribe's routine, "[s]ince the very first" show in 2004. McQuinn Depo. 18:2-20:2, Ex. 8. Additionally, KidTribe released a DVD in 2007, which contains the slogan HOOP IT UP as the first words printed on its back cover. McQuinn Depo. 23:6-24:22, 26:25-28:8, Ex. 10.

At the end of the day, it is incontrovertible that Applicants Breaux and Erickson, while employees of Opposer, used and witnessed other KidTribe performers and audience members use the HOOP IT UP Mark. McQuinn Depo. 10:22-11:8, 17:14-18; Employment Complaint; Notice of Claim and Conference. Given this unrebutted testimony and the Applicants' admissions that they were KidTribe employees, as well as Applicants' stipulated first use date of September 30, 2010, which is a date after their employment with Opposer terminated, and long after Opposer's first use of the mark, Opposer has priority as a matter of law.

---

[2] Opposer notes that it also took the testimony of five customers of Opposer, who each testified as to their knowledge of KidTribe's use of HOOP IT UP, but such testimony was excluded on Applicants' Motion to Strike (Dkt. No. 31), which Opposer believes was incorrectly decided and will be the subject of appeal in the event that judgment is not entered in favor of Opposer.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD


|  |  |  |
|---|---|---|
| **KidTribe, Inc.** | ) | |
| Opposer, | ) | |
| | ) | |
| v. | ) | Opposition No.____**91201062**____ |
| | ) | |
| **Kenneth W. Erickson and** | ) | |
| **Kelly J. Breaux** | ) | |
| Applicants. | ) | |

## APPLICANTS' TRIAL BRIEF

Pursuant to 37 C.F.R. § 2.128, Applicants Kenneth W. Erickson and Kelly J. Breaux ("Applicants") hereby file this brief in support of their position that Opposer's Notice of Opposition against Application Serial No. 85142516 should be dismissed with prejudice.


## ISSUE PRESENTED FOR REVIEW

Should the Board dismiss Opposer's opposition to the registration of Applicants' HOOPITUP trademark with prejudice on the basis that Opposer has failed to prove priority of use?


## STATEMENT OF THE CASE

On September 30, 2010, Applicants filed an application under §1(b) for the mark HOOPITUP for a wide variety of services related to exercise, health, and fitness (Serial No. 85142516). On August 9, 2011, Opposer filed a Notice of Opposition against Applicants' application on the basis of priority and likelihood of confusion with Opposer's alleged prior

common law use of HOOP IT UP for similar services.  The Parties have stipulated that (1) a

likelihood of confusion exists between Opposer's alleged HOOP IT UP mark and Applicants'

HOOPITUP mark, and (2) Applicants will rely on their application filing date as the date of first

use of their HOOPITUP mark.  D.N. 16.  Because the testimony of Opposer's witness is not

credible and is largely uncorroborated, Applicants seek dismissal of Opposer's Notice of

Opposition with prejudice on the basis that Opposer has failed to demonstrate priority of use.


**DESCRIPTION OF THE RECORD**

The evidentiary record consists of the following:

1.     Applicants' application for HOOPITUP (Serial No. 85142516).

2.     Eight Notices of Reliance submitted by Applicants (D.N. 33-40).

3.     Three Notices of Reliance submitted by Opposer during the rebuttal testimony

period (D.N. 41-43).

4.     Testimony deposition of Opposer's witness (Kellee McQuinn) and exhibits

thereto (D.N. 44-46, 53).

5.     Joint Stipulation of the Parties (D.N. 16).


**EVIDENTIARY OBJECTIONS**

As explained below, there are four evidentiary objections that Applicants respectfully

request the Board to consider.

1.     Kellee McQuinn's Testimony Deposition – Exhibit 6

During the testimony deposition of Opposer's witness Kellee McQuinn, Applicants

objected on the record to the submission into evidence of two video recordings and one audio

recording that comprise Exhibit 6 on the basis that they were not timely disclosed to Applicants. McQuinn Depo., 11:9-25, 48:2-3. On March 4, 2013, Opposer served on Applicants three separate recordings labeled KT00066, KT00067, and KT00068. Applicants' Notice of Reliance, D.N. 38. On that same date, Opposer served Supplemented Responses to Applicants' Second Set of Interrogatories, which provided information about KT00066, KT00067, and KT00068. Applicants' Notice of Reliance, D.N. 36. The discovery period had closed approximately *seven* months earlier on August 15, 2012. D.N. 10. Opposer provided no explanation as to why these recordings were not served earlier in the proceeding. This delay prejudiced Applicants because they were deprived of the opportunity to depose McQuinn about the recordings (the discovery period had already closed) or anyone else associated with the recordings. This includes an individual by the name of George Black, who McQuinn testified produced the music in the audio recording in 2008. McQuinn Depo., 14:6-18. Clearly, George Black is a witness who Applicants would have had a strong interest in deposing during the discovery period.

In view of the above, Applicants request that the Board strike Exhibit 6 of McQuinn's testimony deposition from the evidentiary record in its entirety.

2.    "Media Alert" Submitted Under Notice of Reliance By Opposer (D.N. 41)

Opposer submitted a document titled "Media Alert" under a Notice of Reliance during its rebuttal testimony period. D.N. 41. This document does not rebut any evidence submitted by Applicants during their testimony period, nor does it impeach any of the evidence submitted by Applicants under notice of reliance during their testimony period. Moreover, this document has not been properly authenticated and does not fall into any of the categories of documents that are eligible for submission under the notice of reliance procedures. Therefore, the Board should strike the "Media Alert" from the evidentiary record.

3.    State of California Labor Commissioner Documents (D.N. 42 and D.N. 43)

During its rebuttal testimony period, Opposer submitted under notice of reliance various documents filed by Applicants with the State of California Labor Commissioner. D.N. 42 and 43. Opposer attempts to use these documents to show that Applicants were employees of Opposer. Opposer's Brief, p. 4. These documents do not rebut any evidence submitted by Applicants during their testimony period, nor do they impeach any of the evidence submitted by Applicants under notice of reliance during their testimony period. Furthermore, these documents are irrelevant because Applicants are relying solely on their application filing date as their priority date and not some earlier time when Applicants worked with Opposer. If anything, these documents show that Opposer committed payroll fraud by treating Applicants as independent contractors when they should have been classified as employees under California employment law. Nevertheless, for the foregoing reasons, the Board should strike these documents from the evidentiary record.

4.    Screenshot of Website in Opposer's Trial Brief

In its trial brief, Opposer incorporates an alleged screenshot of Opposer's website. Opposer's Brief, p. 4. The Board should disregard the website screenshot since it has not been properly authenticated by Opposer and was not submitted into evidence during Opposer's testimony period. In addition, it is entirely possible that Opposer's website was altered to include HOOP IT UP after the filing date of Applicants' intent-to-use application for HOOPITUP.

The following background information illustrates why McQuinn's testimony is suspect at best. During the discovery phase of this proceeding, Opposer produced a musical sound recording labeled Bates No. KT00065. Applicants' Motion to Test Sufficiency of Response to Request for Admission, D.N. 14. Applicants submitted a copy of this sound recording during their testimony period. Applicants' Notice of Reliance, D.N. 40. Opposer has admitted the authenticity of this sound recording. Applicants' Notice of Reliance, D.N. 37. This sound recording incorporates a song consisting of music and lyrics. Applicants' Notice of Reliance, D.N. 40. The lyrics performed in the sound recording are *identical* to the written lyrics admitted into evidence as Exhibit 7 during McQuinn's testimony. Applicants' Notice of Reliance, D.N. 40, McQuinn Depo., 41:19 – 43:7, Ex. 7. After the Board granted a motion filed by Applicants to test the sufficiency of Opposer's response to a request for admission pertaining to the music in the sound recording, Opposer retracted KT00065, claiming that "it was mistakenly produced by Opposer as evidence of prior use." Applicants' Notice of Reliance, D.N. 33. So, if the sound recording incorporating the music and lyrics is not evidence of prior use, it is exceedingly difficult to believe that the lyrics by themselves would be evidence of prior use dating back to 2008. The lyrics are clearly set to the music and undoubtedly would not have preexisted the music.

Simply put, the production of KT00065 to Applicants during the discovery period was no "mistake" as claimed by Opposer. Opposer retracted the sound recording as evidence of prior use because Opposer did not want to provide a substantive response as to whether the music in the sound recording was based on a popular song titled "Party Rock Anthem" by the band LMFAO. Applicants' Motion to Test Sufficiency of Response to Request for Admission, D.N. 14. As a matter of fact, the song "Party Rock Anthem" was not released until January 25, 2011,

which is many months *after* Applicants filed their intent-to-use application for HOOPITUP.

Applicants' Notice of Reliance, D.N. 34.  As the Board can see, Opposer was caught in a lie and essentially had no choice but to retract KT00065 or potentially open itself up to a copyright infringement lawsuit.

A explained in the Evidentiary Objections section of this Brief, Applicants strongly believe that the video and audio recordings introduced by Opposer as Exhibit 6 during McQuinn's testimony deposition should be stricken since they were produced late without any explanation.  However, in the event the Board decides to consider such evidence, Applicants contend that such evidence does not support Opposer's allegations of prior use.  As far as the *ABC7 News Chicago* video clip is concerned, McQuinn uses the phrase HOOP IT UP twice during her appearance on the broadcast.  McQuinn Depo., Ex. 6.  First, in answer to the anchor's question about whether the kids mind exercising, McQuinn responds that "We hoop it up.  We have a lot of fun." *Id.* Second, at the opening of the hula-hoop demonstration, McQuinn states, "All right let's hoop it up everybody.  Grab your hoop here we go." *Id.* Similarly, in the *E! Network Style On-Demand* video clip, McQuinn states that "You gotta hoop it up.  You gotta make exercise fun." *Id.*

In Applicants' opinion, these uses of HOOP IT UP do not function to indicate the source of Opposer's hula-hooping fitness and exercise programs.  They are just motivational statements no different than a coach urging his players to "Give it your all," cheerleaders shouting "Go team!" from the sidelines, or the umpire yelling "Play ball!" at the commencement of a baseball game.  There is simply no evidence from which one could conclude that these uses of HOOP IT UP as a verb would be perceived by ordinary people as a slogan or tagline used exclusively by Opposer to advertise and sell its services.

Furthermore, both the *ABC7 News Chicago* and *E! Network Style On-Demand* video clips are from 2006, which is four years prior to the filing date of Applicants' application for HOOPITUP. There is no evidence in the record that Opposer has used these video clips in its marketing efforts over the past four years, nor is there any evidence in the record that these video clips are publicly accessible on the Internet or otherwise.

Exhibit 6 also includes an audio recording of what McQuinn testified to as the "first version of the Hoop it Up song that I wrote the lyrics and co-wrote the music to back in 2008." McQuinn Depo., 14:6-9, Ex. 6. McQuinn testified that she played this rough and unmastered recording during events and assemblies for her clients. McQuinn Depo., 14:19-22, 29:6-12.

Applicants find McQuinn's testimony extremely difficult to believe. This audio recording was served on Applicants by Opposer only *after* (1) Opposer received an adverse decision by the Board regarding Opposer's refusal to respond to a request for admission pertaining to a different sound recording (KT00065), and (2) Opposer retracted KT00065 rather than substantively respond to the request for admission. D.N. 19; Applicants' Notice of Reliance, D.N. 33. The audio recording in Exhibit 6 was served on Applicants on March 4, 2013, which was over a month after the Board rendered its decision against Opposer. Applicants' Notice of Reliance, D.N. 38. This would have given Opposer plenty of time to fabricate the musical sound recording in Exhibit 6, especially considering that the recording was only a rough and unmastered production that was "not fully produced at all." McQuinn Depo., 29:6-16.

any mark used by Opposer; as the founder testified, again without rebuttal or challenge, it was at the core of her business.  With this knowledge of and use of the HOOP IT UP mark by these employee-Applicants, they chose to terminate their employment and form a company in direct competition with Opposer, and as part of their unfairly competitive scheme, now seek to take from Opposer one of its most valuable assets – the HOOP IT UP mark.

It is no wonder that the Applicants failed to take their own testimony.  They knew that they are not innocent of this inequitable conduct and could not state otherwise under oath. They knew that they could not testify under oath that they were the first to use this mark.  They knew that they could not withstand cross examination without fabricating a story.

Instead, and in this light all they could do, and have done in their trial brief, is to try to attack some of the evidence that has been submitted by Opposer. But nothing they do can hide the fact that they were employees of Opposer, used the mark on Opposer's behalf as employees, knew the value of the mark to the Opposer, and through this attempted registration process now try to steal it from Opposer.

And nothing they can say in their brief, and in the absence of their own testimony, controverts Opposer's clear testimony, under oath, that Opposer was the first to use the HOOP IT UP mark.  Accordingly, judgment should be entered in Opposer's favor.

## B.  ARGUMENT

### 1.  Opposer Has Proven Priority Under the Governing Law.

The guiding law here is black letter:  with respect to service marks, "[i]t is not required that [the petitioner] meet the technical statutory requirements to register …in order . . . to have a basis for objection to another's registration. Prior public identification of petitioner with the name

. . . from use analogous to service mark usage is a sufficient ground for cancellation." *National Cable Television Ass'n v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1578, 19 U.S.P.Q.2d 1424 (Fed. Cir. 1991)(cites omitted) (prior public use of ACE for awards in film editing given by the American Cinema Editors is sufficient to cancel registration of ACE for awards presented for excellence in cable television). *See also* 3 *McCarthy on Trademarks and Unfair Competition* §16:14 ("Priority established by use analogous to trademark use") and cases cited therein, including *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 1065, 11 U.S.P.Q.2d 1638 (Fed. Cir. 1989).

As shown in Opposer's Main Brief and below, Opposer's founder Ms. Quinn's uncontroverted testimony is that she, and the former employee applicants, used the HOOP IT UP mark publicly in school assemblies, and that she also used it very publicly at the White House Easter Egg Hunts yearly since 2010, on television and in and on various documents and media associated with Opposer's business. This evidence, all unrebutted by any testimony, establishes priority both as a technical prior use and "use analogous to service mark usage."

**2. The Uncontroverted Testimony of Kellee McQuinn Proves Opposer's Priority of Use in its HOOP IT UP Service Mark.**

The uncontroverted testimony of Opposer's founder and principal, Kellee McQuinn, is that Opposer has "been using the phrase [HOOP IT UP] since the first assembly" in the "2004, 2005 school year," and that "if there's one phrase that is intrinsically connected and cannot be removed from our show it is the term "HOOP IT UP.""[1] McQuinn Depo. 8:2-7, 19:13-15.

---

[1] Opposer notes that it also took the testimony of five customers of Opposer, each of whom testified as to his or her knowledge of KidTribe's prior use of HOOP IT UP. However, such testimony was excluded on Applicants' Motion to Strike (Dkt. No. 31), which was partially decided on the basis that in so deciding there was no prejudice to Opposer because such customers' testimony could be viewed as being cumulative of Ms. McQuinn's own testimony

### 1. Exhibit 6 to the Testimony Deposition of Kellee McQuinn

Applicants seek to exclude Exhibit 6 to the Testimony Deposition of Kellee McQuinn (Dkt. No. 53). Applicants claim that they were unable to depose Ms. McQuinn on the subject of the sound recording and two videos that comprise Exhibit 6, and that they were prejudiced thereby. Opposer produced the sound recording (KT00066) and videos (KT00067-KT00068) to Applicants on March 4, 2014, as soon as those materials were discovered by Opposer, as is Opposer's duty to supplement its discovery responses under Federal Rule of Civil Procedure 26(e). McQuinn Depo. 43:22-24. Upon the production of documents KT00066 – KT00068, Applicants never objected to the production as being prejudicial, or requested to re-open discovery or otherwise sought Opposer's consent to take the deposition of Ms. McQuinn, which consent would have been granted had Applicants simply made a request. It is not acceptable for Applicants to accept Opposer's supplemental production of documents without any objection and to later claim that such production was prejudicial to Applicants. Applicants had over two months to review the sound recording and videos before this evidence was presented as part of Opposer's trial testimony, and never once did Applicants state that they wished to take further discovery into those items until their Trial Brief. Because Applicants are not prejudiced by Opposer's Exhibit 6 to the McQuinn Testimony Deposition, and in fact cross examined Ms. McQuinn on the subject of Exhibit 6 at her testimony deposition, the Exhibit should not be stricken from the record.

### 2. Media Alert

Applicants argue that the Media Alert (Dkt. No. 41) submitted by Opposer during its Rebuttal Testimony Period does not rebut any evidence submitted by Applicants during their

Trial Period.  Opposer disagrees.  During their Testimony Period, Applicants submitted several

documents via Notice of Reliance, including Wikipedia pages pertaining to the release dates of

certain pop songs, which Applicants allege constitute evidence that Opposer does not have

priority of use in its HOOP IT UP service mark.  Opposer has submitted the Media Alert to rebut

that alleged evidence and to demonstrate that Opposer's customers associated the HOOP IT UP

service mark with Opposer before Applicants' USPTO Application filing date of September 30,

2010.  Further, the Media Alert comports with 37 CFR § 2.122(e), as a "printed

publication…available to the general public…or of general circulation among members of the

public or that segment of the public which is relevant under an issue in a proceeding."  The

Media Alert is a press release that was distributed to various news outlets by the Elk Grove

Unified School District, one of Opposer's customers, and demonstrates that the Elk Grove

Unified School District associated the service mark HOOP IT UP exclusively with Opposer as

early as June 9, 2006, over four years prior to Applicants' USPTO Application filing date.

Accordingly, this document is proper rebuttal evidence, and is the proper subject of a Notice of

Reliance and therefore should not be stricken from the record.[2]

### 3. State of California Labor Commissioner Documents

Applicants also move to exclude the Complaint and Notice of Claim and Conference

filed with the State of California Labor Commissioner by each of the Applicants, in which both

Applicants Breaux and Erickson admit that they were employees of Opposer through July 1,

2010, just three months before Applicants started a business directly competitive with Opposer

and filed the service mark application that is the subject of this proceeding.  (Dkt. Nos. 42-43).

These California Labor Commission documents rebut Applicants' attempts to introduce

---

[2] One of the excluded testimony witnesses testified to the creation and distribution of this document as well.

Wikipedia pages pertaining to pop songs and a sound recording (KT00065) that Opposer has represented does not constitute evidence of Opposer's prior use of the HOOP IT UP mark. McQuinn Depo. 41:19-43:2. These documents rebut Applicants' disingenuous and inequitable arguments that they were unaware of Opposer's prior use of the slogan and service mark HOOP IT UP in connection with Opposer's business by demonstrating that both of the Applicants were by their own admission employees of Opposer during the time Opposer used the mark HOOP IT UP, which predates Applicants' claimed date of first use. As stated earlier, Ms. McQuinn's uncontroverted testimony proves that Applicants Breaux and Erickson in fact used the HOOP IT UP slogan and service mark themselves.

### 4. Screenshot of Opposer's Website, www.kidtribe.com.

Applicants also object to Opposer's inclusion of a screenshot of its website, www.kidtribe.com, as it appeared at the time Opposer's Main Brief was submitted on February 28, 2014. Opposer is unaware of any TTAB rule which prevents the inclusion of an image within the text of a trial brief. Moreover, Opposer does not claim that its website constitutes evidence of priority of use in its HOOP IT UP mark. Rather, Opposer merely is demonstrating that its website home page now includes an $^{SM}$ symbol next to the words HOOP IT UP. Opposer's founder Kellee McQuinn's trial testimony corroborates this assertion, as Ms. McQuinn responded "Yes," when asked if Opposer was currently using TM symbols with the slogan HOOP IT UP on the KidTribe website. McQuinn Depo. 47:9-14. Accordingly, the image should not be excluded from Opposer's Main Brief, as it in no way prejudices Applicants and serves only to demonstrate an example of Opposer's use of the HOOP IT UP mark at the present time.

Form 30

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on February 4, 2015
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Heather Bennett                          /Heather Bennett/

Name of Counsel                          Signature of Counsel

Law Firm    Law Office of Heather Bennett

Address    4500 Via Marina, Suite 309

City, State, ZIP    Marina Del Rey, CA 90292

Telephone Number    310-351-8487

FAX Number

E-mail Address    heather@hbennettesq.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIRMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(c)

This brief contains 5,985 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

This brief has been prepared in a proportionally spaced typeface using Word 2013 in Times New Roman size 14.

DATED: February 4, 2015

By:

Heather D. Bennett
Law Office of Heather Bennett
*Attorney for Appellants*